# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**John Adesalu,**                                   )
                                                    )
      **Plaintiff,**                     )
                                                    )
      **v.**                            )        **Civil Action No. 07-2187 (PLF)**
                                                    )
**Kevin J. Martin, Chairman,**                      )
**Federal Communications Commission,**              )
                                                    )
      **Defendant.**                     )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendant, the Federal Communications Commission ("FCC" or "Commission"), respectfully moves for summary judgment.  As grounds for this motion, defendant asserts that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  A memorandum of points and authorities and defendant's statement of genuine issues of material fact not in dispute, the Declarations of  Valerie Brock, Assistant Bureau Chief for Management, Wireline Competition Bureau ("WCB"), FCC ("Brock Decl."),  Roger Woock, Chief, Industry Analysis and Technology Division ("IATD"), WCB, FCC ("Woock Decl."); Alan I. Feldman, Deputy Chief, IATD, WCB, FCC ("Feldman Decl."), and Noelle Green, Office of Managing Director ("OMD"), FCC ("Green Decl."), and a proposed order granting the relief sought are attached hereto.

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
WYNEVA JOHNSON, D.C. BAR # 278515
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7224


Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
John Adesalu,                         )

    Plaintiff,               )

    v.                      )      Civil Action No. 07-2187 (PLF)

)
Kevin J. Martin, Chairman,      )
Federal Communications Commission,  )

    Defendant.            )
_____)

## STATEMENT OF MATERIAL FACTS FOR WHICH
## THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7(h), defendant submits the following statement of

material facts as to which there is no genuine issue:

1.    Plaintiff identifies himself as a "Black male of Nigerian national origin" and has

been employed as an Industry Economist in the Industry Analysis and Technology

Division ("IATD") of the FCC's Wireline Competition Bureau ("WCB") since March 24,

2002.  *See* Complaint at ¶ 5; Brock Decl. at ¶ 4.

2.    Plaintiff's first-level supervisor is Alan Feldman, Deputy Chief, IATD, and his

second-level supervisor is Rodger Woock, Chief, IATD.  Messrs. Feldman and Woock

are white and were born in the United States.  *See* Feldman Decl. at ¶ 8; Woock Decl at ¶

6.

3.    The GS-13 level is the full performance level of plaintiff's position.  *See* Brock

Decl. at ¶ 4.

4.    The full performance level is the highest grade level of an employee's career

ladder to which the employee may be promoted without being required to compete with

other individuals or receiving a non-competitive promotion through accretion of duties (assuming that the employee successfully satisfies applicable time-in-grade and performance requirements).  *Id*.

5.      The full performance level of an employee's position is determined by the personnel action under which the employee is initially appointed and the level of work required for that particular position.  *Id*.

6.      Plaintiff was initially appointed to the GS-13 level at the FCC in August 1996. *Id*.

7.      There are procedures by which plaintiff may obtain promotion to the GS-14 level: he may either apply for a competitive vacancy announcement and be selected, or request a desk audit to determine whether he is performing work at the GS-14 level and should be promoted non-competitively through accretion of duties.  *See* Brock Decl. at ¶ 8.

8.      The IATD was created on March 24, 2002.  *See* Brock Decl. at ¶ 3.

9.      Between March 24, 2002 and January 2008, there have been no GS-14 Industry Economist positions available in the IATD, nor has IATD promoted any Industry Economists to the GS-14 level non-competitively through accretion of duties.  *Id*. at ¶ 5.

10.      In January 2008, there was a GS-14 Industry Economist position available in IATD.  *See* Brock Decl. at  ¶ 5.  Plaintiff did not apply for that position.  *Id*.

11.      The IATD has promoted only two Industry Economists from the GS-13 to the GS-14 level: Kenneth Lynch (effective August 10, 2003) and Paul Zimmerman (effective September 22, 2002).  *Id*. at ¶ 6.

12.      Messrs. Lynch and Zimmerman, who are white and Hispanic, respectively, both received career-ladder promotions to the GS-14 level for which other employees were not

eligible to compete, because the full performance level of their positions, unlike plaintiff's, was GS-14. *Id.*; *see also, e.g.,* 5 C.F.R. § 335.103(c)(3)(i).

13.     Both Messrs. Lynch and Zimmerman were initially hired in a different FCC office into positions that had full performance levels of GS-14. *See* Brock Decl. at ¶ 6. They were subsequently reassigned to IATD, and their existing full performance levels remained at the GS-14 level. *Id.*

14.     Plaintiff has received three within-grade (step) increases since IATD was created – from the GS-13, step 5 level to the GS-13, step 6 level (effective July 23, 2003); to the GS-13, step 7 level effective July 24, 2005; and to the GS-13, step 8 level effective on or about July 20, 2008. *Id.* at ¶ 7.

15.     Plaintiff alleges that "[s]ometime in May or June 2004" his supervisor promised him a promotion "in two years if he worked hard and continued working on the statistical tables for the annual publication of the SOCC." *See* Complaint at ¶ 27.

16.     In his administrative EEO complaint, plaintiff identified Mr. Woock as the supervisor who allegedly promised him a promotion. *See* Defendant's Exhibit No. 5 at 2.

17.     On December 2, 2005, plaintiff met with Mr. Woock and requested a promotion to the GS-14 level. *See* Woock Decl. at ¶ 3. Mr. Woock told plaintiff that he would not promote him, because he did not have the authority automatically to promote plaintiff, and plaintiff's work performance did not suggest that a non-competitive accretion of duties promotion was warranted. *Id.*

18.     On December 22, 2005, plaintiff contacted an EEO counselor. *See* Defendant's Exhibit No. 6 at 1.

19.     On March 20, 2006, plaintiff filed a formal administrative EEO complaint

alleging that he had "not been promoted for over 10 years," and was "repeatedly denied promotions because I am black and because of my national origin." *See* Defendant's Exhibit No. 5.  Plaintiff alleged further that "[t]he most recent incident of discrimination occurred on December 2, 2005, when I met with my supervisor, Roger Woock (white male), and he told me he would not promote me." *Id.*

20.     On April 10, 2006, the FCC's Office of Workplace Diversity (its EEO office) requested that plaintiff provide more specific information regarding his non-promotion claims, including the vacancy announcement numbers for positions that he allegedly sought and the names of individuals whom he alleged were similarly situated to him and were promoted.  *See* Defendant's Exhibit No. 7.

21.     On April 18, 2006, plaintiff filed a "Supplement to Discrimination Complaint" that identified five individuals whom he believed were similarly situated to him and were treated more favorably with respect to promotions, and alleged that he applied for job vacancies on January 25, 2002, March 9, 2004, and July 15, 2004.  *See* Defendant's Exhibit No. 8.  Plaintiff provided no additional information regarding these vacancies, *e.g.*, the vacancy announcement numbers, the grade or title of the advertised positions, the FCC bureau or office advertising the vacancies, or copies of his application materials.

22.     In his administrative EEO complaint plaintiff identified five individuals whom he believes are similarly situated to him and were promoted preferentially.  He alleged that Ellen Burton was "hired in 1996…as a GS-14 economist and promoted to a GS-15 a year or two later;" Jim Eisner was hired "in 1997 or 1998 as a GS/12/13 (?) economist [and] promoted the following year to GS-14 and to GS-15 a year or two later;" Craig Stroup was "hired in 1998 (?) [and] followed the same career path as Jim Eisner's;" Les Selzer is

"a GS-14 economist…[who] was promoted to GS-15 a year or two later…[who] retired immediately after the promotion;" and Tracy Waldon is "a GS-13 economist…[who] was promoted to GS-15 and chief economist of the Media Bureau about 3 years ago." *See* Defendant's Exhibit No. 8 at 3.

23.     Applicable personnel regulations prohibited plaintiff from being promoted to the GS-14 level.  *See, e.g.,* 5 C.F.R. §§ 335.103(c); 335.103(c)(3)(ii).

24.     Mr. Woock had no express or implied authority to automatically promote (or promise to promote) plaintiff.  Mr. Woock could only recommend an employee for promotion.  *See* Brock Decl. at ¶ 8; Woock Decl. at ¶ 3; Complaint at ¶ 29.  That recommendation required approval from WCB's front office and the FCC's human resources office before a promotion could be effected.  *Id*.

Respectfully submitted,


\_\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


\_\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


\_\_\_/s/_____
WYNEVA JOHNSON, D.C. BAR # 278515
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7224

Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| John Adesalu, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-2187 (PLF)** |
| | ) | |
| Kevin J. Martin, Chairman, | ) | |
| Federal Communications Commission, | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, alleging that the Federal Communications Commission ("FCC" or "Commission") discriminated against him on the basis of his race, color, and national origin by not promoting him to the GS-14 level. As demonstrated in this Memorandum and the attached Declarations of Valerie P. Brock ("Brock Decl."), Alan I. Feldman ("Feldman Decl."), Noelle Green ("Green Decl."), and Rodger Woock ("Woock Decl.") [Defendant's Exhibit Nos. 1-4], the majority of plaintiff's claims are untimely by several years; plaintiff fails to establish a *prima facie* case of employment discrimination with respect to his one timely claim; and defendant has set forth a legitimate and nondiscriminatory explanation regarding the matters at issue. Defendant submits that there are no genuine issues of material fact in this case, and defendant is therefore entitled to judgment as a matter of law.

I.     **BACKGROUND**

Plaintiff, who identifies himself as a "Black male of Nigerian national origin," has been employed as an Industry Economist in the Industry Analysis and Technology Division ("IATD") of the FCC's Wireline Competition Bureau ("WCB") since March 24, 2002. *See* Complaint at ¶ 5; Brock Decl. at ¶ 4. His first-level supervisor is Alan Feldman, Deputy Chief, IATD, and his second-level supervisor is Rodger Woock, Chief, IATD. Messrs. Feldman and Woock are white and were born in the United States. *See* Feldman Decl. at ¶ 8; Woock Decl at ¶ 6.

The GS-13 level is the full performance level of plaintiff's position. *See* Brock Decl. at ¶ 4. The full performance level is the highest grade level of an employee's career ladder to which the employee may be promoted without being required to compete with other individuals or receiving a non-competitive promotion through accretion of duties (assuming that the employee successfully satisfies applicable time-in-grade and performance requirements). *Id*. The full performance level of an employee's position is determined by the personnel action under which the employee is initially appointed and the level of work required for that particular position. *Id*. Plaintiff was initially appointed to the GS-13 level at the FCC in August 1996. *Id*. There are procedures by which plaintiff may obtain promotion to the GS-14 level: he may either apply for a competitive vacancy announcement and be selected, or request a desk audit to determine whether he is performing work at the GS-14 level and should be promoted non-competitively through accretion of duties. *See* Brock Decl. at ¶ 8.

The IATD was created on March 24, 2002. *See* Brock Decl. at ¶ 3. Between that date and January 2008, there were no GS-14 Industry Economist positions available in

the IATD, nor did IATD promote any Industry Economists to the GS-14 level non-competitively through accretion of duties.[1]  *Id*. at ¶ 5.  IATD has promoted only two Industry Economists from the GS-13 to the GS-14 level: Kenneth Lynch (effective August 10, 2003) and Paul Zimmerman (effective September 22, 2002).  *Id*. at ¶ 6. Messrs. Lynch, who is white,[2] and Zimmerman, who is Hispanic, both received career-ladder promotions to the GS-14 level for which other employees were not eligible to compete, because the full performance level of their positions, unlike plaintiff's, was GS-14.[3]  *Id*.  Plaintiff has received three within-grade (step) increases since IATD was created – from the GS-13, step 5 level to the GS-13, step 6 level (effective July 23, 2003); to the GS-13, step 7 level effective July 24, 2005; and to the GS-13, step 8 level effective on or about July 20, 2008.  *Id*. at ¶ 7.

Plaintiff alleges that "[s]ometime in May or June 2004" his supervisor promised him a promotion "in two years if he worked hard and continued working on the statistical tables for the annual publication of the SOCC [statistics of communications carriers]." *See* Complaint at ¶ 27.  Plaintiff's Complaint does not identify the supervisor to whom this allegation refers.  In his administrative EEO complaint, however, plaintiff identified Mr. Woock as the supervisor who allegedly made this promise.  *See* Defendant's Exhibit

---

[1] In January 2008, there was a GS-14 Industry Economist position available in IATD.  *See* Brock Decl. at ¶ 5.  Plaintiff did not apply for that position.  *Id*.

[2] Defendant obtains information regarding employees' race from their self-reporting on Standard Form 181. The SF-181 directs employees to select one or more "racial categories" with which they "most closely identify," and does not ask employees to identify their color or national origin.  The "racial categories" do not correspond to particular countries of origin, but only to one or more regional areas, *e.g.,* "North and South America."  Plaintiff and Messrs. Feldman and Woock provided the information cited herein regarding their race, color, and national origin in connection with this litigation.

[3] Both Messrs. Lynch and Zimmerman were initially hired in a different FCC office into positions that had full performance levels of GS-14.  *See* Brock Decl. at ¶ 6. They were subsequently reassigned to IATD, and their existing full performance levels remained at the GS-14 level.  *Id*.

No. 5 at 2 [plaintiff's March 20, 2006 administrative EEO complaint]. Mr. Woock denies

making any such promise to plaintiff during a May/June 2004 meeting or any other time.

*See* Woock Decl. at ¶ 3.

On December 2, 2005, plaintiff met with Mr. Woock and requested a promotion

to the GS-14 level. *See* Woock Decl. at ¶ 3. Mr. Woock told plaintiff that he would not

promote him, because he did not have the authority automatically to promote plaintiff,

and plaintiff's work performance did not suggest that a non-competitive accretion of

duties promotion was warranted. *Id.*

On December 22, 2005, plaintiff contacted an EEO counselor. *See* Defendant's

Exhibit No. 6 at 1 [Initial Contact And/Or Counseling Session for Informal Complaint of

Discrimination Form]. On March 20, 2006, he filed a formal administrative EEO

complaint alleging that he had "not been promoted for over 10 years," and was

"repeatedly denied promotions because I am black and because of my national origin."

*See* Defendant's Exhibit No. 5. Plaintiff alleged further that "[t]he most recent incident

of discrimination occurred on December 2, 2005, when I met with my supervisor, Roger

Woock (white male), and he told me he would not promote me." *Id.*

On April 10, 2006, the FCC's Office of Workplace Diversity (its EEO office)

requested that plaintiff provide more specific information regarding his non-promotion

claims, including the vacancy announcement numbers for positions that he allegedly

sought and the names of individuals whom he alleged were similarly situated to him and

were promoted. *See* Defendant's Exhibit No. 7 [April 10, 2006 letter from P. June

Taylor, Acting Director, OWD to Allen Lescht, Esq.]. On April 18, 2006, plaintiff filed a

"Supplement to Discrimination Complaint" that identified five individuals whom he

4

believed were similarly situated to him and were treated more favorably with respect to promotions, and alleged that he applied for job vacancies on January 25, 2002, March 9, 2004, and July 15, 2004.  *See* Defendant's Exhibit No. 8.  Plaintiff provided no additional information regarding these vacancies, *e.g*., the vacancy announcement numbers, the grade or title of the advertised positions, the FCC bureau or office advertising the vacancies, or copies of his application materials.[4]

Defendant thereafter completed its EEO investigation.  Plaintiff requested a hearing before the EEOC.  On May 16, 2007, the EEOC granted summary judgment in favor of the FCC, concluding that the majority of plaintiff's non-promotion claims were untimely, and there was no evidence of discrimination with respect to his one timely claim.  *See* Defendant's Exhibit No. 9 [Order Entering Judgment in *Adesalu v. Martin*, EEOC No. 570-2006-00564X].  Plaintiff subsequently appealed the EEOC's decision.  On September 7, 2007, the EEOC affirmed its decision.  *See* Defendant's Exhibit No. 10.

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate where, as here, the record shows that there is no genuine issue as to any material fact and the

---

[4] With respect to the January 25, 2002 and July 15, 2004 vacancies to which plaintiff refers, defendant has been unable to ascertain whether Mr. Adesalu was eligible and/or applied for the vacancies, or information regarding the selection processes.  *See* Green Decl. at ¶ 3.  The FCC's files regarding these alleged vacancies in 2002 and 2004 have likely been destroyed in accordance with defendant's records retention schedule.  *Id*.  With respect to the March 9, 2004 vacancy, the FCC recently located a delegated examining unit file pertaining to VAN DEU-04-003, which advertised Industry Economist positions in "Various [FCC] Bureaus and Offices" at the GS-11 through 14 levels.  *See* Green Decl. at ¶ 4.  The vacancy was open from February 25, 2004 through March 9, 2004.  *Id*. at ¶ 4.  Mr. Adesalu applied for the vacancy at the GS-14 level on March 9, 2004.  *Id*.  The selectee, Kitty K. Chan, was chosen to fill the position at the GS-13 level on April 28, 2004, and thereafter began work in IATD at the GS-13 level.  *Id*.  By letter dated March 29, 2004, Mr. Adesalu was informed that he was rated as eligible for the position, but did not rank among the best qualified candidates, so therefore was not referred to the selecting official for consideration.  *Id*.

moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *Matsushita*, 475 U.S. at 587.  The mere existence of a factual dispute, however, will not defeat summary judgment.  The non-moving party must show that the dispute is genuine and material to the case.  That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

Moreover, Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Further, the non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). *See also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**B.**    **Title VII**

In *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. *Id*. at 451. Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[5] and may rely on direct or, as in this case, circumstantial evidence to meet that burden. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race by relying on circumstantial evidence, as is the case with plaintiff here, analyzed using the scheme first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] Under that

---

[5] "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so. *Hopkins v. Price Waterhouse*, 737 F. Supp. 1202 (D.D.C. 1990), *aff'd* 920 F.2d 967 (D.C. Cir. 1990); *Metropolitan Stevedore Company v. Rambo*, 521 U.S. 121, 137 n.9 (1997). "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose." *Id.*

[6] Reliance on the *McDonnell Douglas* scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability. *See Fogg v. Gonzales*, 492 F.3d 447, 451 n.*

7

scheme, the plaintiff must first, by a preponderance of the evidence, establish a *prima facie* case of discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.  *See McDonnell Douglas*, 411 U.S. at 802.  Once it is established that both parties have met their respective burdens of production (*i.e.*, plaintiff by presenting a *prima facie* case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. *Hicks*, 509 U.S. at 510.  Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action.  *St. Mary's Honor Center*, 509 U.S. at 515-518.  This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor.   In the single motive case, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Under the D.C. Circuit's recent decision in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), once the defendant has articulated a legitimate non-discriminatory reason for its actions, the court "need not - <u>and should not</u>" decide whether a plaintiff who suffered an adverse employment action established a *prima facie* case. *Id*. at 494 (emphasis in original). Instead, the court must focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ." *See Short v. Chertoff*, ___ F. Supp. 2d ____ 2008 WL 2174856 *6 (D.D.C.).

"[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown <u>both</u> that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." *Id*. at 519. Plaintiff bears the ultimate burden of persuasion on the issue of whether she was intentionally discriminated against. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Which-ever standard is employed, plaintiff fails to meet his burden of coming forward with evidence to create a triable issue. As demonstrated below, the undisputed facts illustrate that plaintiff can not demonstrate that discrimination was a motivating factor, much less that it was the sole motivating factor in the challenged decision.

### III.    ARGUMENT

#### A.    The Majority Of Plaintiff's Claims Are Untimely.

Plaintiff failed to exhaust his administrative remedies for the majority of his non-promotion claims because he failed to comply with the deadlines for contacting an Equal Employment Opportunity ("EEO") counselor.  Prior to seeking relief in federal court under Title VII, a federal employee must timely exhaust all available administrative remedies.  *See* 42 U.S.C. § 2000e-16(c)); 29 C.F.R. § 1614.407; *Kizas v. Webster*, 707 F.2d 524, 544 & n.99 (D.C. Cir. 1983); *see, e.g., United Airlines v. Evans*, 431 U.S. 553, 555 (1977).  Courts have strictly enforced the time deadlines throughout the complaint process under Title VII.  *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) ("A plaintiff who fails to comply, to the letter, with administrative deadlines ordinarily will be denied a judicial audience."); *Carter v. Rubin*, 14 F. Supp. 2d 22, 32 (D.D.C. 1998) (holding that federal employees may not file employment discrimination actions outside applicable time deadlines); *see also Bayer v. Department of the Treasury*, 956 F.2d 330, 332-33 (D.C. Cir. 1992) (although failure to comply with time limits is not a jurisdictional defect, plaintiff bears the burden of pleading and proving sufficient reasons to excuse noncompliance).

These procedural requirements governing a plaintiff's right to bring a Title VII claim in court are critical.  "It is part and parcel of the Congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining nondiscrimination in employment."  *Kizas*, 707 F.2d at 544.  "Exhaustion is required in order to give federal agencies an opportunity to handle

matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown*, 777 F.2d at 14.

In this case, plaintiff alleges discriminatory non-promotion on several occasions dating back more than ten years. First, he alleges that "other Industry Economists that were not Black and/or Nigerian" have been promoted "over ten years," and that he "has a similar professional background and education as the promoted individuals and has more experience at the FCC" than such individuals.[7] *See* Complaint at ¶¶ 10, 12. Second, he alleges that "[p]rior to March 24, 2002," other Industry Economists were promoted "non-competitively to the GS-14 levels and higher through accretion of duties." *Id*. at ¶ 11. Third, plaintiff alleges discriminatory non-promotion with respect to FCC vacancies for which he contends he applied on January 25, 2002, March 9, 2004, and July 15, 2004. *See* Complaint at ¶ 20. All of these claims should be dismissed because plaintiff failed to timely contact an EEO counselor.

EEOC regulations implemented pursuant to 42 U.S.C. § 2000e-16(b) require an aggrieved party to initiate contact with an EEO counselor within 45 days of the date of the alleged discriminatory conduct or the effective date of an alleged discriminatory personnel action.[8] *See* 29 C.F.R. § 1614.105(a)(1); *Stewart v. Ashcroft*, 352 F.3d 422,

---

[7] Plaintiff's Complaint does not identify the other Industry Economists to whom his allegations refer; however, in his administrative EEO complaint plaintiff identified five individuals whom he believes are similarly situated to him and were promoted preferentially. He alleged that (1) Ellen Burton was "hired in 1996…as a GS-14 economist and promoted to a GS-15 a year or two later;" (2) Jim Eisner was hired "in 1997 or 1998 as a GS/12/13 (?) economist [and] promoted the following year to GS-14 and to GS-15 a year or two later;" (3) Craig Stroup was "hired in 1998 (?) [and] followed the same career path as Jim Eisner's;" (4) Les Selzer is "a GS-14 economist…[who] was promoted to GS-15 a year or two later…[who] retired immediately after the promotion;" and Tracy Waldon is "a GS-13 economist…[who] was promoted to GS-15 and chief economist of the Media Bureau about 3 years ago. *See* Defendant's Exhibit No. 8 at 3.

[8] The 45-day time requirement is not jurisdictional, but rather operates "like a statute of limitations, [which] is subject to waiver, estoppel, and equitable tolling." *Saltz v. Lehman*, 672 F.2d 207, 208 (D.C.Cir.1982) (quoting *Zipes v. Trans World Airlines, Inc*., 455 U.S. 385, 393 (1982)). There is no basis to toll or waive the limitations period here.

11

425 (D.C. Cir. 2003). With certain exceptions inapplicable here, claims alleging discrete

acts of discrimination occurring outside of this statutory time period are time-barred and

not actionable, even when they are related to acts alleged in timely filed charges. *Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); 29 C.F.R. §§

1614.107(a)(2); 1614.109(b). The Supreme Court classifies the failure to promote as one

such "easy to identify" discrete act that constitutes a separate, actionable practice, and

thus requires the timely filing of a charge of discrimination. *See Morgan*, 536 U.S. at 114.

Plaintiff first contacted an EEO counselor on December 22, 2005. The 45th day

prior to December 22, 2005 was November 7, 2005. All of plaintiff's non-promotion

claims regarding discrete acts that occurred prior to November 7, 2005 are therefore

untimely filed and not actionable. *See Morgan*, 536 U.S. at 114.

Each alleged non-promotion that is the subject of plaintiff's Complaint constitutes

a discrete and identifiable "act" for which plaintiff, if he believed that he was being

discriminated against, was required to file a timely charge. In order to comply with the

administrative EEO deadlines, plaintiff was required to contact an EEO counselor within

45 days following each such alleged non-promotion. The triggering standard that

initiates the 45-day limitations period for EEO counselor contact is "reasonable

suspicion." *Johnson v. Gonzales*, 479 F. Supp. 2d 55, 59 (D.D.C. 2007); *Paredes v.*

*Nagle*, 1982 WL 319 (D.D.C. 1982); *see also Stewart v. Ashcroft*, 352 F.3d 422, 425

(D.C. Cir. 2003). When a party "obtains information that gives him a reasonable

suspicion that he has been the victim of discrimination," but before all the facts that

support a charge of discrimination have become apparent, the limitations period begins to

run. *See Hyson v. Boorstin*, 1982 WL 155452 (D.D.C. 1982), at *2 (internal quotations

omitted); *see also Delaware State College v. Ricks*, 449 U.S. 250, 261 (1980)

("limitations periods normally commence when the employer's decision is made").

Therefore, "EEO procedures are time barred if the plaintiff knew, or should have known,

about the alleged discriminatory action 45 days prior to his filing of" an administrative

complaint.  *See Aceto v. England*, 328 F. Supp. 2d 1, 7 (D.D.C. 2004).

     Plaintiff clearly believed that he was being treated unfairly with respect to

promotional opportunities as early as October 1999 – more than six years prior to the date

that he contacted an EEO counselor.  On October 4, 1999, plaintiff e-mailed his former

supervisor (Peyton Wynns) to follow-up on a June 7, 1999 meeting that he states

occurred "to discuss and seek remedy from [Mr. Wynns] on my lack of progress (i.e.,

career promotion)…"  *See* Defendant's Exhibit No. 11.  Plaintiff's e-mail inquired about

the "refusal to promote me in light of my accomplishments," and alleged that "you have

promoted all others that you hired after me…."  *Id.*  Plaintiff's e-mail asserted that he had

been "given all kinds of excuses, which have nothing to do with either my credentials and

ability as economist," and that "[e]nough is enough!  I have been silent too long on this

issue."  *Id.*  On October 15, 2003, plaintiff e-mailed former WCB Bureau Chief William

Maher regarding what he perceived as his "lack of career advancement in the Division

and the Bureau," and alleged that "Peyton Wynns violated my civil rights…by failing to

provide me equal employment opportunities…."  *See* Defendant's Exhibit No. 12.

Plaintiff alleged further that he had "tried to no avail all attempts to rectify this situation

with both old and current (acting) Division managers…," and that "[e]ven in this new day

with a new (acting) manager, nothing has changed…."  *Id.*

With respect to plaintiff's non-promotion claims concerning other Industry Economists' GS-14 promotions[9], four of these individuals (Ms. Burton and Messrs. Eisner, Stroup, and Waldon) were promoted to the GS-14 level during the time period August 1996 through July 2000 -- Mr. Selzer, however, was already employed at the *GS-15* level when he first came to the FCC in 1995.[10]  The 45th day of the statutory limitations periods for plaintiff's non-promotion claims concerning these individuals occurred at the latest between October 1999 (the date of plaintiff's above-described e-mail to Peyton Wynns) and October 2003 (the date of plaintiff's e-mail to William Maher).  Plaintiff's December 2005 EEO counselor contact regarding these claims was therefore untimely by, at a minimum, over two years.[11]

With respect to the alleged January 25, 2002 and July 15, 2004 vacancies for which plaintiff contends he applied, as stated, defendant has been unable to ascertain whether plaintiff was eligible and/or applied for the vacancies, or information regarding the selection processes, and any merit promotion or delegated examining unit files concerning any such vacancies have likely been destroyed in accordance with defendant's records retention schedule.  *See* Green Decl. at ¶ 3.  With respect to the March 9, 2004 vacancy, by letter dated March 29, 2004, Mr. Adesalu was informed that he was rated as eligible for the position, but did not rank among the best qualified

---

[9] As stated in note 7, plaintiff's Complaint does not identify the other Industry Economists to whom his allegations refer; however, his administrative EEO complaint identified five individuals whom he believes were promoted preferentially.

[10] Agency personnel records reflect that Ellen Burton was promoted to the GS-14 level effective August 9, 1996; James R. Eisner was promoted to the GS-14 level effective July 4, 1999; Craig L. Stroup was promoted to the GS-14 level effective June 20, 1999; Les Selzer transferred to the FCC on a lateral appointment from the Interstate Commerce Commission at the GS-15 level effective May 14, 1995; and Tracy Waldon was promoted to the GS-14 level effective July 30, 2000. *See* Brock Decl. at ¶ 9.

[11] As discussed more fully below, none of the individuals is similarly situated to plaintiff, a fact that constitutes a separate and independent basis for dismissing plaintiff's claims regarding these individuals.

candidates, so therefore was not referred to the selecting official for consideration. *Id.* at ¶ 4. Plaintiff thus would have been aware in or about March 2004 that he had not been selected for that position. Regardless, taking the most recent alleged vacancy, a reasonable person would certainly realize that he had not been selected and/or promoted after one year had passed from the date of his application -- by July 2005. Plaintiff did not contact an EEO counselor, however, until more than five months later – more than seventeen months after his alleged application.

Plaintiff's claims regarding the five individuals and the three vacancies -- a variety of non-promotions on separate occasions -- clearly fall within the "easy to identify" class of claims that are time-barred unless a timely charge is filed. Viewing circumstances in a light most favorable to plaintiff, by July 2005 at the absolute latest, he possessed sufficient facts to form what he might believe to be a reasonable suspicion of discrimination regarding the foregoing claims. By then all of the discrete non-promotions had occurred and plaintiff had expressed his belief that he was being subjected to discrimination regarding promotions. Yet, he did not contact an EEO counselor until December 22, 2005. Accordingly, plaintiff's non-promotion claims regarding discrete events that occurred prior to November 7, 2005 (the 45th day preceding December 22, 2005) are time-barred and should be dismissed.

**B.    Plaintiff Fails to Establish A *Prima Facie* Case Of Discrimination With Respect To His One Timely Claim.**

Plaintiff's only timely claim in this case concerns his December 2, 2005 meeting with Rodger Woock, during which he alleges that Mr. Woock reneged on a promise to promote him to the GS-14 level. Plaintiff fails even to establish a *prima facie* case of discrimination based on this meeting. To establish a *prima facie* case of discrimination, a

claimant must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007), citing *Brown v. Brody,* 199 F.3d 446, 452 (D.C. Cir. 1999). An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006). *See Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997) (in determining whether a particular employment action constitutes an adverse action, the trier of fact should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating."); *Crady v. Liberty Nat'l and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience") (cited with approval in *Farce v. Tanoue*, 131 F. Supp. 2d 36, 40 (D.D.C. 2001). "Not everything that makes an employee unhappy is an actionable adverse action. . . ." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions." *Nichols*, 424 F. Supp. 2d at 136. An "employment decision does not rise to the level of an actionable adverse action unless there is a tangible change in the duties or working conditions constituting a *material* employment disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134-35 (D.C. Cir. 2002) (emphasis added) (citing *Walker v. WMATA*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000)).

The alleged reneging on a promise to promote does not constitute an actionable adverse employment action where, as here, the promotion is prohibited by applicable personnel regulations and/or Agency guidelines.  *See Boyd v. Snow*, 335 F. Supp. 2d 28, 36-37 (D.D.C. 2004) (supervisor reneging on alleged promise to promote did not constitute adverse employment action where agency procedures prohibited the promotion at issue).  As this Court explained in *Boyd*:

> Mr. Helke's failure to keep his alleged promise to promote Ms. Boyd after one year also was not an adverse employment action. Ms. Boyd does not dispute that "[a]gency procedures for promotion within the attorney series required 104 weeks at the GS-13 level as a prerequisite for promotion to the GS-14 level and only when warranted due to exceptional performance far exceeding the performance typically expected of an attorney at his or her level" (citation omitted). Nor does she argue that her performance was exceptional. It is therefore irrelevant to this analysis that Mr. Helke (and others) may have *falsely* told Ms. Boyd that she would be promoted more quickly. Because he was not authorized to take such action for 104 weeks, maintaining Ms. Boyd's status at grade 13, step 10 could not have been retaliatory. She would not have been promoted before 104 weeks of employment in any event, given her "fully satisfactory" mid-year rating, which she does not challenge here.

*See Boyd v. Snow*, 335 F. Supp. 2d at 37.

In this case, because plaintiff was already employed at the top of his career ladder, applicable personnel regulations prohibited him from being promoted to the GS-14 level. *See, e.g.,* 5 C.F.R. §§ 335.103(c); 335.103(c)(3)(ii) (providing that competitive procedures apply to all promotions unless, among other exceptions inapplicable here, an employee's position is classified at a higher grade level because of additional duties and responsibilities).  Even if Mr. Woock promised to promote plaintiff, which he denies, he had no express or implied authority to automatically promote (or promise to promote) plaintiff.  If an employee were eligible for promotion and promotion was warranted, Mr. Woock could only recommend an employee for promotion.  *See* Brock Decl. at ¶ 8;

17

Woock Decl. at ¶ 3.  That recommendation would require approval from WCB's front office and the FCC's human resources office before a promotion could be effected.  *Id*.  Because he was not authorized to automatically promote plaintiff, maintaining plaintiff's status at the GS-13 level could not have been discriminatory.  *See Boyd*, 335 F. Supp. 2d at 37.

Moreover, the alleged reneging on a promise to promote does not constitute an "unfavorable action [that] gives rise to an inference of discrimination."  During the time period surrounding December 2005 (or at any time since IATD's inception in 2002) there were no available GS-14 Industry Economist positions in IATD for which plaintiff could have been selected, nor were any similarly situated comparators treated more favorably than him with respect to promotions.  *See, e.g., Cruz v. Coach Stores, Inc*., 202 F.3d 560, 565-66 (2d Cir. 2000) (claim of race discrimination based on supervisor reneging on promise to promote fails to establish *prima facie* case because employee did not claim that she applied and was qualified for any position that was subsequently filled by individual outside her protected class).  Even though plaintiff is a member of protected classes, as to the remaining elements of the *prima facie* case, which are essential to his case and on which he would bear the burden of proof at trial, plaintiff has failed to make a showing to establish their existence and summary judgment should therefore be granted in favor of the FCC.

**C.    The FCC Has A Legitimate, Non-Discriminatory Explanation For Plaintiff's Non-Promotion, And Plaintiff Fails To Establish That The Explanation Is Pretextual Or To Otherwise Create An Inference Of Discrimination**.

Even assuming that plaintiff has established a *prima facie* case of discrimination with respect to the December 2005 claim, there is a legitimate and non-discriminatory explanation as to why he was not promoted to the GS-14 level.

**1.    Defendant's Articulated Non-Discriminatory Explanation**.

Plaintiff was not promoted because (1) applicable personnel regulations and Agency guidelines precluded him from being "automatically" promoted; (2) there were no GS-14 Industry Economist positions available in the IATD during the relevant time period; and (3) there was no basis to promote him non-competitively because he did not request a desk audit and his work performance in any event did not justify promotion to the GS-14 level.

It is undisputed that the GS-13 level is the top of plaintiff's career ladder.  *See* Brock Decl. at ¶ 4.  As stated, because he was already employed at the top of his career ladder, applicable personnel regulations precluded plaintiff from simply being promoted to the GS-14 level.  *See, e.g.,* 5 C.F.R. §§ 335.103(c); 335.103(c)(3)(ii) (providing that competitive procedures apply to all promotions unless, among other exceptions inapplicable here, an employee's position is classified at a higher grade level because of additional duties and responsibilities).  Mr. Woock denies promising plaintiff a promotion.  Regardless, disagreement concerning whether Mr. Woock made any such promise does not constitute a disputed genuine issue of material fact, because Mr. Woock had no express or implied authority to promise a promotion.  Mr. Woock could only recommend an employee for promotion.  *See* Brock Decl. at ¶ 8.  As stated, that

19

recommendation required approval from WCB's front office and the FCC's human resources office before a promotion could be effected. *Id*. Since applicable personnel regulations and Agency guidelines did not authorize Mr. Woock to automatically promote plaintiff, his compliance with those regulations and guidelines that resulted in maintaining plaintiff's status at the GS-13 level could not have been discriminatory.

Plaintiff alleges that his supervisor promised him a promotion "in two years *if* he worked hard *and* continued working on the statistical tables for the annual publication of the SOCC." See Complaint at ¶ 27 (emphasis added). Plaintiff thus concedes that any such promotion was never assured, but rather conditioned upon his work performance which, as discussed more fully below, was sub-par. In any event, with or without Mr. Woock's recommendation, there were only two ways for plaintiff to be promoted within IATD: applying for an available GS-14 position or requesting a desk audit to demonstrate that he was performing at the GS-14 level and should be promoted non-competitively. *See, e.g.,* 5 C.F.R. §§ 335.103(c); 335.103(c)(3)(ii). It is undisputed that plaintiff took neither step. *See* Woock Decl. at ¶ 3; Feldman Decl. at ¶ 3. That failure is fatal to his discrimination claim.

From IATD's inception in March 2002 to January 2008, there were no GS-14 Industry Economist positions available in IATD, nor did IATD promote any Industry Economist non-competitively to the GS-14 level via accretion of duties. *See* Brock Decl. at ¶ 5. The only two Industry Economists to be promoted within IATD from the GS-13 to the GS-14 level (Kenneth Lynch, effective August 10, 2003 and Paul Zimmerman, effective September 22, 2002) received non-competitive career-ladder promotions for which plaintiff, like all other employees, was ineligible to compete. *Id*. at ¶ 6; *see also,*

*e.g.,* 5 C.F.R. § 335.103(c)(3)(i) (providing that competitive procedures are inapplicable to the promotion of an employee who is employed in a career ladder position into which he was originally appointed through competitive procedures). These promotions were possible only because, unlike plaintiff, Messrs. Lynch and Zimmerman were already employed in positions with GS-14 full performance levels when they were reassigned to IATD. *See* Brock Decl. at ¶ 6.

Plaintiff was informed from the time that he began work in the IATD in March 2002 that he had reached the full-performance level of his position and that the only two ways for him to be promoted were by applying for an open GS-14 position or by requesting a desk audit to demonstrate that he was performing at the GS-14 level and should be promoted non-competitively. *See* Feldman Decl. at ¶ 3. Mr. Feldman informed plaintiff that because there were no GS-14 Industry Economist vacancies for which he could apply in the IATD, plaintiff's best option for promotion within the IATD was to try to improve his work performance and acquire skills to seek promotion through accretion of duties. *Id.*

There is no evidence that plaintiff requested a desk audit at any time during the relevant time period of this action to determine whether he could be promoted by accretion. And even had plaintiff requested a desk audit, his work performance was not sufficient to warrant promotion. Plaintiff's work, from the time he arrived in the IATD, always required review and typically had many mistakes. *See* Feldman Decl. at ¶ 4; Attachment A thereto (setting forth several examples of problems with plaintiff's work performance on specific projects). Correspondence attached to Mr. Feldman's Declaration reflects plaintiff's admissions of error and his apologies for mistakes on work

projects on a number of occasions. *See, e.g.*, first page of Attachment B to Feldman Decl. (May 22, 1997 e-mail from plaintiff to "PWYNNS" and "AFELDMAN" discussing problem with work project in which plaintiff states "this was an honest mistake…I am embrarassed by this and apologise for the honest mistake; and will make revisions to the data-set as soon as possible"); second page of same attachment (January 14, 1998 e-mail chain between plaintiff and Alan Feldman discussing problems with work project in which plaintiff states "this was an oversight on my part and not intentional…[s]orry for the delay"); fourth page from end of same attachment (January 11, 2005 e-mail chain between plaintiff and Alan Feldman discussing overdue work project in which plaintiff states "[s]orry for the lateness").  Plaintiff was informed of his supervisors' concerns with his work performance as part of his performance appraisal reviews, and he and Mr. Feldman had many discussions about his performance.  *See* Feldman Decl. at ¶ 4.

Plaintiff generally performed poorly on work projects in the division, and was not able consistently to work independently and complete work projects satisfactorily without significant supervisory oversight.  *See* Woock Decl. at ¶ 4.  Mr. Woock worked with plaintiff to try to improve his work performance.  *Id.*  Mr. Woock assigned plaintiff a project to perform a competitive financial analysis of the Regional Bell Operating Companies to determine their ability to leverage assets to capitalize acquisitions.  *Id.* Plaintiff was unable to work independently and complete this work project satisfactorily, despite repeated assistance from Mr. Woock.  *Id.*

Mr. Feldman encouraged plaintiff to take training courses that could develop skills that might assist him in obtaining a promotion to the GS-14 level.  *See* Feldman Decl. at ¶ 5.  These training courses were directly relevant to the types of projects on

which plaintiff typically worked, and the project that Mr. Woock had assigned to assist plaintiff with trying to improve his skills. *Id.* Plaintiff, however, refused to take the training classes that Mr. Feldman recommended. *Id.*

### 2.     Plaintiff Has Made No Showing Of Pretext.

As set forth above, defendant has articulated a legitimate, non-discriminatory explanation regarding plaintiff's non-promotion. *See* Burdine, 450 U.S. at 254-55. In articulating a legitimate, non-discriminatory explanation, the employer's burden is one of production, not of proof, since the ultimate burden of persuading the court that the employer intentionally discriminated remains at all times with the employee. *See Aka*, 156 F.3d at 1288; *Hicks*, 509 U.S. at 507. The employer's burden is satisfied if it simply explains what it has done or produces evidence of a legitimate, non-discriminatory explanation.   Hicks, 509 U.S. at 509.  The legitimate, non-discriminatory explanation need not be one with which the employee agrees.  An employer may act for any reason, whether good or bad, so long as unlawful discrimination is not a motivating factor for the employer's action.  See Burdine, 450 U.S. at 259; Simmons v. Billington, 53 Emp. Prac. Dec. & 39, 994, 1989 WL 222729, at *3 (D.D.C. 1989).   "[T]he issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.   Fischbach v. District of Columbia Dept of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted). The law does not make an employer liable just because the employer may have made a poor decision.   See Davis v. State Univ. of New York, 802 F.2d 638, 641 (2d Cir. 1986).  See Winston v. Smithsonian Sci. Info. Exch., Inc., 437 F.Supp. 456, 473 (D.D.C. 1977) ([A]n employer may make an employment decision for a good reason, a bad reason, or no reason at all so

long as racial or other discriminatory distinctions do not influence the decision. *Aff'd.*, 595 F.2d 888 (D.C. Cir. 1979). The burden remains on plaintiff to establish by a preponderance of the evidence that defendant's legitimate and non-discriminatory explanation is merely a pretext for discrimination. Plaintiff cannot make this showing.

Plaintiff has failed to produce any evidence to suggest that he should have been promoted to the GS-14 level in December 2005 or otherwise. Although under certain circumstances a plaintiff could seek to establish pretext or an inference of discrimination by showing that similarly situated individuals were treated more favorably under similar circumstances, plaintiff makes no such showing here. In particular, plaintiff fails to identify any similarly situated comparators who were treated more favorably than him with respect to promotions. To be considered similarly situated, all relevant aspects of individuals' employment situations must be "nearly identical." *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). To be similarly situated to plaintiff, a comparator would therefore have to be employed as an Industry Economist at the GS-13 level in the IATD with the same supervisors and during the same time period. The five alleged comparators whom plaintiff identifies in his administrative EEO complaint were all promoted to the GS-14 level during the time period August 1996 through July 2000 -- years before the IATD was created and Mr. Woock became chief of that division.[12] *See* Brock Decl. at ¶ 9. These individuals were therefore not similarly situated to plaintiff.

Moreover, plaintiff fails to establish that his qualifications for promotion are plainly superior to, or even comparable to, his purported comparators. Plaintiff contends

---

[12] Additionally, Mr. Selzer was employed at the GS-15 level when he was reassigned from the ICC to the FCC in May 1995. This is yet another reason why he is not similarly situated to plaintiff, a GS-13 employee seeking promotion to the GS-14 level. *See* Brock Decl. at ¶ 9.

that he "has a similar professional background and education as the promoted individuals and has more experience at the FCC." *See* Complaint at ¶ 12. In fact, all of these individuals possess qualifications that are plainly superior to plaintiff's qualifications. Ellen Burton heads major work projects, handles many assignments, and does superior work in a timely fashion. *See* Woock Decl. at ¶ 5. Jim Eisner does outstanding work, frequently picks up extra assignments, and meets deadlines. *Id*. Craig Stroup has an excellent work record, does a significant amount of consulting work for IATD with other FCC divisions, looks for extra work, and is willing and able to take on significant responsibility. *Id*. Further, Ellen Burton, James R. Eisner, Craig L. Stroup, and Les Selzer have Ph.D's. *See* Feldman Decl. at ¶ 6. Tracy Waldon does not have a Ph.D., but has completed all the requirements for the degree but the dissertation. *Id.* Plaintiff does not have a Ph.D, and has consistently had performance problems. *Id.*

Finally, plaintiff alleges that he was qualified for promotion because a prior supervisor sent an e-mail praising his abilities; he received successful performance appraisals; and he received two performance awards. *See* Complaint at ¶¶ 14-18. The e-mail was sent in 1995, and recommended that plaintiff be promoted to the top of his career ladder. It is undisputed that plaintiff was indeed promoted to the top of his career ladder – the GS-13 level – effective August 4, 1996. *See* Brock Decl. at ¶ 4. Plaintiff received ratings of "pass" (in the FCC's "pass/fail" appraisal system) on his performance appraisals. *See* Feldman Decl. at ¶ 7. The ratings of "pass" do not establish that plaintiff is qualified for promotion to a higher GS-level; only that he was performing at a "passable" level of competence at the GS-13 level notwithstanding certain performance deficiencies. Similarly, the awards that plaintiff received (in 2003 and 2004) reflect his

performance at the GS-13 level, and are not indicative of his ability to perform successfully at the GS-14 level. Two awards for work on particular projects establish only that plaintiff's supervisors treated him fairly by rewarding occasions on which he demonstrated good performance, and do not suggest that his overall work performance was without deficiencies or that he was qualified for promotion to a higher GS-level. In sum, while it may be unfortunate that there has been neither the opportunity nor the basis for plaintiff to be promoted to the GS-14 level in IATD, this situation does not equate with intentional discrimination.

IV.     **CONCLUSION**

Based upon the foregoing and the record evidence, summary judgment should be entered in the FCC's favor.

Respectfully submitted,


\_\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


\_\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


\_\_\_/s/_____
WYNEVA JOHNSON, D.C. BAR # 278515
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7224

Of counsel:

Michael A. Krasnow, Esq.
Office of General Counsel
Federal Communications Commission

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**John Adesalu,**                       )
                                        )
    **Plaintiff,**   )
                                        )
    **v.**            )       **Civil Action No. 07-2187 (PLF)**
                                        )
**Kevin J. Martin, Chairman,**          )
**Federal Communications Commission,**  )
                                        )
    **Defendant.**     )
_____)

## <u>ORDER</u>

    This matter comes before the Court on Defendant's Motion for Summary Judgment.

Upon consideration of the Motion, the opposition, the reply, and the entire record herein, it is by

the Court this _____ day of _____, 2008 hereby

    ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED; and

it is further

    ORDERED that with respect to these, the above captioned matter is hereby DISMISSED

WITH PREJUDICE.


SO ORDERED.


_____
UNITED STATES DISTRICT JUDGE

# Defendant's Exhibit No. 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| John Adesalu, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 07-2187 (PLF) |
| Kevin J. Martin, Chairman, Federal Communications Commission, | ) |
| Defendant. | ) |

## DECLARATION OF VALERIE P. BROCK

1.      I am presently employed as Assistant Bureau Chief for Management, Wireline Competition Bureau ("WCB"), Federal Communications Commission ("FCC" or "Commission").  I have served in this capacity since April 3, 2006.

2.      The information set forth in this Declaration is based upon my official knowledge acquired in my official management position in WCB, FCC.

3.      WCB's Industry Analysis and Technology Division ("IATD") was created on March 24, 2002.

4.      Since March 24, 2002, John B. Adesalu has been employed as an Industry Economist in the IATD at the GS-13 level.  The GS-13 level is the full performance level of Mr. Adesalu's position, as reflected on the SF-50 that was issued to Mr. Adesalu when he was promoted to that level.  *See* SF-50, attached hereto as Attachment A, at box 45. The full performance level is the highest grade level of an employee's career ladder to which the employee may be promoted without being required to compete with other individuals, or without receiving an accretion of duties promotion, presuming that the employee successfully satisfies applicable time-in-grade and performance requirements. The full performance level of an employee's position is determined by the personnel action under which the employee is initially appointed and by the level of work required for that particular position.

5.      Between March 24, 2002 and January 2008, there have been no GS-14 Industry Economist positions available in the IATD, nor has IATD promoted any Industry Economists to the GS-14 level non-competitively through accretion of duties.  In January 2008, IATD received authority to fill a GS-14 Industry Economist position, however that position was not filled.  Mr. Adesalu did not apply for that position.

6.     Since March 24, 2002, IATD has promoted only two Industry Economists from the GS-13 to the GS-14 level: Kenneth Lynch (effective August 10, 2003) and Paul Zimmerman (effective September 22, 2002).  Messrs. Lynch and Zimmerman both received career-ladder promotions to the GS-14 level, for which other employees were not eligible to compete.  The full performance level of Messrs. Lynch and Zimmerman's positions was the GS-14 level because they were initially selected from a competitive posting in another FCC office for positions that had a full performance level of GS-14.  Messrs. Lynch and Zimmerman were subsequently reassigned to IATD, and their full performance levels remained GS-14.

7.     Mr. Adesalu has received three within-grade (step) increases since March 24, 2002 -- from the GS-13, step 5 level to the GS-13, step 6 level (effective July 23, 2003); to the GS-13, step 7 level effective July 24, 2005, and to the GS-13, step 8 level effective July 20, 2008.  *See* SF-50's, attached hereto as Attachment B (the SF-50 for the July 20th action is not yet available).

8.     Based on FCC and bureau guidelines, a WCB Division Chief, including the Chief, IATD, does not have the authority to "promise" an employee a promotion to a higher grade level.  Rather, a Division Chief may recommend that an employee be promoted, and that recommendation must then be approved by WCB's front office and the FCC's Office of Managing Director (its human resources office) before an employee may be promoted.  With respect to Mr. Adesalu, because he is employed at the full performance level of his position, in order to be promoted to the GS-14 level, he must either apply and be selected for a competitive vacancy announcement, or request an accretion of duties promotion (a desk audit) to determine whether he is performing work at the GS-14 level and should be promoted non-competitively.

9.     FCC personnel records reflect that Ellen Burton was promoted to the GS-14 level effective August 9, 1996; James R. Eisner was promoted to the GS-14 level effective July 4, 1999; Craig L. Stroup was promoted to the GS-14 level effective June 20, 1999; Les Selzer transferred to the FCC on a lateral appointment from the Interstate Commerce Commission at the GS-15 grade level on May 14, 1995; and Tracy Waldon was promoted to the GS-14 level effective July 30, 2000.  *See* SF-50's, attached hereto as Attachment C.

10.     Pursuant to 28 U.S.C. § 1746, I, Valerie P. Brock, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on this 25th day of July, 2008.

Valerie P. Brock

2

# **Attachment A**
# **to Exhibit 1**

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4.

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| DESALU  JOHN B | | | | 08/04/96 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 702 | PROMOTION | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N3M | REG 335.102 COMP | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| INDUSTRY ANAL | | | | | INDUSTRY ECONOMIST | | | | | |
| 6006401  6302LF | | | | | 86021102  035GMF | | | | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1101 | | 12 | | 44,458.00 | PA | GS | 0110 | 13 | 01 | 52,867.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 41,926.00 | 2,532.00 | 44,458.00 | .00 | 49,856.00 | 3,011.00 | 52,867.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION<br>CABLE SERVICES BUREAU<br>FINANCIAL ANAL & COMPL DIV | FEDERAL COMMUNICATIONS COMMISSION<br>COMMON CARRIER BUREAU<br>DEPUTY BUREAU CHIEF-OPERATIONS<br>INDUSTRY ANALYSIS DIV |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 - None<br>2 - 5-Point | 3 - 10-Point/Disability<br>4 - 10-Point/Compensable | 5 - 10-Point/Other<br>6 - 10-Point/Compensable/30% | 0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES  X NO |
| 1 | | | 1 | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| D  BASIC-STANDARD | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS AND FICA | 03/18/88 | F  FULL TIME | |

## POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved | | E  E - Exempt<br>N - Nonexempt | | 0030 |
| 1 | | | | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON  DIST OF COLUMBIA  DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| C 21 | | | | |

## 45. Remarks

RECTED FROM FCC MPA #96-214B  DATED: 07/18/96
FICIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
E INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
IT-LABOR RELATIONS CODE: I
LL PERFORMANCE LEVEL OF THIS POSITION IS GS-13.

| 46. Employing Department or Agency | 50. Signature/Authentication And Title of Approving Official |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | ASSOCIATE MANAGING DIRECTOR<br>HUMAN RESOURCES MANAGEMENT |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
| FC 21 | 1058 | 08/20/96 |

Part  50-316

Editions Prior to 7/91 Are Not Usable After 6/30/...
NSN 7540-01-333-62...

**2 – OPF Copy – Long-Term Record — DO NOT DESTROY**

# **Attachment B**
# to Exhibit 1

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| DESALU, JOHN B | | | | 07/27/03 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 893 | WITHIN GRADE INC | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| Q7M | REG 531.404 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | | 15. TO: Position Title and Number | | |
|---|---|---|---|---|---|
| | | | INDUSTRY ECONOMIST | | |
| | | | 96021102    035GMF | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 05 | 78,263.00 | PA | GS | 0110 | 13 | 06 | 80,565.00 | PA |
| 12A. Basic Pay | | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | 20A. Basic Pay | | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | |
| 69,419.00 | | 8,844.00 | 78,263.00 | .00 | | 71,461.00 | | 9,104.00 | 80,565.00 | .00 | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FEDERAL COMMUNICATIONS COMMISSION |
| | WIRELINE COMPETITION BUREAU |
| | IND ANAL & TECH DIV |
| | FC 214003000000000000    PP 15 2003 |

| EMPLOYEE DATA | | | | | |
|---|---|---|---|---|---|
| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
| 1 | 1 - None      3 - 10-Point/Disability      5 - 10-Point/Other | 1 | 0 - None    2 - Conditional | | YES    X NO |
| | 2 - 5-Point    4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | | 1 - Permanent  3 - Indefinite | | |
| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| D0    BASIC-STANDARD | | 9    NOT APPLICABLE | | 0 |
| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| K    FERS AND FICA | | 03/18/88 | F    FULL TIME | |

| POSITION DATA | | | | |
|---|---|---|---|---|
| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
| 1 | 1 - Competitive Service    3 - SES General | E | | 0030 |
| | 2 - Excepted Service    4 - SES Career Reserved | E - Exempt    N - Nonexempt | | |
| 38. Duty Station Code | | 39. Duty Station (City - County - State or Overseas Location) | | |
| 11-0010-001 | | WASHINGTON    DIST OF COLUMBIA    DC | | |
| 40. AGENCY DATA | 41. | 42. | 43. | 44. |

45. Remarks.

WORK PERFORMANCE IS AT AN ACCEPTABLE LEVEL OF COMPETENCE.

| 47. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | |
| 46. Agency Code | 48. Personnel Office ID | 49. Approval Date | ASSOCIATE MANAGING DIRECTOR |
| FC 21 | 1056 | 07/26/03 | HUMAN RESOURCES MANAGEMENT |

Editions Prior to 7/91 Are Not Usable After 6/30/9
NSN 7540-01-333-623

50-315

Standard Form 50-B.
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|---|---|
| ADESALU, JOHN B | | | | | | | 07/24/05 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code **893** | 5-B. Nature of Action **WITHIN GRADE INC** | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code **Q7M** | 5-D. Legal Authority **REG 531.404** | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number |
|---|---|---|---|---|---|
| | | | | | INDUSTRY ECONOMIST |
| | | | | | 96021102    035GMF |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 06 | | 87,244.00 | PA | GS | 0110 | 13 | 07 | 89,736.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 75,223.00 | 12,021.00 | 87,244.00 | .00 | 77,372.00 | 12,364.00 | 89,736.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FEDERAL COMMUNICATIONS COMMISSION |
| | WIRELINE COMPETITION BUREAU |
| | IND ANAL & TECH DIV |
| | FC 214003000000000000    PP 15 2005 |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| **1** 1-None 2-5 Point | 3-10 Point/Disability 4-10 Point/Compensable | 5-10 Point/Other 6-10 Point/Compensable/30% | **1** 0-None 1-Permanent 2-Conditional 3-Indefinite | | YES  NO ☒ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| **D0** BASIC-STANDARD | **9** NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| **K** FERS AND FICA | 03/18/88 | **F** FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| **1** 1-Competitive Service 2-Excepted Service 3-SES General 4-SES Career Reserved | **E** E-Exempt N-Nonexempt | | 0030 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON    DIST OF COLUMBIA    DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
WORK PERFORMANCE IS AT AN ACCEPTABLE LEVEL OF COMPETENCE.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | KENT E BRAM |
| | CHIEF HUMAN CAPITAL OFFICER |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| FC 21 | 1058 | 07/23/05 |

Editions Prior to 7/91 Are Not Usable After 6/30/
NSN 7540-01-333-62

5 Part 50-315                2 - OPF Copy - Long-Term Record - DO NOT DESTROY

# Attachment C
## to Exhibit 1

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| BURTON, ELLEN | | | 08/26/96 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 108 | TERM APPT NTE 08/25/00 | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| BWA | CERT FC 96 0023 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | INDUSTRY ECONOMIST |
| | 96058201   035GNF |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Ba |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0110 | 14 | 10 | 81,217.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | .00 | | .00 | 76,591.00 | 4,626.00 | 81,217.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FEDERAL COMMUNICATIONS COMMISSION |
| | COMMON CARRIER BUREAU |
| | DEPUTY BUREAU CHIEF-OPERATIONS |
| | INDUSTRY ANALYSIS DIV |
| 7A | |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for |
|---|---|---|---|---|---|
| 1 | 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other<br>2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 3 | 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | YES [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determina |
|---|---|---|
| C   BASIC | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| K   FERS AND FICA | 08/26/96 | F   FULL TIME | Biweekly Pay Period |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Stat |
|---|---|---|---|
| 1   1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E   E – Exempt<br>N – Nonexempt | | 0030 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

PPOINTMENT AFFIDAVIT EXECUTED: 08/26/96
FFICIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
HE INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
NIT-LABOR RELATIONS CODE: I
ELECTED FROM FCC MPA #96-215B   DATED: 07/29/96
LIGIBLE FOR HEALTH BENEFITS
REVIOUS RETIREMENT COVERAGE: NEVER COVERED
MPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.
PPROVED BY MANAGING DIRECTOR EFFECTIVE: 08/22/96
ULL PERFORMANCE LEVEL OF THIS POSITION IS GS-14.

| 6. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | |
| 7. Agency Code | 48. Personnel Office ID | 49. Approval Date | ASSOCIATE MANAGING DIRECTOR |
| FC 21 | 1058 | 08/27/96 | HUMAN RESOURCES MANAGEMENT |

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| EISNER, JAMES R | | | 07/04/99 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 702 | PROMOTION | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N3M | REG 335.102 COMP | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| INDUSTRY ECONOMIST<br>97037701   035GMF | INDUSTRY ECONOMIST<br>95026107   035GNF |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Ba |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 13 | 02 | 59,961.00 | PA | GS | 0110 | 14 | 01 | 68,570.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 55,586.00 | 4,375.00 | 59,961.00 | .00 | 63,567.00 | 5,003.00 | 68,570.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FEDERAL COMMUNICATIONS COMMISSION<br>COMMON CARRIER BUREAU<br>DEPUTY BUREAU CHIEF-OPERATIONS<br>INDUSTRY ANALYSIS DIV |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for F |
|---|---|---|---|
| 1   1 - None   3 - 10-Point/Disability   5 - 10-Point/Other<br>2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 3   0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | | YES   [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinan |
|---|---|---|
| C0   BASIC | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| K   FERS AND FICA | 09/29/96 | F   FULL TIME | Biweekly<br>Pay Period |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Statu |
|---|---|---|---|
| 1   1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | E   E - Exempt<br>N - Nonexempt | | 0030 |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

·LECTED FROM ANNOUNCEMENT# 99-204B DATED 6/9/99.
·SITION IS AT THE FULL PERFORMANCE LEVEL.
·E INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
·IT-LABOR RELATIONS CODE: I
·FICIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
·PROVED BY THE MANAGING DIRECTOR ON 7/2/99.

| loying Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| ·L COMMUNICATIONS COMMISSION | |
| Code   48. Personnel Office ID   49. Approval Date | *Carolyn P. Last*<br>ASSOCIATE MANAGING DIRECTOR<br>HUMAN RESOURCES MANAGEMENT |
|   1058   07/14/99 | |

| 15 | 2 - OPF Copy - Long-Term Record - DO NOT DESTROY | Editions Prior to 7/91 Are Not Usable After 6/30,<br>NSN 7540-01-333-6 |

Standard Form 50-B
?, 7/91
?. Office of Personnel Management
M Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| ROUP, CRAIG L | | | 06/20/99 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| . Code  5-B. Nature of Action | | 6-A. Code  6-B. Nature of Action | |
| 02  PROMOTION | | | |
| . Code  5-D. Legal Authority | | 6-C. Code  6-D. Legal Authority | |
| 6M  REG 335.102 CAR PROM | | | |
| . Code  5-F. Legal Authority | | 6-E. Code  6-F. Legal Authority | |

| FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| INDUSTRY ECONOMIST | INDUSTRY ECONOMIST |
| 037701   035HMF | 95026101   035GNF |

| ay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 13 | 04 | 63,829.00 | PA | GS | 0110 | 14 | 01 | 68,570.00 | PA |

| . Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 9,172.00 | 4,657.00 | 63,829.00 | .00 | 63,567.00 | 5,003.00 | 68,570.00 | .00 |

22. Name and Location of Position's Organization

FEDERAL COMMUNICATIONS COMMISSION
COMMON CARRIER BUREAU
DEPUTY BUREAU CHIEF-OPERATIONS
INDUSTRY ANALYSIS DIV

| EMPLOYEE DATA | | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| Veterans Preference | 3 - 10-Point/Disability | 5 - 10-Point/Other | | 3 | | YES  X NO |
| 1 - None | 4 - 10-Point/Compensable | 6 - 10-Point/Compensable/30% | | 0 - None  2 - Conditional | | |
| 2 - 5-Point | | | | 1 - Permanent  3 - Indefinite | | |
| FEGLI | | | 28. Annuitant Indicator | | | 29. Pay Rate Determinant |
| ) BASIC-5X ADDITIONAL | | | 9  NOT APPLICABLE | | | 0 |
| Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | | 33. Part-Time Hours Per Biweekly Pay Period |
| FERS AND FICA | | 05/11/97 | F  FULL TIME | | | |

| POSITION DATA | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| Position Occupied | 3 - SES General | E  E - Exempt | | 0030 |
| 1 - Competitive Service | 4 - SES Career Reserved | N - Nonexempt | | |
| 2 - Excepted Service | | | | |
| Duty Station Code | | 39. Duty Station (City - County - State or Overseas Location) | | |
| -0010-001 | | WASHINGTON   DIST OF COLUMBIA   DC | | |

| AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

Remarks

ROVED BY THE MANAGING DIRECTOR ON
TION IS AT THE FULL PERFORMANCE LEVEL.
INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
-LABOR RELATIONS CODE I.
CIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
OVED BY THE MANAGING DIRECTOR ON 7/2/99.

| Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| FERAL COMMUNICATIONS COMMISSION | ASSOCIATE MANAGING DIRECTOR |
| gency Code   48. Personnel Office ID   49. Approval Date | HUMAN RESOURCES MANAGEMENT |
| 1058   06/24/99 | |

-315

00 000000000    PP 13 1*1999*BATCH 10585539 000-00 201-06 AG/EO 21-1058

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| SELZER, LESLIE J | | | 05/14/95 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 130 | TRANSFER | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| KTM | REG 315.501 LATERAL | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | IND ECONMST |
| | 95053001   035G0F |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0110 | 15 | 10 | 93,166.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | 88,326.00 | 4,840.00 | 93,166.00 | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| IC | FEDERAL COMMUNICATIONS COMMISSION<br>COMMON CARRIER BUREAU<br>DEPUTY BUREAU CHIEF—POLICY<br>TARIFF DIV |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other<br>2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 1 — 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | YES   X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| K   BASIC—2X ADDITIONAL | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1   CS | 08/18/74 | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E   E – Exempt<br>N – Nonexempt | | 0030 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

APPOINTMENT AFFIDAVIT EXECUTED: 05-15-95
OFFICIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
THE INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
UNIT-LABOR RELATIONS CODE: I
ELIGIBLE FOR HEALTH BENEFITS.
PREVIOUS RETIREMENT COVERAGE: CSRS
POSITION IS AT THE FULL PERFORMANCE LEVEL.
APPROVED BY MANAGING DIRECTOR EFFECTIVE: 05/12/95

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Officer |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | ASSOCIATE MANAGING DIRECTOR<br>HUMAN RESOURCES MANAGEMENT |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| FC 21 | 1058 | 05/17/95 | |

| 5-Part   50-315 | 2 – OPF Copy – Long-Term Record — DO NOT DESTROY | Editions Prior to 7/91 Are Not Usable After 6/30/93<br>NSN 7540-01-333-6237 |
|---|---|---|

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| WALDON, TRACY CHARLES | | | 07/30/00 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 702 | PROMOTION | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N3M | REG 335.102 COMP | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| INDUSTRY ECONOMIST | INDUSTRY ECONOMIST |
| 35026001   035AMF | 95026100   035AMF |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 13 | 03 | 64,949.00 | PA | GS | 0110 | 14 | 01 | 71,954.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 59,559.00 | 5,390.00 | 64,949.00 | .00 | 65,983.00 | 5,971.00 | 71,954.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FEDERAL COMMUNICATIONS COMMISSION |
| | COMMON CARRIER BUREAU |
| | DEPUTY BUREAU CHIEF-OPERATIONS |
| | INDUSTRY ANALYSIS DIV |
| | FC 21163080000000000000   PP 15 2000 |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for |
|---|---|---|---|
| 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other | 1 | | YES [X] NO |
| 2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 0 - None   2 - Conditional | | |
| | 1 - Permanent   3 - Indefinite | | |

| | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| 27. FEGLI | | 9   NOT APPLICABLE | 0 |
| C0   BASIC | | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   FERS AND FICA | 06/20/93 | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service   3 - SES General | E   E - Exempt | | 0030 |
| 2 - Excepted Service   4 - SES Career Reserved | N - Nonexempt | | |
| 1 | | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

SELECTED FROM GG-248GP             DATED 7/26/00
POSITION IS AT THE FULL PERFORMANCE LEVEL.
OFFICIAL POSITION DESCRIPTION ATTACHED TO EMPLOYEE COPY
THE INCUMBENT OF THIS POSITION IS INCLUDED IN THE FCC BARGAINING
UNIT-LABOR RELATIONS CODE I

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| FEDERAL COMMUNICATIONS COMMISSION | Carolyn P. Lark |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | ASSOCIATE MANAGING DIRECTOR |
| FC 21 | 1058 | 08/08/00 | -HUMAN RESOURCES MANAGEMENT |

| | Editions Prior to 7/91 Are Not Usable After 6/_ |
|---|---|
| | NSN 7540-01-333- |

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Part    50-316

# <u>Defendant's Exhibit No. 2</u>

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| John Adesalu, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2187 (PLF) |
| | ) | |
| Kevin J. Martin, Chairman, | ) | |
| Federal Communications Commission, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ALAN I. FELDMAN

1.      I am presently employed as Deputy Chief, Industry Analysis and Technology Division ("IATD"), Wireline Competition Bureau ("WCB"), Federal Communications Commission ("FCC" or "Commission").  I have served in that capacity since March 2002, and temporarily as Acting Division Chief in IATD during the time period June 2006 through December 2007.

2.      The information set forth in this Declaration is based upon my official knowledge acquired in my official management position in WCB, FCC.

3.      I have supervised John B. Adesalu during the entire time that I have been employed in IATD.  On various occasions, Mr. Adesalu has discussed his promotion potential with me.  I have informed him that the GS-13 level is the full promotion level of his position and that he cannot be automatically promoted.  I have informed him further that there are essentially two ways for him to get promoted: through an accretion of duties promotion, which would mean that he had been doing work at the higher GS-14 level for over one year, or by applying and being selected for a position at the GS-14 level.  Because there were no GS-14 Industry Economist vacancies for which he could apply in the IATD, I advised Mr. Adesalu that his best option for promotion within the IATD was to try to improve his work performance and acquire skills to seek promotion through accretion of duties.  To my knowledge, Mr. Adesalu has never requested a desk audit, which is generally the first step in the process through which the Commission ascertains whether an employee is qualified for an accretion of duties promotion.

4.      Mr. Adesalu's work has typically contained many mistakes and consistently needed significant supervisory review.  Attached hereto as Attachment A are several examples of problems with Mr. Adesalu's work performance on specific projects.  Examples 1, 2 and 4 in Attachment A are specific projects that Mr. Adesalu performed under my direct supervision, and Example 3 was done under the supervision of Peyton

Wynns, one of Mr. Adesalu's former supervisors. Attached hereto as Attachment B are several additional examples of problems with Mr. Adesalu's work performance. I informed Mr. Adesalu of my concerns with his work as part of his performance appraisal reviews, and I have had many discussions with him regarding ways to improve his work performance.

5.      I have encouraged Mr. Adesalu to take training courses to develop skills that might assist him in obtaining a promotion to the GS-14 level. These training courses were directly relevant to the types of projects on which Mr. Adesalu typically worked, and the project that Mr. Woock had assigned him (pertaining to the Regional Bell Operating Companies) to assist him with trying to improve his skills. Mr. Adesalu, however, refused to take several of the training classes that I recommended. For example, I suggested that Mr. Adesalu take an intermediate or advanced course in MS Excel spreadsheets when I observed that he was copying single cells to other locations in a spreadsheet rather than copying a whole range of cells to another area. Another example was a training course to improve writing skills that the Division managers were recommending to all of the professional staff. Mr. Adesalu refused to take both courses.

6.      Ellen Burton, James R. Eisner, Craig L. Stroup, and Les Selzer have Ph.D's. Tracy Waldon does not have a Ph.D., but has completed all the requirements for the degree but the dissertation. Mr. Adesalu does not have a Ph.D.

7.      During Mr. Adesalu's tenure in IATD, the performance of non-supervisory and non-managerial IATD employees has been evaluated on a pass–fail appraisal system. During that time period, Mr. Adesalu has received ratings of "pass" on his performance appraisals.

8.      I am Caucasian, white, and was born in the United States.

9.      Pursuant to 28 U.S.C. § 1746, I, Alan I. Feldman, declare under penalty of perjury that the foregoing is true and correct. Executed on this 25th day of July, 2008.

Alan I. Feldman

2

# ATTACHMENT A
## to Exhibit 2

To: Linda Miller, Office of Workforce Diversity
From: Alan Feldman, Acting Chief
Industry Analysis and Technology Division
Wireline Competition Bureau
June 26, 2006

Enclosed are a few examples detailing Mr. Adesalu's work quality during his time in the Industry Analysis and Technology Division (and its predecessor, the Industry Analysis Division).

1. Email chain pertaining to producing a table for a report entitled *Trends in Telephone Service* (Trends), along with sample products of Mr. Adesalu's assignment. Included in the sample products are the starting point, his 1st, 2nd, and 3rd attempt, and a version I generated.
2. Three emails showing missed deadlines in producing documentation similar to that produced by other members working on a team project.
3. Two email chains detailing Mr. Adesalu's efforts to conduct a research project and his inability to bring those efforts to fruition.
4. Sample marked up tables from Mr. Adesalu's efforts to produce summary information for our periodic publication, *Statistics of Communications Common Carriers* (SOCC).

I am providing additional detail for example 1 in order to put it in perspective. One can see from the initial emails documented in the chain (4/19/06 & 4/24/06) that all of the team members were requested to finish their assigned work and place it on the Commission's storage facilities for management review. Because Mr. Adesalu did not have write permission to that particular portion of the storage facility (K drive) he delivered his supposedly finished product to me for placement on the K drive. I reviewed his table prior to placing it on the K drive and found numerous problems with his work product. I recommended that he correct these problems and include the pertinent table footnotes with the table (4/26/06 email in the chain). Mr. Adesalu took offense at my suggestion and accused me of treating him in an unprofessional manner. This has been his typical response to recommendations for suggested improvements and critiques of his work products.

The first table (with footnotes) included in example 1 was Mr. Adesalu's starting point. It is a table contained in a different document (SOCC) that needed some minor changes for inclusion in the new document (Trends). Those needed changes are highlighted on the starting point table. Mr. Adesalu's 1st attempt shows he delivered an exact duplicate of the starting point table and somehow managed to include an incorrect set of footnotes that had the right-side portion of the text cut off. A simple look at the end product would have enabled Mr. Adesalu to see these faults and correct them prior to submission.

Instead Mr. Adesalu was informed of these problems in the 4/26/06 email in the chain and delivered his 2nd attempt on 4/27/06, as documented in his email of the same date. Upon receipt of that table (2nd attempt), I did a quick review and again found problems with Mr. Adesalu's work product. He still was using the wrong footnotes and had the wrong page number for the table. He was informed of this in the final email (4/27/06) of the chain, shown first in the email chain.

Mr. Adesalu's 3rd attempt (as of 4/27/06) is also included and shows the footnotes were still wrong and, even if correct, were formatted poorly for camera-ready copy.

The final table included in example 1 is a version I created in twenty minutes. Mr. Adesalu's efforts, still not complete, have taken days.

If necessary, I can provide additional detail regarding this example, and for examples 2 through 4, and I will do so if it is needed.

92

## Alan Feldman

| | |
|---|---|
| From: | Alan Feldman |
| Sent: | Thursday, April 27, 2006 3:39 PM |
| To: | John Adesalu |
| Cc: | Rodger Woock |
| Subject: | RE: Trends Team 2006 May 1st Draft |

*Recent email chain referring to current work with example outputs.*

John, Please review your work prior to putting things on the K drive. This version also has the wrong footnotes and the table has the wrong page number. If you need help, please see me. Alan

*** Non-Public: For Internal Use Only ***

    -----Original Message-----
    **From:** John Adesalu
    **Sent:** Thursday, April 27, 2006 3:16 PM
    **To:** Alan Feldman
    **Subject:** RE: Trends Team 2006 May 1st Draft

    The table is there but it is saved as "Table 9-1Trends.xls". You can check it and resave as "Table 9-1.xls".

    John B. Adesalu


    *** Non-Public: For Internal Use Only ***

    -----Original Message-----
    **From:** Alan Feldman
    **Sent:** Thursday, April 27, 2006 9:57 AM
    **To:** John Adesalu
    **Cc:** Larry Povich; Rodger Woock
    **Subject:** RE: Trends Team 2006 May 1st Draft

    John, First of all, I didn't mean anything negative by the statement "It also would make sense to incorporate the notes directly into the spreadsheet of the table so everything pertaining to that table is in one place, similar to the rest of the Trends report." All I was saying is it would be a good idea to put the spreadsheet together in this fashion. As for the actual table and notes, I have never seen anything done that carelessly. All you would have needed to do is look at the output and you would have seen that it was totally unacceptable as a final product ready for placement on the K drive. And finally, do not wait for Larry to return next week. Give me the corrected table as soon as you can. Please come by and see me if you don't understand how to correct the table and notes and get it into the Trends format. I want to review the table to be sure it is done correctly. Thank you, Alan

    *** Non-Public: For Internal Use Only ***

    -----Original Message-----
    **From:** John Adesalu
    **Sent:** Thursday, April 27, 2006 9:39 AM
    **To:** Alan Feldman
    **Cc:** Larry Povich; Rodger Woock
    **Subject:** RE: Trends Team 2006 May 1st Draft

Alan, I do not know what you are implying with the statement "It also would make sense......" in your e-mail (below) to me yesterday. I am not going to belittle myself by engaging in similar response to you. I hope history is not trying to repeat itself here and is not a harbinger of a new policy from the management. Whatever it may be, I would request that you desist from this kind of derogatory remarks, or disparaging treatments, towards me and accord me the same professionalism you accord to other staffers in the division. I will send my table and notes to Larry upon his return.

John B. Adesalu

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Wednesday, April 26, 2006 2:54 PM
**To:** John Adesalu
**Cc:** Larry Povich
**Subject:** RE: Trends Team 2006 May 1st Draft

John,  You're attachments are not ready for copying to the K drive.  First, you need to put the table into the Trends format.  We can't use the SOCC headings and page numbering scheme that you've attached.  Second, you need to use the correct set of notes and also put them into the Trends format.  The notes you've attached are not related to the table you attached.  It also would make sense to incorporate the notes directly into the spreadsheet of the table so everything pertaining to that table is in one place, similar to the rest of the Trends report.  Finally, the table should be named consistent with the rest of the Trends tables.   Alan

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** John Adesalu
**Sent:** Wednesday, April 26, 2006 1:26 PM
**To:** Alan Feldman
**Subject:** RE: Trends Team 2006 May 1st Draft

Attached are Table 9-1 and Notes to be saved to Trends' folder on K drive as you have suggested below. Thanks!

John B. Adesalu

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Monday, April 24, 2006 4:35 PM
**To:** John Adesalu
**Subject:** RE: Trends Team 2006 May 1st Draft

Send me the table and text and I'll place it on the K drive.  No need to wait for Larry.

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** John Adesalu
**Sent:** Monday, April 24, 2006 4:28 PM
**To:** Alan Feldman
**Subject:** RE: Trends Team 2006 May 1st Draft

I have been trying to save my table (for Table 9-1) and the text (for Notes) on the K drive but to no avail. I am getting the error message that the folder is marked for "read only". I sent an e-mail about it to Larry last Friday without knowing that he is on leave.

John B. Adesalu.


*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Monday, April 24, 2006 11:41 AM
**To:** Larry Povich; Paul Zimmerman; Alex Belinfante; James Eisner; Kenneth Lynch; Jim Lande; Suzanne Mendez; Stephen Steckler; Craig Stroup; Michael Goldstein; Jonathan Kraushaar; Cathy Zima; John Adesalu; John Vu
**Subject:** RE: Trends Team 2006 May 1st Draft

Larry is on leave this week and I would like to finish the draft by the time he returns on Monday, May 1st. The universal service data for section 19 is scheduled to arrive today and all other data should already be here. Please see me if you think you will have problems meeting the May 1st deadline. Thanks, Alan

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Larry Povich
**Sent:** Wednesday, April 19, 2006 4:14 PM
**To:** Paul Zimmerman; Alex Belinfante; James Eisner; Kenneth Lynch; Jim Lande; Suzanne Mendez; Stephen Steckler; Craig Stroup; Michael Goldstein; Jonathan Kraushaar; Cathy Zima; Alan Feldman; John Adesalu; John Vu
**Cc:** Larry Povich
**Subject:** Trends Team 2006 May 1st Draft

Ladies and Gentlemen:

Your tables and charts look good. We need to you finish your tables/charts/text draft.
A good model for you text is the work Craig and John did on Section 18. The text section should also be complete as a draft on May 1st. The text sections can be generated by going to last year's text folder and "cutting out" your section and editing the section

to reflect changes. Please *redline* or **bold** the changes in your text.  Save the text in Word to the trend106 folder and put a printed copy in my mail box.

The tables and charts that Alan and I reviewed today go a long way towards finishing *Trends* by our deadline. Thank you.

Public: For Internal Use Only ***

Starting point

## Statistics of Communications Common Carriers
### Table 1.4 # Total Toll Service Revenues by Provider #
(Dollar Amounts Shown in Millions)

| Company | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T Companies [1] | | | | | | | | | | | |
| AT&T Communications, Inc. | 37,166 | 38,069 | 39,264 | 39,470 | 40,551 | 39,680 | 37,646 | 33,310 | 27,094 | 22,418 | 22,243 |
| Alascom, Inc. | 329 | 325 | | | | | | | | | |
| Teleport Communications Group, Inc. | | | | | | 284 | 464 | 632 | 437 | 396 | 1,376 |
| ACC Long Distance Corp. | | | 118 | 122 | 123 | | | | | | |
| MCI Companies [2] | | | | | | | | | | | |
| MCI - L.D. Operations | | | | | 22,192 | 23,431 | 22,554 | 21,259 | 17,659 | 16,062 | 11,602 |
| MCI Telecommunications Corp. | 11,715 | 14,617 | 16,372 | 17,150 | | | | | | | |
| WorldCom, Inc. | 2,221 | 3,640 | 4,485 | 5,897 | | | | | | | |
| Wiltel, Inc. | 917 | | | | | | | | | | |
| MFS Intelenet, Inc. | | | 118 | 122 | | | | | | | |
| Intermedia Communications, Inc. | | | | | 380 | 516 | 444 | | | | |
| Sprint Corporation - Long Distance Division | 6,805 | 7,277 | 7,944 | 8,595 | 7,994 | 9,708 | 9,038 | 8,424 | 7,077 | 6,326 | 5,900 |
| SBC Companies | | | | | | | | | | | |
| SBC Communications, Inc. [ILEC] [3] | | | | | | | 2,748 | 2,420 | 2,182 | 2,083 | 1,692 |
| SBC Long Distance, Inc.* | | | | | | | | 449 | 729 | 1,572 | 2,892 |
| SNET America, Inc.* | | | | 142 | 162 | 186 | 189 | 177 | 158 | 154 | 143 |
| Verizon Companies | | | | | | | | | | | |
| Bell Atlantic Comm, Inc. d/b/a Verizon Long Dist.* | | | | | | | 130 | 864 | 1,433 | 1,802 | 2,041 |
| Verizon Communications, Inc. [ILEC] [3] | | | | | | | 2,278 | 1,988 | 1,668 | 1,629 | 1,555 |
| Verizon Select Services, Inc. | | | | 340 | 607 | 834 | 1,004 | 509 | | 223 | 441 |
| NYNEX LD Co. d/b/a Verizon Enter. Solutions * | | | | | | | | | | 316 | 316 |
| Qwest Companies [4] | | | | | | | | | | | |
| Qwest Communications Corp.* | | | | | 320 | 517 | 1,773 | 2,309 | 3,202 | 2,824 | 3,307 |
| Qwest Communications, Inc. [ILEC] [3] | | | | | | | 374 | 264 | 175 | 124 | 78 |
| Qwest LD Corp. | | | | | | | | | | | 366 |
| Qwest Interprise America, Inc. | | | | | | | | | | | 339 |
| LCI Int'l Telecom Corp. d/b/a Qwest Comm. Svcs. * | 453 | 671 | 1,103 | 1,001 | 1,664 | 1,394 | 1,271 | 871 | | | |
| USLD Communications, Inc.* | 136 | 155 | 188 | 241 | 279 | 216 | | | | | |
| IDT Corporation | | | | | 376 | 850 | 945 | 1,303 | 1,532 | 1,835 | 2,217 |
| Global Crossing Companies | | | | | | | | | | | |
| Global Crossing Bandwidth, Inc. | 144 | 127 | | 324 | 539 | 692 | 1,555 | 1,225 | 1,312 | 1,565 | 1,317 |
| Global Crossing Telecommunications, Inc. | 568 | 827 | 1,119 | 775 | 874 | 874 | 801 | 817 | 786 | 615 | 625 |
| Global Crossing North American Networks, Inc. | 306 | 309 | 323 | 223 | | | 196 | | | | |
| International Exchange Ntwks, Ltd. (IXnet, Inc.) | | | | | | | 131 | | | | |
| BellSouth Companies | | | | | | | | | | | |
| BellSouth Long Distance, Inc. * | | | | | | | | 294 | 486 | 928 | 1,483 |
| BellSouth Telecommunications, Inc. [ILEC] [3] | | | | | | | 466 | 412 | 341 | 341 | 368 |
| WilTel Communications, LLC [5] | | | | 227 | 126 | 184 | 413 | 593 | 737 | 1,112 | 1,302 |
| VarTec Companies | | | | | | | | | | | |
| VarTec Telecom, Inc. | 107 | 125 | 470 | 820 | 836 | 819 | 923 | 947 | 793 | 404 | c |
| Excel Telecommunications, Inc. | 156 | 363 | 1,091 | 1,179 | 1,219 | 942 | 703 | 611 | 427 | 665 | c |
| eMeritus Communications, Inc. | 215 | 429 | 379 | 264 | 260 | 169 | | | | | |
| Long Distance Wholesale Club | | | 176 | 121 | 131 | | | | | | |
| Broadwing Communications, LLC | | | | | | | | | | 310 | 658 |
| Teleglobe America Inc. | | | | | 275 | 557 | 282 | 208 | 269 | 409 | 508 |
| ITC^DeltaCom Cos. [6] | | | | | | | | | | | |
| ITC^DeltaCom Communications, Inc | | | | | 122 | 172 | 270 | 259 | 311 | 308 | 324 |
| Business Telecom, Inc. | | 115 | 149 | 195 | 212 | 260 | 271 | 286 | 251 | 228 | 177 |
| Citizens Communications Cos. [7] | | | | | | | | | | | |
| Frontier Communications of America, Inc. | 133 | 121 | | | | | | | | | 193 |
| Electric Lightwave, Inc. | | | | | | | 145 | 227 | 180 | 176 | 169 |
| General Communication, Inc. [8] | 106 | 120 | 143 | 158 | 175 | 184 | 211 | 238 | 227 | 263 | 283 |
| McLeodUSA Telecommunications Services, Inc. | | | | | | 232 | 448 | 463 | 358 | 274 | 225 |
| Evercom Systems, Inc. | | | | | | 205 | 206 | 245 | 239 | 184 | 206 |
| Level 3 Communications, LLC | | | | | | | | 160 | 131 | 134 | 190 |
| ALLTEL Communications, Inc. (ACI) | | | | | | 120 | 175 | 174 | 160 | 175 | 188 |
| Primus Telecommunications, Inc. | | | | | | | | | | 219 | 183 |
| Talk America Inc. | | 180 | 232 | 305 | 426 | 398 | 428 | 249 | 160 | 158 | 176 |
| Americatel Corporation | | | | | | 129 | 188 | 269 | 246 | 193 | 139 |
| Norlight Telecommunications, Inc. | | | | | | | 119 | 142 | 140 | 141 | 136 |
| Sum of Above Companies [8] | | | | | | | | | | | 65,258 |
| Toll Service Revenues of Above Companies | | | | | | | | | | | 58,537 |
| Incumbent Local Exchange Carriers [c] | 13,375 | 11,332 | 11,248 | 10,215 | 9,429 | 8,046 | | | | | |
| Other Toll Service Providers [9] | 9,626 | 10,709 | 14,765 | 13,029 | 15,783 | 16,647 | 20,827 | 16,702 | 12,797 | 12,034 | 11,561 |
| Total Toll Service Revenues [10] | 84,478 | 89,629 | 99,691 | 100,793 | 105,055 | 108,246 | 109,616 | 99,300 | 83,697 | 78,600 | 70,098 p |

Note: Total toll service revenues include intrastate, interstate and international toll revenues.  Also, some numbers for previous years have been revised for consistency with other reports.

\# Some of the companies included non toll-related revenues in their annual submissions filed pursuant to section 43.21(c) of the Commission's rules.

\* Regional Bell Operating Company's long distance subsidiaries.          c - Confidential

p - preliminary



**Statistics of Communications Common Carriers**

**Notes for Table 1.4.**

The revenue information for the larger long distance telephone companies, shown in Table 1.4, is reported annually to the FCC pursuant to 47 CFR 43.21(c) filings. The revenue information for large local exchange telephone companies is based on the annual filings of ARMIS (Automated Reporting Management Information System) Reports 43-02. The Commission also collects revenue information on FCC Form 499-A (Telecommunications Reporting Worksheet) and, in previous years, on FCC Forms 431 (Telecommunications Relay Service Worksheet) and 457 (Universal Service Worksheet). Revenues for carriers that are not subject to the filing requirements under § 43.21(c), or ARMIS Reports, are estimated by the FCC staff based on carriers' filings of the FCC Forms 431, 457, and 499-A.

**Company Notes**

[1]  ACC Long Distance Corp. and Teleport Communications Group merged in April of 1998, and the combined company, Teleport Communications Group, merged with AT&T Communications, Inc., in July of that year. AT&T Communications acquired Alascom, Inc., August 7, 1995 and began filing a consolidated revenue statement in 1996.

*Needs to be updated*

[2]  On July 21, 2002, WorldCom and substantially all of its U.S. subsidiaries filed voluntary petitions for relief in the U.S. Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On April 20, 2004, WorldCom emerged from bankruptcy and merged with and into MCI whereby the separate existence of WorldCom ceased and MCI became the surviving company.

[3]  For the years 1994 - 1999, the RBOC ILEC toll service revenues are included in total ILEC toll revenues.

[4]  Qwest Interprise America, Inc. is a subsidiary for out-of-region DSL (digital subscriber line); and Qwest LD Corp. is a subsidiary for in-region long distance.

[5]  In November 2003, WilTel Communications, LLC became a wholly-owned, indirect subsidiary of Leucadia National Corporation. Thus, it no longer files with the SEC (Securities & Exchange Commission) on a stand-alone basis.

[6]  In October 2004, ITC^DeltaCom completed its acquisition (begun in July 2003) of BTI Telecom Corp. outstanding common stock.

[7]  Frontier was acquired by Citizens Communications Company in June of 2001 and Electric Lightwave on June 20, 2002.

[8]  ILECs' totals are shown separately through 1999 because they primarily carried intraLATA calls due, in part, to the restrictions imposed on the RBOCs by the 1984 Divestiture agreement. By 2000 most local exchange customers could presubscribe to any carrier for intraLATA toll service and some RBOCs began to receive section 271 approval to provide interLATA toll services.

[9]  Includes wireless toll service revenues reported by wireless carriers, toll service revenues reported by CLECs, and toll service revenues reported by non-RBOC ILECs.

[10]  Estimated by the FCC staff.



*J Adopft attempt at Trends Ta 9.1*

## Statistics of Communications Common Carriers

### Table 1.4 -- Total Toll Service Revenues by Provider [#]
#### (Dollar Amounts Shown in Millions)

| Company | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T Companies [1] | | | | | | | | | | | |
| AT&T Communications, Inc. | $37,166 | $38,069 | $39,264 | $39,470 | $40,551 | $39,680 | $37,646 | $33,310 | $27,094 | $22,418 | $22,243 |
| Alascom, Inc. | 329 | 325 | | | | | | | | | |
| Teleport Communications Group, Inc. | | | | | | 284 | 464 | 632 | 437 | 396 | 1,376 |
| ACC Long Distance Corp. | | | 118 | 122 | 123 | | | | | | |
| MCI Companies [2] | | | | | | | | | | | |
| MCI - L.D. Operations | | | | | | 22,192 | 23,431 | 22,554 | 21,259 | 17,659 | 16,062 | 11,602 |
| MCI Telecommunications Corp. | 11,715 | 14,617 | 16,372 | 17,150 | | | | | | | |
| WorldCom, Inc. | 2,221 | 3,640 | 4,485 | 5,897 | | | | | | | |
| Wiltel, Inc. | 917 | | | | | | | | | | |
| MFS Intelenet, Inc. | | | 118 | 122 | | | | | | | |
| Intermedia Communications, Inc. | | | | | | 380 | 516 | 444 | | | |
| Sprint Corporation - Long Distance Division | 6,805 | 7,277 | 7,944 | 8,595 | 7,994 | 9,708 | 9,038 | 8,424 | 7,077 | 6,326 | 5,900 |
| SBC Companies | | | | | | | | | | | |
| SBC Communications, Inc. (ILEC) [3] | | | | | | | 2,748 | 2,420 | 2,182 | 2,083 | 1,692 |
| SBC Long Distance, Inc.* | | | | | | | | 449 | 729 | 1,572 | 2,892 |
| SNET America, Inc.* | | | | 142 | 162 | 186 | 189 | 177 | 158 | 154 | 143 |
| Verizon Companies | | | | | | | | | | | |
| Bell Atlantic Comm., Inc. d/b/a Verizon Long Dist.* | | | | | | | 130 | 864 | 1,433 | 1,802 | 2,041 |
| Verizon Communications, Inc. (ILEC) [3] | | | | | | | 2,278 | 1,988 | 1,668 | 1,629 | 1,555 |
| Verizon Select Services, Inc. | | | | 340 | 607 | 834 | 1,004 | 509 | | 223 | 441 |
| NYNEX LD Co. d/b/a Verizon Enter. Solutions * | | | | | | | | | | 316 | 316 |
| Qwest Companies [4] | | | | | | | | | | | |
| Qwest Communications Corp.* | | | | | 320 | 517 | 1,773 | 2,309 | 3,202 | 2,824 | 3,307 |
| Qwest Communications, Inc. (ILEC) [3] | | | | | | | 374 | 264 | 175 | 124 | 78 |
| Qwest LD Corp. | | | | | | | | | | | 366 |
| Qwest Interprise America, Inc. | | | | | | | | | | | 339 |
| LCI Int'l Telecom Corp. d/b/a Qwest Comm. Svcs. * | 453 | 671 | 1,103 | 1,001 | 1,664 | 1,394 | 1,271 | 871 | | | |
| USLD Communications, Inc.* | 136 | 155 | 188 | 241 | 279 | 216 | | | | | |
| IDT Corporation | | | | | | 376 | 850 | 945 | 1,303 | 1,532 | 1,835 | 2,217 |
| Global Crossing Companies | | | | | | | | | | | |
| Global Crossing Bandwidth, Inc. | 144 | 127 | | 324 | 539 | 692 | 1,555 | 1,225 | 1,312 | 1,565 | 1,317 |
| Global Crossing Telecommunications, Inc. | 568 | 827 | 1,119 | 775 | 874 | 874 | 801 | 817 | 786 | 615 | 625 |
| Global Crossing North American Networks, Inc. | 306 | 309 | 323 | 223 | | | 196 | | | | |
| International Exchange Ntwks, Ltd. (IXnet, Inc.) | | | | | | | 131 | | | | |
| BellSouth Companies | | | | | | | | | | | |
| BellSouth Long Distance, Inc. * | | | | | | | | 294 | 486 | 928 | 1,483 |
| BellSouth Telecommunications, Inc. (ILEC) [3] | | | | | | | 466 | 412 | 341 | 341 | 268 |
| WilTel Communications, LLC [5] | | | | 227 | 126 | 184 | 413 | 593 | 737 | 1,112 | 1,302 |
| VarTec Companies | | | | | | | | | | | |
| VarTec Telecom, Inc. | 107 | 125 | 470 | 820 | 836 | 819 | 923 | 947 | 793 | 404 | c |
| Excel Telecommunications, Inc. | 156 | 363 | 1,091 | 1,179 | 1,219 | 942 | 703 | 611 | 427 | 665 | c |
| eMeritus Communications, Inc. | 215 | 429 | 379 | 264 | 260 | 169 | | | | | |
| Long Distance Wholesale Club | | | 176 | 121 | 131 | | | | | | |
| Broadwing Communications, LLC | | | | | | | | | | 310 | 658 |
| Teleglobe America Inc. | | | | | | 275 | 557 | 282 | 208 | 269 | 409 | 508 |
| ITC^DeltaCom Cos. [6] | | | | | | | | | | | |
| ITC^DeltaCom Communications, Inc | | | | | 122 | 172 | 270 | 259 | 311 | 308 | 324 |
| Business Telecom, Inc. | | | 115 | 149 | 195 | 212 | 260 | 271 | 286 | 251 | 228 | 177 |
| Citizens Communications Cos. [7] | | | | | | | | | | | |
| Frontier Communications of America, Inc. | 133 | 121 | | | | | | | | | 193 |
| Electric Lightwave, Inc. | | | | | | | 145 | 227 | 180 | 176 | 169 |
| General Communication, Inc. [8] | 106 | 120 | 143 | 158 | 175 | 184 | 211 | 238 | 227 | 263 | 283 |
| McLeodUSA Telecommunications Services, Inc. | | | | | | 232 | 448 | 463 | 358 | 274 | 225 |
| Evercom Systems, Inc. | | | | | 205 | 206 | 245 | 239 | 184 | 206 |
| Level 3 Communications, LLC | | | | | | | | 160 | 131 | 134 | 190 |
| ALLTEL Communications, Inc. (ACI) | | | | | | 120 | 175 | 174 | 160 | 175 | 188 |
| Primus Telecommunications, Inc. | | | | | | | | | | 219 | 183 |
| Talk America Inc. | | 180 | 232 | 305 | 426 | | 398 | 428 | 249 | 160 | 158 | 176 |
| Americatel Corporation | | | | | | 129 | 188 | 269 | 246 | 193 | 139 |
| Norlight Telecommunications, Inc. | | | | | | | 119 | 142 | 140 | 141 | 136 |
| Sum of Above Companies [f] | | | | | | | | | | | 65,258 |
| Toll Service Revenues of Above Companies | | | | | | | | | | | 58,537 |
| Incumbent Local Exchange Carriers [g] | 13,375 | 11,332 | 11,248 | 10,215 | 9,429 | 8,046 | | | | | |
| Other Toll Service Providers [9] | 9,626 | 10,709 | 14,765 | 13,029 | 15,783 | 16,647 | 20,827 | 16,702 | 12,797 | 12,034 | 11,561 |
| Total Toll Service Revenues [10] | $84,478 | $89,629 | $99,691 | $100,793 | $105,055 | $108,246 | $109,616 | $99,300 | $83,697 | $78,600 | $70,098 | [p] |

Note: Total toll service revenues include intrastate, interstate and international toll revenues. Also, some numbers for previous years have been revised for consistency with other reports.

[#] Some of the companies included non toll-related revenues in their annual submissions filed pursuant to section 43.21(c) of the Commission's rules.

[*] Regional Bell Operating Company's long distance subsidiaries.

[p] - preliminary

c - Confidential

Statistics of Communications Common Carriers

**Notes for Table 1.4 - 1.5.**

The revenue information for the larger long distance telephone companies, shown in Table 1.4, is reported and CFR 43.21(c) filings. The revenue information for large local exchange telephone companies is based on th (Automated Reporting Management Information System) Reports 43-02. The Commission also collects rev (Telecommunications Reporting Worksheet) and, in previous years, on FCC 431 (Telecommunications Rel (Universal Service Worksheet).Revenues for carriers that are not subject to the filing requirements under Pa estimated by the FCC staff based on carriers' filings of the FCC Forms 431, 457, and 499A.

**Company Notes**

[1]  ACC Long Distance Corp. and Teleport Communications Group merged in April of 1998, and the comb Communications Group, merged with AT&T Communications, Inc., in July of that year. AT&T Comm August 7, 1995 and began filing a consolidated revenue statement in 1996.

[2]  On July 21, 2002, WorldCom and substantially all of its U.S. subsidiaries filed voluntary petitions for rel the Southern District of New York under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On April 2 bankruptcy and merged with and into MCI whereby the separate existence of WorldCom ceased and MC

[3]  Includes revenue for long distance and data services.

[4]  Qwest Interprise America, Inc. is a subsidiary for out-of-region DSL (Digital Subscriber Line); and Qwes region long distance.

[5]  In November 2003, WilTel Communications, LLC became a wholly-owned, indirect subsidiary of Leuca longer files with the SEC (Securities & Exchange Commission) on a stand-alone basis.

[6]  Excludes operating revenues derived from non-communications (i.e., non-regulatory) operations.

[7]  Citizens Communications Company offers its ILEC services under the "Frontier" name, and its CLEC ser Inc. Both companies are wholly-owned subsidiaries of Citizens and were acquired, respectively, in June c

[8]  Operating revenue of Cincinnati Bell Any Distance Inc, a wholly-owned subsidiary of Cincinnati Bell Inc threshold for the calendar-year 2004.

[9] BCSI, Inc. sold all of its customers and all of its operating assets to C III Communications, LLC in June c
business and did not file revenue report pursuant to Part 43.21(c) of the Commission's Rules for the caler

[10] Operating revenue is below the indexed revenue threshold for the calendar-year 2004.

[11] ILECs' totals are shown separately through 1999 because they primarily carried intraLATA calls due, in p
the RBOCs by the 1984 Divesture agreement. By 2000 most local exchange customers could presubscrib
service and some RBOCs began to receive section 271 approval to provide interLATA toll services.

[12] Includes wireless toll service revenues reported by wireless carriers, toll service revenues reported by CL
reported by non-RBOC ILECs.

[13] Estimated by the FCC staff. Estimated total toll service revenues for the year 2004 includes about $3.5 bi

J Aderohe
2ND attempt

Table 9.1
Total Toll Service Revenues by Provider
(Dollar Amounts Shown in Millions)

| Company | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T Companies [1] | | | | | | | | | | | |
| AT&T Communications, Inc. | $37,166 | $38,069 | $39,264 | $39,470 | $40,551 | $39,680 | $37,646 | $33,310 | $27,094 | $22,418 | $22,243 |
| Alascom, Inc. | 329 | 325 | | | | | | | | | |
| Teleport Communications Group, Inc. | | | | | | 284 | 464 | 632 | 437 | 396 | 1,376 |
| ACC Long Distance Corp. | | | 118 | 122 | 123 | | | | | | |
| MCI Companies [2] | | | | | | | | | | | |
| MCI – L.D. Operations | | | | | | 22,192 | 23,431 | 22,554 | 21,259 | 17,659 | 16,062 | 11,602 |
| MCI Telecommunications Corp. | 11,715 | 14,617 | 16,372 | 17,150 | | | | | | | |
| WorldCom, Inc. | 2,221 | 3,640 | 4,485 | 5,897 | | | | | | | |
| Wiltel, Inc. | 917 | | | | | | | | | | |
| MFS Intelenet, Inc. | | 118 | 122 | | | | | | | | |
| Intermedia Communications, Inc. | | | | | | 380 | 516 | 444 | | | |
| Sprint Corporation - Long Distance Division | 6,805 | 7,277 | 7,944 | 8,595 | 7,994 | 9,708 | 9,038 | 8,424 | 7,077 | 6,326 | 5,900 |
| SBC Companies | | | | | | | | | | | |
| SBC Communications, Inc. [ILEC] [3] | | | | | | | 2,748 | 2,420 | 2,182 | 2,083 | 1,692 |
| SBC Long Distance, Inc.* | | | | | | | | 449 | 729 | 1,572 | 2,892 |
| SNET America, Inc.* | | | | 142 | 162 | 186 | 189 | 177 | 158 | 154 | 143 |
| Verizon Companies | | | | | | | | | | | |
| Bell Atlantic Comm, Inc. d/b/a Verizon Long Dist.* | | | | | | | 130 | 864 | 1,433 | 1,802 | 2,041 |
| Verizon Communications, Inc. [ILEC] [3] | | | | | | | 2,278 | 1,988 | 1,668 | 1,629 | 1,555 |
| Verizon Select Services, Inc. | | | | 340 | 607 | 834 | 1,004 | 509 | | 223 | 441 |
| NYNEX LD Co. d/b/a Verizon Enter. Solutions * | | | | | | | | | | 316 | 316 |
| Qwest Companies [4] | | | | | | | | | | | |
| Qwest Communications Corp.* | | | | | 320 | 517 | 1,773 | 2,309 | 3,202 | 2,824 | 3,307 |
| Qwest Communications, Inc. [ILEC] [3] | | | | | | | 374 | 264 | 175 | 124 | 78 |
| Qwest LD Corp. | | | | | | | | | | | 366 |
| Qwest Interprise America, Inc. | | | | | | | | | | | 339 |
| LCI Int'l Telecom Corp. d/b/a Qwest Comm. Svcs. * | 453 | 671 | 1,103 | 1,001 | 1,664 | 1,394 | 1,271 | 871 | | | |
| USLD Communications, Inc.* | 136 | 155 | 188 | 241 | 279 | 216 | | | | | |
| IDT Corporation | | | | | | 376 | 850 | 945 | 1,303 | 1,532 | 1,835 | 2,217 |
| Global Crossing Companies | | | | | | | | | | | |
| Global Crossing Bandwidth, Inc. | 144 | 127 | | 324 | 539 | 692 | 1,555 | 1,225 | 1,312 | 1,565 | 1,317 |
| Global Crossing Telecommunications, Inc. | 568 | 827 | 1,119 | 775 | 874 | 874 | 801 | 817 | 786 | 615 | 625 |
| Global Crossing North American Networks, Inc. | 306 | 309 | 323 | 223 | | | 196 | | | | |
| International Exchange Ntwks, Ltd. (IXnet, Inc.) | | | | | | | 131 | | | | |
| BellSouth Companies | | | | | | | | | | | |
| BellSouth Long Distance, Inc. * | | | | | | | | 294 | 486 | 928 | 1,483 |
| BellSouth Telecommunications, Inc. [ILEC] [3] | | | | | | | 466 | 412 | 341 | 341 | 268 |
| WilTel Communications, LLC [5] | | | | 227 | 126 | 184 | 413 | 593 | 737 | 1,112 | 1,302 |
| VarTec Companies | | | | | | | | | | | |
| VarTec Telecom, Inc. | 107 | 125 | 470 | 820 | 836 | 819 | 923 | 947 | 793 | 404 | c |
| Excel Telecommunications, Inc. | 156 | 363 | 1,091 | 1,179 | 1,219 | 942 | 703 | 611 | 427 | 665 | c |
| eMerius Communications, Inc. | 215 | 429 | 379 | 264 | 260 | 169 | | | | | |
| Long Distance Wholesale Club | | | 176 | 121 | 131 | | | | | | |
| Broadwing Communications, LLC | | | | | | | | | | 310 | 658 |
| Teleglobe America Inc. | | | | | | 275 | 557 | 282 | 208 | 269 | 409 | 508 |
| ITC^DeltaCom Cos. [6] | | | | | | | | | | | |
| ITC^DeltaCom Communications, Inc | | | | | 122 | 172 | 270 | 259 | 311 | 308 | 324 |
| Business Telecom, Inc. | | | 115 | 149 | 195 | 212 | 260 | 271 | 286 | 251 | 228 | 177 |
| Citizens Communications Cos. [7] | | | | | | | | | | | |
| Frontier Communications of America, Inc. | 133 | 121 | | | | | | | | | |
| Electric Lightwave, Inc. | | | | | | | 145 | 227 | 180 | 176 | 169 |
| General Communication, Inc. [8] | 106 | 120 | 143 | 158 | 175 | 184 | 211 | 238 | 227 | 263 | 283 |
| McLeodUSA Telecommunications Services, Inc. | | | | | | 232 | 448 | 463 | 358 | 274 | 225 |
| Evercom Systems, Inc. | | | | | | 205 | 206 | 245 | 239 | 184 | 206 |
| Level 3 Communications, LLC | | | | | | | | 160 | 131 | 134 | 190 |
| ALLTEL Communications, Inc. (ACI) | | | | | | 120 | 175 | 174 | 160 | 175 | 188 |
| Primus Telecommunications, Inc. | | | | | | | | | | 219 | 183 |
| Talk America Inc. | | | 180 | 232 | 305 | 426 | 398 | 428 | 249 | 160 | 158 | 176 |
| Americatel Corporation | | | | | | 129 | 188 | 269 | 246 | 193 | 139 |
| Norlight Telecommunications, Inc. | | | | | | | 119 | 142 | 140 | 141 | 136 |
| Sum of Above Companies | | | | | | | | | | | 65,258 |
| Toll Service Revenues of Above Companies | | | | | | | | | | | 58,537 |
| Incumbent Local Exchange Carriers [8] | 13,375 | 11,332 | 11,248 | 10,215 | 9,429 | 8,046 | | | | | |
| Other Toll Service Providers [9] | 9,626 | 10,709 | 14,765 | 13,029 | 15,783 | 16,647 | 20,827 | 16,702 | 12,797 | 12,034 | 11,561 |
| Total Toll Service Revenues [10] | $84,478 | $89,629 | $99,691 | $100,793 | $105,055 | $108,246 | $109,616 | $99,300 | $83,697 | $78,600 | $70,098 |

Note:  Total toll service revenues include intrastate, interstate and international toll revenues.  Also, some numbers for previous years have been revised for consistency with other reports.

 # Some of the companies included non toll-related revenues in their annual submissions filed pursuant to section 43.21(c) of the Commission's rules.

 * Regional Bell Operating Company's long distance subsidiaries.

9 - 6                    c - Confidential

Notes for Table 9.1

1 ACC Long Distance Corp. and Teleport Communications Group merged in April of 1998, and the combined company, Teleport Communications Group, merged with AT&T Communications, Inc., in July of that year. AT&T Communications acquired Alascom, Inc., August 7, 1995 and began filing a consolidated revenue statement in 1996.

2 On July 21, 2002, WorldCom and substantially all of its U.S. subsidiaries filed voluntary petitions for relief in the U.S. Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On April 20, 2004, WorldCom emerged from bankruptcy and merged with and into MCI whereby the separate existence of WorldCom ceased and MCI became the surviving company.

3 Includes revenue for long distance and data services.

4 Qwest Interprise America, Inc. is a subsidiary for out-of-region DSL (Digital Subscriber Line); and Qwest LD Corp. is a subsidiary for in-region long distance.

5 In November 2003, WilTel Communications, LLC became a wholly-owned, indirect subsidiary of Leucadia National Corporation. Thus, it longer files with the SEC (Securities & Exchange Commission) on a stand-alone basis.

6 Excludes operating revenues derived from non-communications (i.e., non-regulatory) operations.

7 Citizens Communications Company offers its ILEC services under the "Frontier" name, and its CLEC services through Electric Lightwave, Inc. Both companies are wholly-owned subsidiaries of Citizens and were acquired, respectively, in June of 2001 and on June 20, 2002.

8 Operating revenue of Cincinnati Bell Any Distance Inc, a wholly-owned subsidiary of Cincinnati Bell Inc, is below the indexed revenue threshold for the calendar-year 2004.

9 BCSI, Inc. sold all of its customers and all of its operating assets to C III Communications, LLC in June of 2003. As a result, it ceased doing business and did not file revenue report pursuant to § 43.21(e) of the Commission's Rules for the calendar-year 2004..

10 Operating revenue is below the indexed revenue threshold for the calendar-year 2004.

11 ILECs' totals are shown separately through 1999 because they primarily carried intraLATA calls due, in part, to the restrictions imposed on the RBOCs by the 1984 Divestiture agreement. By 2000 most local exchange customers could presubscribe to any carrier for intraLATA toll service and some RBOCs began to receive section 271 approval to provide interLATA toll services.

Includes wireless toll service revenues reported by wireless carriers, toll service revenues reported by CLECs, and toll service revenues reported by non-RBOC ILECs.

169

*J. Alexander current attempt (last updated) 4/27/06*

Table 9.1
Total Toll Service Revenues by Provider
(Dollar Amounts Shown in Millions)

| Company | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T Companies [1] | | | | | | | | | | | |
| AT&T Communications, Inc. | $37,166 | $38,069 | $39,264 | $39,470 | $40,551 | $39,680 | $37,646 | $33,310 | $27,094 | $22,418 | $22,243 |
| Alascom, Inc. | 329 | 325 | | | | | | | | | |
| Teleport Communications Group, Inc. | | | | | | 284 | 464 | 632 | 437 | 396 | 1,376 |
| ACC Long Distance Corp. | | | 118 | 122 | 123 | | | | | | |
| MCI Companies [2] | | | | | | | | | | | |
| MCI - L.D. Operations | | | | | 22,192 | 23,431 | 22,554 | 21,259 | 17,659 | 16,062 | 11,602 |
| MCI Telecommunications Corp. | 11,715 | 14,617 | 16,372 | 17,150 | | | | | | | |
| WorldCom, Inc. | 2,221 | 3,640 | 4,485 | 5,897 | | | | | | | |
| Wiltel, Inc. | 917 | | | | | | | | | | |
| MFS Intelenet, Inc. | | | 118 | 122 | | | | | | | |
| Intermedia Communications, Inc. | | | | | | 380 | 516 | 444 | | | |
| Sprint Corporation - Long Distance Division | 6,805 | 7,277 | 7,944 | 8,595 | 7,994 | 9,708 | 9,038 | 8,424 | 7,077 | 6,326 | 5,900 |
| SBC Companies | | | | | | | | | | | |
| SBC Communications, Inc. [ILEC] [3] | | | | | | | 2,748 | 2,420 | 2,182 | 2,083 | 1,692 |
| SBC Long Distance, Inc.* | | | | | | | | 449 | 729 | 1,572 | 2,892 |
| SNET America, Inc.* | | | | 142 | 162 | 186 | 189 | 177 | 158 | 154 | 143 |
| Verizon Companies | | | | | | | | | | | |
| Bell Atlantic Comm, Inc. d/b/a Verizon Long Dist.* | | | | | | | 130 | 864 | 1,433 | 1,802 | 2,041 |
| Verizon Communications, Inc. [ILEC] [3] | | | | | | | 2,278 | 1,988 | 1,668 | 1,629 | 1,555 |
| Verizon Select Services, Inc. | | | | 340 | 607 | 834 | 1,004 | 509 | | 223 | 441 |
| NYNEX LD Co. d/b/a Verizon Enter. Solutions * | | | | | | | | | | 316 | 316 |
| Qwest Companies [4] | | | | | | | | | | | |
| Qwest Communications Corp.* | | | | | 320 | 517 | 1,773 | 2,309 | 3,202 | 2,824 | 3,307 |
| Qwest Communications, Inc. [ILEC] [3] | | | | | | | 374 | 264 | 175 | 124 | 78 |
| Qwest LD Corp. | | | | | | | | | | | 366 |
| Qwest Interprise America, Inc. | | | | | | | | | | | 339 |
| LCI Int'l Telecom Corp. d/b/a Qwest Comm. Svcs. * | 453 | 671 | 1,103 | 1,001 | 1,664 | 1,394 | 1,271 | 871 | | | |
| US LD Communications, Inc.* | 136 | 155 | 188 | 241 | 279 | 216 | | | | | |
| IDT Corporation | | | | | 376 | 850 | 945 | 1,303 | 1,532 | 1,835 | 2,217 |
| Global Crossing Companies | | | | | | | | | | | |
| Global Crossing Bandwidth, Inc. | 144 | 127 | | 324 | 539 | 692 | 1,555 | 1,225 | 1,312 | 1,565 | 1,317 |
| Global Crossing Telecommunications, Inc. | 568 | 827 | 1,119 | 775 | 874 | 874 | 801 | 817 | 786 | 615 | 625 |
| Global Crossing North American Networks, Inc. | 306 | 309 | 323 | 223 | | | 196 | | | | |
| International Exchange Ntwks, Ltd. (IXnet, Inc.) | | | | | | | 131 | | | | |
| BellSouth Companies | | | | | | | | | | | |
| BellSouth Long Distance, Inc. * | | | | | | | | 294 | 486 | 928 | 1,483 |
| BellSouth Telecommunications, Inc. [ILEC] [3] | | | | | | | 466 | 412 | 341 | 341 | 268 |
| WilTel Communications, LLC [5] | | | | | 227 | 126 | 184 | 413 | 593 | 737 | 1,112 | 1,302 |
| VarTec Companies | | | | | | | | | | | |
| VarTec Telecom, Inc. | 107 | 125 | 470 | 820 | 836 | 819 | 923 | 947 | 793 | 404 | c |
| Excel Telecommunications, Inc. | 156 | 363 | 1,091 | 1,179 | 1,219 | 942 | 703 | 611 | 427 | 665 | c |
| eMeritus Communications, Inc. | 215 | 429 | 379 | 264 | 260 | 169 | | | | | |
| Long Distance Wholesale Club | | | 176 | 121 | 131 | | | | | | |
| Broadwing Communications, LLC | | | | | | | | | | 310 | 658 |
| Teleglobe America Inc. | | | | | | 275 | 557 | 282 | 208 | 269 | 409 | 508 |
| ITC^DeltaCom Cos. [6] | | | | | | | | | | | |
| ITC^DeltaCom Communications, Inc | | | | | 122 | 172 | 270 | 259 | 311 | 308 | 324 |
| Business Telecom, Inc. | | | 115 | 149 | 195 | 212 | 260 | 271 | 286 | 251 | 228 | 177 |
| Citizens Communications Cos. [7] | | | | | | | | | | | |
| Frontier Communications of America, Inc. | 133 | 121 | | | | | | | | | 193 |
| Electric Lightwave, Inc. | | | | | | | 145 | 227 | 180 | 176 | 169 |
| General Communication, Inc. [8] | 106 | 120 | 143 | 158 | 175 | 184 | 211 | 238 | 227 | 263 | 283 |
| McLeodUSA Telecommunications Services, Inc. | | | | | | | 232 | 448 | 463 | 358 | 274 | 225 |
| Evercom Systems, Inc. | | | | | | 205 | 206 | 245 | 239 | 184 | 206 |
| Level 3 Communications, LLC | | | | | | | | 160 | 131 | 134 | 190 |
| ALLTEL Communications, Inc. (ACI) | | | | | | 120 | 175 | 174 | 160 | 175 | 188 |
| Primus Telecommunications, Inc. | | | | | | | | | | 219 | 183 |
| Talk America Inc. | | | 180 | 232 | 305 | 426 | 398 | 428 | 249 | 160 | 158 | 176 |
| Americatel Corporation | | | | | | | 129 | 188 | 269 | 246 | 193 | 139 |
| Norlight Telecommunications, Inc. | | | | | | | 119 | 142 | 140 | 141 | 136 |
| Sum of Above Companies [a] | | | | | | | | | | | 65,258 |
| Toll Service Revenues of Above Companies | | | | | | | | | | | 58,537 |
| Incumbent Local Exchange Carriers [8] | 13,375 | 11,332 | 11,248 | 10,215 | 9,429 | 8,046 | | | | | |
| Other Toll Service Providers [9] | 9,626 | 10,709 | 14,765 | 13,029 | 15,783 | 16,647 | 20,827 | 16,702 | 12,797 | 12,034 | 11,561 |
| Total Toll Service Revenues [10] | $84,478 | $89,629 | $99,691 | $100,793 | $105,055 | $108,246 | $109,616 | $99,300 | $83,697 | $78,600 | $70,098 |

Note: Total toll service revenues include intrastate, interstate and international toll revenues. Also, some numbers for previous years have been revised for consistency with other reports.
[a] Some of the companies included non toll-related revenues in their annual submissions filed pursuant to section 43.21(c) of the Commission's rules.
* Regional Bell Operating Company's long distance subsidiaries.

c - Confidential

9-6

Notes for Table 9.1

1  ACC Long Distance Corp. and Teleport Communications Group merged in April of 1998, and the combined company, Teleport Communications Group, merged with AT&T Communications, Inc., in July of that year. AT&T Communications acquired Alascom, Inc., August 7, 1995 and began filing a consolidated revenue statement in 1996.

2  On July 21, 2002, WorldCom and substantially all of its U.S. subsidiaries filed voluntary petitions for relief in the U.S. Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On April 20, 2004, WorldCom emerged from bankruptcy and merged with and into MCI whereby the separate existence of WorldCom ceased and MCI became the surviving company.

3  Includes revenue for long distance and data services.

4  Qwest Interprise America, Inc. is a subsidiary for out-of-region DSL (Digital Subscriber Line); and Qwest LD Corp. is a subsidiary for in-region long distance.

5  In November 2003, WilTel Communications, LLC became a wholly-owned, indirect subsidiary of Leucadia National Corporation. Thus, it longer files with the SEC (Securities & Exchange Commission) on a stand-alone basis.

6  Excludes operating revenues derived from non-communications (i.e., non-regulatory) operations.

7  Citizens Communications Company offers its ILEC services under the "Frontier" name, and its CLEC services through Electric Lightwave, Inc. Both companies are wholly-owned subsidiaries of Citizens and were acquired, respectively, in June of 2001 and on June 20, 2002.

8  Operating revenue of Cincinnati Bell Any Distance Inc, a wholly-owned subsidiary of Cincinnati Bell Inc, is below the indexed revenue threshold for the calendar-year 2004.

9  BCSI, Inc. sold all of its customers and all of its operating assets to C III Communications, LLC in June of 2003. As a result, it ceased doing business and did not file revenue report pursuant to § 43.21(c) of the Commission's Rules for the calendar-year 2004..

10  Operating revenue is below the indexed revenue threshold for the calendar-year 2004.

11  ILECs' totals are shown separately through 1999 because they primarily carried intraLATA calls due, in part, to the restrictions imposed on the RBOCs by the 1984 Divestiture agreement. By 2000 most local exchange customers could presubscribe to any carrier for intraLATA toll service and some RBOCs began to receive section 271 approval to provide interLATA toll services.

Includes wireless toll service revenues reported by wireless carriers, toll service revenues reported by CLECs, and toll service revenues reported by non-RBOC ILECs.

Table 9.1
Total Toll Service Revenues by Provider [#]
(Dollar Amounts Shown in Millions)

*(handwritten: AF Feldman / Verizon (this took about 20 minutes to generate)*

| Company | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T Companies [1] | | | | | | | | | | | |
| AT&T Communications, Inc. | $37,166 | $38,069 | $39,264 | $39,470 | $40,551 | $39,680 | $37,646 | $33,310 | $27,094 | $22,418 | $22,243 |
| Alascom, Inc. | 329 | 325 | | | | | | | | | |
| Teleport Communications Group, Inc. | | | | | | 284 | 464 | 632 | 437 | 396 | 1,376 |
| ACC Long Distance Corp. | | | 118 | 122 | 123 | | | | | | |
| MCI Companies [2] | | | | | | | | | | | |
| MCI - L.D. Operations | | | | | 22,192 | 23,431 | 22,554 | 21,259 | 17,659 | 16,062 | 11,602 |
| MCI Telecommunications Corp. | 11,715 | 14,617 | 16,372 | 17,150 | | | | | | | |
| WorldCom, Inc. | 2,221 | 3,640 | 4,485 | 5,897 | | | | | | | |
| Wiltel, Inc. | 917 | | | | | | | | | | |
| MFS Intelenet, Inc. | | | 118 | 122 | | | | | | | |
| Intermedia Communications, Inc. | | | | | 380 | 516 | 444 | | | | |
| Sprint Corporation - Long Distance Division | 6,805 | 7,277 | 7,944 | 8,595 | 7,994 | 9,708 | 9,038 | 8,424 | 7,077 | 6,326 | 5,900 |
| SBC Companies | | | | | | | | | | | |
| SBC Communications, Inc. [ILEC] [3] | | | | | | | 2,748 | 2,420 | 2,182 | 2,083 | 1,692 |
| SBC Long Distance, Inc.* | | | | | | | | 449 | 729 | 1,572 | 2,892 |
| SNET America, Inc.* | | | | 142 | 162 | 186 | 189 | 177 | 158 | 154 | 143 |
| Verizon Companies | | | | | | | | | | | |
| Bell Atlantic Comm, Inc. d/b/a Verizon Long Dist.* | | | | | | | 130 | 864 | 1,433 | 1,802 | 2,041 |
| Verizon Communications, Inc. [ILEC] [3] | | | | | | | 2,278 | 1,988 | 1,668 | 1,629 | 1,555 |
| Verizon Select Services, Inc. | | | | | 340 | 607 | 834 | 1,004 | 509 | 223 | 441 |
| NYNEX LD Co. d/b/a Verizon Enter. Solutions * | | | | | | | | | | 316 | 316 |
| Qwest Companies [4] | | | | | | | | | | | |
| Qwest Communications Corp.* | | | | | 320 | 517 | 1,773 | 2,309 | 3,202 | 2,824 | 3,307 |
| Qwest Communications, Inc. [ILEC] [3] | | | | | | | 374 | 264 | 175 | 124 | 78 |
| Qwest LD Corp. | | | | | | | | | | | 366 |
| Qwest Interprise America, Inc. | | | | | | | | | | | 339 |
| LCI Int'l Telecom Corp. d/b/a Qwest Comm. Svcs. * | 453 | 671 | 1,103 | 1,001 | 1,664 | 1,394 | 1,271 | 871 | | | |
| USLD Communications, Inc.* | 136 | 155 | 188 | 241 | 279 | 216 | | | | | |
| IDT Corporation | | | | | 376 | 850 | 945 | 1,303 | 1,532 | 1,835 | 2,217 |
| Global Crossing Companies | | | | | | | | | | | |
| Global Crossing Bandwidth, Inc. | 144 | 127 | | 324 | 539 | 692 | 1,555 | 1,225 | 1,312 | 1,565 | 1,317 |
| Global Crossing Telecommunications, Inc. | 568 | 827 | 1,119 | 775 | 874 | 874 | 801 | 817 | 786 | 615 | 625 |
| Global Crossing North American Networks, Inc. | 306 | 309 | 323 | 223 | | | 196 | | | | |
| International Exchange Ntwks, Ltd. (IXnet, Inc.) | | | | | | | 131 | | | | |
| BellSouth Companies | | | | | | | | | | | |
| BellSouth Long Distance, Inc. * | | | | | | | | 294 | 486 | 928 | 1,483 |
| BellSouth Telecommunications, Inc. [ILEC] [3] | | | | | | | 466 | 412 | 341 | 341 | 268 |
| WilTel Communications, LLC [5] | | | | 227 | 126 | 184 | 413 | 593 | 737 | 1,112 | 1,302 |
| VarTec Companies | | | | | | | | | | | |
| VarTec Telecom, Inc. | 107 | 125 | 470 | 820 | 836 | 819 | 923 | 947 | 793 | 404 | c |
| Excel Telecommunications, Inc. | 156 | 363 | 1,091 | 1,179 | 1,219 | 942 | 703 | 611 | 427 | 665 | c |
| eMeritus Communications, Inc. | 215 | 429 | 379 | 264 | 260 | 169 | | | | | |
| Long Distance Wholesale Club | | | 176 | 121 | 131 | | | | | | |
| Broadwing Communications, LLC | | | | | | | | | | 310 | 658 |
| Teleglobe America Inc. | | | | | 275 | 557 | 282 | 208 | 269 | 409 | 508 |
| ITC^DeltaCom Cos. [6] | | | | | | | | | | | |
| ITC^DeltaCom Communications, Inc | | | | | 122 | 172 | 270 | 259 | 311 | 308 | 324 |
| Business Telecom, Inc. | | | 115 | 149 | 195 | 212 | 260 | 271 | 286 | 251 | 177 |
| Citizens Communications Cos. [7] | | | | | | | | | | | |
| Frontier Communications of America, Inc. | 133 | 121 | | | | | | 145 | 227 | 180 | 193 |
| Electric Lightwave, Inc. | | | | | | | | | | | 169 |
| General Communication, Inc. [8] | 106 | 120 | 143 | 158 | 175 | | 184 | 211 | 238 | 227 | 263 | 283 |
| McLeodUSA Telecommunications Services, Inc. | | | | | | | 232 | 448 | 463 | 358 | 274 | 225 |
| Evercom Systems, Inc. | | | | | | 205 | 206 | 245 | 239 | 184 | 206 |
| Level 3 Communications, LLC | | | | | | | | 160 | 131 | 134 | 190 |
| ALLTEL Communications, Inc. (ACI) | | | | | | | 120 | 175 | 174 | 160 | 175 | 188 |
| Primus Telecommunications, Inc. | | | | | | | | | | 219 | 183 |
| Talk America Inc. | | | 180 | 232 | 305 | 426 | 398 | 428 | 249 | 160 | 158 | 176 |
| Americatel Corporation | | | | | | | 129 | 188 | 269 | 246 | 193 | 139 |
| Norlight Telecommunications, Inc. | | | | | | | 119 | 142 | 140 | 141 | 136 |
| Sum of Above Companies [#] | | | | | | | | | | | 65,258 |
| Toll Service Revenues of Above Companies | | | | | | | | | | | 58,537 |
| Incumbent Local Exchange Carriers [§] | 13,375 | 11,332 | 11,248 | 10,215 | 9,429 | 8,046 | | | | | |
| Other Toll Service Providers [9] | 9,626 | 10,709 | 14,765 | 13,029 | 15,783 | 16,647 | 20,827 | 16,702 | 12,797 | 12,034 | 11,561 |
| Total Toll Service Revenues [10] | $84,478 | $89,629 | $99,691 | $100,793 | $105,055 | $108,246 | $109,616 | $99,300 | $83,697 | $78,600 | $70,098 |

Note:  Total toll service revenues include intrastate, interstate and international toll revenues.  Also, some numbers for previous years have been revised for consistency with other reports.
[#]  Some of the companies included non toll-related revenues in their annual submissions filed pursuant to section 43.21(c) of the Commission's rules.
*  Regional Bell Operating Company's long distance subsidiaries.                    c - Confidential

Notes for Table 9.1.

The revenue information for the larger long distance telephone companies, shown in Table 9.1, is reported annually to the FCC pursuant to 47 CFR 43.21(c) filings. The revenue information for large local exchange telephone companies is based on the annual filings of ARMIS (Automated Reporting Management Information System) Reports 43-02. The Commission also collects revenue information on FCC Form 499-A (Telecommunications Reporting Worksheet) and, in previous years, on FCC Forms 431 (Telecommunications Relay Service Worksheet) and 457 (Universal Service Worksheet). Revenues for carriers that are not subject to the filing requirements under § 43.21(c), or ARMIS Reports, are estimated by the FCC staff based on carriers' filings of the FCC Forms 431, 457, and 499-A.

Company Notes

[1] On November 18, 2005, SBC Communications Inc. (SBC) merged with AT&T Corp. (ATTC). Following the merger, the company changed its name from "SBC Communications Inc." to "AT&T Inc." and began marketing its services and products, brand names as well as several other brands including Cingular Wireless (Cingular), through its joint venture with BellSouth Corp., under the AT&T. In 2005, AT&T Inc. began filing a consolidated operating revenue and communications plant report for SBC Long Distance, LLC, AT&T Communications, Inc., including AT&T Alascom. Inc. and Teleport Communications, Group, Inc. and its subsidiary, and its subsidiary, ACC Corp.

[2] On July 21, 2002, WorldCom and substantially all of its U.S. subsidiaries filed voluntary petitions for relief in the U.S. Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the U.S. Bankruptcy Code. On April 20, 2004, WorldCom emerged from bankruptcy and merged with and into MCI whereby the separate existence of WorldCom ceased and MCI became the surviving company.

[3] For the years 1994 - 1999, the RBOC ILEC toll service revenues are included in total ILEC toll revenues.

[4] Qwest Interprise America, Inc. is a subsidiary for out-of-region DSL (digital subscriber line); and Qwest LD Corp. is a subsidiary for in-region long distance.

[5] In November 2003, WilTel Communications, LLC became a wholly-owned, indirect subsidiary of Leucadia National Corporation. Thus, it no longer files with the SEC (Securities & Exchange Commission) on a stand-alone basis.

[6] In October 2004, ITC^DeltaCom completed its acquisition (begun in July 2003) of BTI Telecom Corp. outstanding common stock.

[7] Frontier was acquired by Citizens Communications Company in June of 2001 and Electric Lightwave on June 20, 2002.

[8] ILECs' totals are shown separately through 1999 because they primarily carried intraLATA calls due, in part, to the restrictions imposed on the RBOCs by the 1984 Divestiture agreement. By 2000 most local exchange customers could presubscribe to any carrier for intraLATA toll service and some RBOCs began to receive section 271 approval to provide interLATA toll services.

[9] Includes wireless toll service revenues reported by wireless carriers, toll service revenues reported by CLECs, and toll service revenues reported by non-RBOC ILECs.

[10] Estimated by the FCC staff.

/13

**Alan Feldman**

| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Wednesday, January 14, 1998 7:17 AM |
| **To:** | AFELDMAN |
| **Cc:** | TBEERS; PWYNNS |
| **Subject:** | SOCC table instructions -Reply |

Text item: Message Text

Alan, this was an oversight on my part and not intentional. The instructions for Tables 2.7, 2.8 and Part 3 do not need any updates. I will try to give you the instructions for Parts 5 and 7 either today or latest tomorrow morning, and am working on them now. Sorry for the delay.

John

>>> Alan Feldman 01/14/98 07:28am >>>
John,
    At our last SOCC meeting, which was held around the middle of December, I asked everyone in the SOCC group to update the table instructions for the tables they had completed and also to update the section in their table instructions pertaining to final book editing that documents which items to check and compare within the table as well as which items to compare with items
in other tables.    The book's production had just been completed and the procedures for doing tables should have been fresh in everyone's mind, especially with all the last minute problems we had.  I requested the updates as soon as possible, although no deadline was given.
    I sent an email reminder to everyone in the group on Jan. 7, 1998 and set a deadline for close of business, Monday Jan. 12.   You're the only one in the group I haven't received anything from.  You should be aware that it is very important when assignments are given that work is completed and schedules and deadlines are met.
    Your table instructions, as well as the final edit procedures, should be easy to update so that they reflect accurate procedures for generating correct tables.  Please let me know today why you haven't been able to complete this assignment and when you will be able to complete it.    Thanks
    Alan

/14

**Alan Feldman**

From:           John Adesalu
Sent:           Tuesday, December 22, 1998 6:48 AM
To:             AFELDMAN
Subject:        socc instructions -Forwarded -Reply -Reply -Reply -Reply -Reply

Text item: Message Text

Alan, per our discussion this morning, attached is the revised basic SOCC instructions
file. I have added the "short-cut'' method to the section on Table 2.10. Let me know if
there is a problem. Thanks

John

>>> Alan Feldman 12/22/98 09:03am >>>
John,
    I'm not interested in skinning cats. What I expect from you, similar to everyone else
working on the SOCC book, is the latest and most up-to-date instructions for completing
the tables that you were responsible for. Adrianne Brent, before retiring, revised (and
greatly simplified) the automated process for doing tables 2.2, 2.4, 2.5, 2.6, and 2.10.
Her newly developed process enables completion of those tables with up-to-date data from
the ARMIS database in hours as opposed to days or even weeks.
    Adrianne's automated procedure (which she explained to you before she retired), with
any modifications you made, is presumably the most current and efficient one. That
process should be reflected in the 3-D spreadsheets she developed and placed on the J
drive's SOCC directory and should have been the
process you utilized to complete those tables. That new process is the one I
want instructions for, not one developed and documented years ago which will no longer be
used.
    Please let me know when up-to-date new instructions will be completed so that I can
finally incorporate them with the rest of the SOCC instructions. We
need to get ready for the next book. Thanks,     Alan

>>> John Adesalu 12/21/98 05:30pm >>>
Alan, I have reattached the correct SOCC basic instructions file. Note that these are
basic instructions and do not contain the "short-cut" methods
because: "There are many ways to skin a cat." My short-cut method for doing Part 2, for
example, may be different from how you or others will do it. For this reason, I left the
basics of the instructions intact. The fundamentals for doing the tables have not changed
from the initial instructions. The only thing that has changed is the efficiency (i.e.,
the short-cut) that is gained from the experience in doing them (i.e., the tables)
everytime.

John

>>> Alan Feldman 12/17/98 11:56am >>>
John,  I see no difference between the file you sent me and the file I sent you to be
revised. Are you telling me there are no revisions to your table's instructions (which
doesn't seem possible) or did you attach the wrong file to
your email?     Alan

>>> John Adesalu 12/16/98 01:27pm >>>
Alan, per my response yesterday, attached is the SOCC basic instructions file in WP. Sorry
for its lateness.

John

>>> Alan Feldman 12/15/98 03:59pm >>>
John,
    I've received revised instructions from everyone but you. They were due last Tuesday.
When can I expect your revisions?
    Alan

1

/15

## Alan Feldman

**From:**    John Adesalu
**Sent:**    Tuesday, January 11, 2005 3:56 PM
**To:**      Alan Feldman
**Subject:** RE: SOCC Instructions

Alan, I am working on them and should finish soon. Please allow me until this Friday to give them to you. Sorry for the lateness. Thanks!

John B. Adesalu

\*\*\* Non-Public: For Internal Use Only \*\*\*

　　　　-----Original Message-----
**From:** Alan Feldman
**Sent:** Tuesday, January 11, 2005 2:15 PM
**To:** John Adesalu
**Subject:** RE: SOCC Instructions

John,  Where are the instructions that were due last Friday?  If they're not done, when will they be completed?  Alan


　　　　\*\*\* Non-Public: For Internal Use Only \*\*\*

　　　　　　-----Original Message-----
**From:** Alan Feldman
**Sent:** Wednesday, December 15, 2004 4:20 PM
**To:** Katie Rangos; John Adesalu; Mike Lehner
**Subject:** SOCC Instructions

I think it's time we refresh our SOCC table-preparation instructions.  Please think about how you compiled your SOCC tables, including the types of editing checking necessary, and provide detailed written instructions so that others can understand and, if necessary, pick up the work should the need arise.  In addition, you should include instructions on the final editing process so that it is clear which items need to be checked and compared within the tables as well as which items need to be compared to items in other tables.  I would like to see these written instructions by COB, Friday, Jan. 7, 2005.  That should be more than enough time to complete this assignment and not interfere with your end of year vacation plans.  Please get with me this week if this assignment poses any problem or if you need any guidance on the level of detail that should be provided.   Thanks,   Alan


　　　　\*\*\* Non-Public: For Internal Use Only \*\*\*

## Alan Feldman

| | |
|---|---|
| **From:** | Peyton Wynns |
| **Sent:** | Thursday, March 23, 2000 4:12 PM |
| **To:** | John Adesalu |
| **Cc:** | Alan Feldman; Thomas Beers |
| **Subject:** | Re: Meeting! |

Text item: Message Text

John, please see bold below.   Peyton

>>> John Adesalu 03/20/00 04:16PM >>>
Peyton, I read your e-mail this morning because I left early, at 1:00 P.M., on Friday for
medical reason. These are my answers to your response:

(1) I have met with Alan via my mid-year performance review meeting with him last Monday.
During the meeting, I alluded to the research project and it was also listed among my
accomplishments. But I can meet with him on it again if you so ordered.  Trust you have
already talked to Alan.  But, if not, you should do so.  Discussing your research with him
requires more than "alluding" to it during a recent performance review and if meeting with
your immediate supervisor requires more explicit direction, please consider it "so
ordered."

(2) Since the research findings will be addressed to the general audience in the
Commission, mostly non-economists, I have decided to present a non-technical, simply
analytical research project. And I have attached a synopsis of the research project and a
data-file to show how far I have gone on data collection. Again, I can turn the research
into a technical paper, if you so ordered. Then, I have to send you another proposal which
is readily available upon your request.  I think the research, whether the results are
presented to a general audience or a technical audience, needs to be more clearly defined
than in your synopsis so it would indeed be helpful to see the outline.  But as you
indicate your other, and more technical,  proposal is readily available, please go ahead
and let me have it Friday morning and I will take it with me.

(3) Regarding DSL, Judy suggested that I include in the table references to the
transmittal letters, and I am working on that. Also, Alan made some editorial suggestions
which I am working on. But I have to do these things in tandem with other demands on my
time within the constraint of 8-hour schedule.  Thanks for sending the revised DSL
spreadsheet today, I look forward to reading it.

(4) Yes, I agree that I can accomplish both tasks in tandem. It's 4:15 P.M. and I have to
go. Please advise of your reaction to the whole thing. Thanks

John


Regarding the spreadsheet you attached, I have a couple of quick initial
questions:  What definition of small telephone company are you using?  So far as I know
there are only about 1400 LECS.  What lines of business are the other companies in and why
are those companies of interest?

Peyton

>>> Peyton Wynns 03/17/00 02:43PM >>>
John,

Cannot do it Monday.  It will have to be later in the week.

First, you should talk to Alan.

Regarding your first choice of research area, small telcos, if we get together later in
the week, I would like to concentrate on the  issues or questions you selected  as the
focus of your research and the specific hypotheses you were

1

planning to test.   Once those are pinned down and the specific data you seek
are identified,  perhaps others around here can make some suggestions on where you can the
necessary data.  Also, I think it would be useful for me to see your outline--or in
essence, research proposal--to get a better feel for how you are proceeding before you
abandon your first choice.  And I am sure Alan would find it useful too.  Maybe you can
email what you have worked up so far to us this afternoon and we can take a look this
weekend.  Don't worry if the
stuff is rough draft or the outline is not fully formed.   Simply a clear
statement of the specific issues and hypothesis should be helpful.

Regarding internet and state taxation, that is simply not in the FCC's jurisdiction so
skip that.  Regarding DSL, advanced services is a worthy area but I hate to see you
abandon the small telco area yet.  I would love to see your spreadsheet get in final form
and issued.  I assume you have incorporated edits already.  I know Alan had some and
assume you received some from Judy as well.  If you haven't heard back from CPD yet, you
need to pin them down on a date for a response.  Anyway, if you can me a hard copy of its
current version this afternoon, I will try to take it with me too.  And let me know a bit
more about what you had in mind on further analysis.  Probably no reason you can't do both
the small company research and some on DSLs too.

Have a great weekend.

Peyton

>>> John Adesalu 03/17/00 11:40AM >>>
Peyton, can I have a meeting with you on Monday, the 20th, to discuss some new ideas for a
research project and/or report, in light of my frustration (lack of
progress!) on small telephone companies due to the lack of data.

The new ideas are briefly (1) new research topic, such as providing an economic analysis
on the controversial e-commerce and state sales tax; and/or (2) to provide a broadened
Report on the DSL since we are planning to put the table online. Thanks

John

**Alan Feldman**

**From:**        Peyton Wynns
**Sent:**        Monday, January 31, 2000 3:35 AM
**To:**          JOHNA
**Cc:**          ALAN; TOM
**Subject:**     Re: Research project!

Text item: Message Text

Thanks, John for the update.  It reminds me, I meant to send some thoughts on a couple of items as I caught up a little.

1.  Regarding your question on herfs,  I am wondering what you came up with?

2.  Regarding the ADSL update, assuming you have incorporated any comments and corrections and nobody has objected  to making it available, I assume its ready to release.  Please go ahead and make sure CPD folks agree with your draft cover/disclaimer page and that it looks O.K. to  John B. and Alan and lets go forward.

3.  My response is a little more complicated on your e-mails on affirmation of a research area and, particularly, on your question on what you "hope to achieve from this. That is, would the research project result in a career advancement (i.e., a promotion) for me, or it would be just a-tail-wagging-the-dog (merely academic) exercise?"

Certainly, the economics of service to areas served by small telephone companies--and the economic characteristics and performance of small companies--is an important subject and one of the many we discussed as possible subjects of further research.

All of our research efforts should be aimed at producing useful information to assist the Commission in understanding the industry it oversees and evaluating the regulatory decisions it faces.  Regarding your proposed research,  you need to tell us what challenging problems you wish to examine,  what hypotheses you hope to test, what you hope to learn, how you expect it will benefit rational decision making, etc.  In short, I cannot tell you what you hope to achieve from a research project you propose.

I fear that your question seems to imply that worthy research conducted by a professional must be guaranteed to lead to promotion or it is "just a tail-wagging-the- dog exercise."   If so, I think this indicates a misunderstanding of what is expected from  a GS-13 professional economist.

Of course, I hope that work and research undertaken as part of your job is both rewarding and challenging.   As you were selected for and hold a GS-13 position, research is expected as part of your current job.  As I have indicated to you, completion of research that is part of your current job responsibility does not justify promotion.  To become a GS-14,  you will need to either perform such a substantial amount of creative and advanced work as to clearly establish that you are actually performing primarily GS-14 rather than GS-13 work (in which case,  promotion through accretion of duties could be considered);  or find a GS-14 opening, apply for it, and be selected as the strongest candidate.

I certainly cannot give you assurances that any discrete research project would ensure a conclusion that you are performing at a GS-14 level rather than simply performing the work that is expected  as a GS-13.  It is up to you to demonstrate the former through your performance here.  Perhaps this research project will provide you with such an opportunity, but it would be improper for me to say that it will, especially as I am still unclear from your e-mail about your project's scope, goals, value, etc.

Certainly, I think it would be valuable if you begin by developing an outline of your proposal, and perhaps following up by approaching your colleagues here in the Division and elsewhere in the Commission to get their reaction to it. Probably a good sense of what you would like the research to accomplish is in order before you begin to go very far in

1

constructing a database.

Your most recent exchange of mail with Alan, raises two additional issues. First, I agree with you that data is crucial to any empirical work. You suggest that this will be explained in the report . Rather than leaving that matter to be explained in the report, I think this needs to be addressed early: What data do you need to analyze the specific questions you wish to address? Certainly you need to establish this before embarking on the effort needed to establish a new database. Second, you say that your analysis "will not include issues such as high cost/universal service, etc.---too controversial and are normative economics." It seems to me that these are among the most challenging and important issues facing the commission and again raises the question, if you are not going to include those issues, what specifically are you going to address?

I hope these thoughts are helpful.

Peyton


>>> John Adesalu 01/27 12:18 PM >>>
Fyi, and for the record, I am currently engaged in a research project to analyze the market for the small U.S. telephone companies. My initial analysis will attempt to use the Structure, Conduct and Performance (SCP) paradigm to analyze this market. The motivation for this project came as a sequel of my meetings with Peyton. Presently, I am in the process of building my database for the project. Thanks

John


Forwarded:

From: Peyton Wynns
Subject: Re: herfs
Date: Thu, 13 Jan 2000 17:58:00
cc: Alan Feldman
John, I don't remember. If no one has chimed in with an answer, maybe you can let us know. Should be quick and easy to find out. I would guess the answer would be in Hirschman's 1964 AER piece. Peyton

>>> John Adesalu 01/12 11:40 AM >>>
Jim, interesting and will attend. But some people call it the Herfindahl-Hirchman Index (HHI). Why?, I don't know. I have always known it as simply the Herfindahl Index. Thanks

John


>>> James Lande 01/12/00 11:11AM >>>
I have reserved 3-B516 for this Friday for 12:00 to 1:30 for anyone who wants to discuss Herfendahl indexes with a slant to the announced Sprint - MCI
merger.. Bring your lunch. Nick Jordan from DOJ has been invited


Forwarded:

From: Peyton Wynns
Subject: Fwd: Re: ADSL update
Date: Fri, 21 Jan 2000 09:20:00
cc: Alan Feldman
John--

Glad to hear that Mark has apparently found the summary useful and wants to further distribute it.

My initial reaction is fine, and that we could even put it on the web for external access provided that you create appropriate disclaimers--like "initial staff draft summary"--but first lets ask others, especially your supervisor and our broadband experts, as I have not yet looked at the latest version carefully.

2

120

Tom, John B, Linda, thoughts?

Peyton

Forwarded:

From: John Adesalu
Subject: Fwd: Re: ADSL update
Date: Fri, 21 Jan 2000 08:14:00
To: Peyton Wynns
Peyton, I am forwarding the attachment to you for your approval. Thanks

John


Forwarded:

From: Mark Uretsky
Subject: Re: ADSL update
Date: Wed, 19 Jan 2000 16:38:00
To: John Adesalu
John,
Can these files be distributed outside the agency or are they for internal distribution
only? Mark

>>> John Adesalu 01/18/00 11:58AM >>>
Updated (4th. revision) file of ADSL offerings is attached. It is a Lotus 1-2-3 file.

John


Forwarded:

From: John Adesalu
Subject: Affirmation!
Date: Wed, 12 Jan 2000 11:19:00
To: Peyton Wynns
Peyton, as a sequel to our last meeting on Dec. 12, 1999, I have decided to do a research
project on the U.S. Small Telephone Companies (SIC Code 4813) as suggested by you, among
other topics. But before advancing  further and/or informing others in the "tri-partite"
(Alan and Tom) on this, I would like to know from you what I hope to achieve from this.
That is, would the research project result in a career advancement (i.e., a promotion) for
me, or it would be just a-tail-wagging-the-dog (merely academic) exercise? For your
information, I have started a preliminary work (i.e., data collection, etc.) on the topic.

I asked you this question because I have had three discussion meetings, with my
accomplishments, with you at my requests on my lack of progress in your division without
any result. I await your response with thanks.

John


Forwarded:

From: John Adesalu
Subject: Re: Research project!
Date: Thu, 27 Jan 2000 16:07:00
To: Alan Feldman
To: Peyton Wynns
To: Thomas Beers
Alan, I will use U.S. Small Business Admin.'s definition of small telephone company to
construct the data file. The latter is very crucial in any empirical work and will be
explained in the report. But I must say that the analysis will not include issues such as
high cost/universal service, etc.---too controversial and are normative economics. Thanks

John


>>> Alan Feldman 01/27/00 01:11PM >>>
Sounds interesting.   Can you clarify the types and sources of data you have on
the small telcos' structure, conduct and performance (and how you define small) , and what
issues the analysis will focus on such as urban vs rural, high cost and/or universal
service, subcribership and digital divide type levels, infrastructure capabilities,  rate
vs cost levels, market valuations, etc.?

>>> John Adesalu 01/27/00 12:18PM >>>
Fyi,  and for the record, I am currently engaged in a research project to analyze the
market for the small U.S. telephone companies. My initial analysis will attempt to use the
Structure, Conduct and Performance (SCP) paradigm to analyze this market. The motivation
for this project came as a sequel of my meetings with Peyton. Presently, I am in the
process of building my database for the project. Thanks

John

122

## STATISTICS OF COMMUNICATIONS COMMON CARRIERS

### Table 2.9 - Summary of Statistics of All Reporting Local Exchange Carriers
### As of December 31, 1999 and for the Year Then Ended

(Dollar Amounts Shown in Thousands)

| Line No. | Acct No. | Items | All Reporting Local Exchange Companies | Regional Bell Operating Companies | GTE Reporting Local Exchange Companies | Mid-Sized Reporting Local Exchange Companies |
|---|---|---|---|---|---|---|
| | | **Balance Sheet Accounts - Assets** | | | | |
| | | **Current Assets:** | | | | |
| 1 | 1120 | Cash and Equivalents | $1,352,711 | $1,161,084 | $138,334 | $53,293 |
| | | **Noncash Current (Excluding Prepayments):** | | | | |
| 2 | 1180 | Telecommunications Accounts Receivable | 17,291,369 | 13,387,394 | 2,986,032 | 917,943 |
| 3 | 1181 | Accounts Receivable Allowance - Telecom | 1,482,518 | 1,152,727 | 254,702 | 75,089 |
| 4 | 1190 | Other Accounts Receivable | 2,921,298 | 1,612,237 | 934,044 | 375,017 |
| 5 | 1191 | Accounts Receivable Allowance - Other | 71,928 | 47,104 | 19,973 | 4,851 |
| 6 | 1200 | Notes Receivable | 18,400 | 5,953 | 4,624 | 7,823 |
| 7 | 1201 | Notes Receivable Allowance | 0 | 0 | 0 | 0 |
| 8 | 1210 | Interest and Dividends Receivable | 26,571 | 22,521 | 3,502 | 548 |
| 9 | 1220 | Inventories | 1,099,008 | 823,881 | 200,348 | 74,779 |
| 10 | 120 | Total Noncash Current (Excl. Prepayments) | 19,802,198 | 14,652,156 | 3,853,871 | 1,296,171 |
| 11 | 1280 | Prepayments | 986,011 | 708,805 | 241,838 | 35,368 |
| 12 | 1350 | Other Current Assets | 147,055 | 152,925 | 0 | (5,870) |
| 13 | 130 | Total Current Assets | 22,287,977 | 16,674,970 | 4,234,044 | 1,378,963 |
| | | **Noncurrent Assets:** | | | | |
| 14 | 1401 | Investments in Affiliated Companies | 5,721,980 | 4,447,790 | 83,548 | 1,190,642 |
| 15 | 1402 | Investments in Nonaffiliated Companies | 71,260 | 40,021 | 11,960 | 19,279 |
| 16 | 1406 | Nonregulated Investments | (191) | 0 | (191) | 0 |
| 17 | 1407 | Unamortized Debt Issuance Expense | 349,112 | 247,306 | 81,295 | 20,511 |
| 18 | 1408 | Sinking Funds | 609 | 0 | 609 | 0 |
| 19 | 1410 | Other Noncurrent Assets | 7,669,398 | 3,327,496 | 3,793,684 | 548,218 |
| 20 | 1437 | Deferred Tax Regulatory Assets | 2,081,133 | 1,895,906 | 140,289 | 44,938 |
| 21 | 1438 | Deferred Maintenance and Retirements | 10,370 | 0 | 10,370 | 0 |
| 22 | 1439 | Deferred Charges | 1,213,055 | 962,099 | 212,457 | 38,499 |
| 23 | 1500 | Other Jurisdictional Assets - Net | (1,611,226) | (1,812,590) | 222,783 | (21,419) |
| 24 | 150 | Total Noncurrent Assets | 15,505,499 | 9,108,027 | 4,556,804 | 1,840,668 |
| | | **Plant:** | | | | |
| 25 | 2001 | Telecommunications Plant in Service (TPIS) | 335,485,811 | 267,331,936 | 47,255,928 | 20,897,947 |
| 26 | 2002 | Property Held for Future Telecom Use (PHFTU) | 46,302 | 44,752 | 0 | 1,550 |
| 27 | 2003 | Telecom Plant Under Construction (TPUC) | 5,683,255 | 4,968,144 | 288,608 | 426,503 |
| 28 | 2004 | Reserved | NA | NA | NA | NA |
| 29 | 2005 | Telecommunications Plant Adjustment | 373,750 | 6,317 | 72,625 | 294,808 |
| 30 | 2006 | Nonoperating Plant | 300,838 | 239,681 | 32,733 | 28,424 |
| 31 | 2007 | Goodwill | 40,282 | 40,282 | 0 | 0 |
| 32 | 210 | Total Plant | 341,930,237 | 272,631,112 | 47,649,893 | 21,649,232 |
| 33 | 2110 | Land & Support | 42,981,649 | 35,154,170 | 5,787,147 | 2,040,332 |
| 34 | 2210 | Central Office Switching | 65,223,609 | 51,029,382 | 9,603,599 | 4,590,628 |
| 35 | 2220 | Operator Systems | 821,637 | 658,622 | 134,417 | 28,598 |
| 36 | 2230 | Central Office Transmission | 71,194,982 | 59,604,531 | 7,590,239 | 4,000,212 |
| 37 | 2310 | Information Origination/Termination | 5,558,868 | 4,438,342 | 737,509 | 383,017 |
| 38 | 2410 | Cable and Wire Facilities | 146,447,357 | 113,716,201 | 22,969,203 | 9,761,953 |
| 39 | 240 | Total TPIS (Before Amortizable Assets) | 332,228,101 | 264,601,248 | 46,822,112 | 20,804,741 |
| 40 | 2680 | Amortizable Tangible Assets | 1,709,525 | 1,443,396 | 182,481 | 83,648 |
| 41 | 2690 | Intangibles | 1,548,180 | 1,287,293 | 251,333 | 9,554 |
| 42 | 260 | Total Telecommunications Plant in Service | 335,485,811 | 267,331,937 | 47,255,928 | 20,897,946 |
| | | **Depreciation And Amortization:** | | | | |
| 43 | 3100 | Accumulated Depreciation - TPIS | 174,922,009 | 139,269,271 | 24,456,272 | 11,196,466 |
| 44 | 3200 | Accumulated Depreciation - PHFTU | 551 | 430 | 0 | 121 |
| 45 | 3300 | Accumulated Depreciation - Nonoperating | 70,940 | 49,377 | 11,041 | 10,522 |
| 46 | 3400 | Accumulated Amortization - Tangible | 326,324 | 281,273 | 4,156 | 40,895 |
| 47 | 3500 | Accumulated Amortization - Intangibles | 535,453 | 449,657 | 85,634 | 162 |
| 48 | 3600 | Accumulated Amortization - Other | 849,426 | 730,930 | 89,794 | 28,702 |
| 49 | 340 | Total Depreciation and Amortization | 176,159,585 | 140,244,281 | 24,638,439 | 11,276,865 |
| 50 | 350 | Net Plant | 165,770,651 | 132,386,831 | 23,011,455 | 10,372,365 |
| 51 | 360 | Total Assets | 203,564,129 | 158,169,829 | 31,802,304 | 13,591,996 |

## STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Table 2.5 - Telephone Calls and Minutes for Reporting Local Exchange Carriers–Year Ended December 31, 1999
(Figures Shown in Thousands)

| State | Local Calls | Intralata Toll Calls Completed (Originating) | Interlata Toll Calls Completed (Originating) Interstate | Intrastate | Total | Interlata Billed Access Minutes (Originating and Terminating) Interstate | Intrastate | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 9,441,603 | 179,011 | 733,017 | 238,004 | 971,019 | 6,741,256 | 2,297,784 | 9,039,039 | AL |
| Arizona | 9,245,541 | 89,737 | 1,203,836 | 202,852 | 1,406,688 | 10,987,072 | 1,698,771 | 12,685,843 | AZ |
| Arkansas | 3,964,700 | 168,948 | 203,557 | 89,243 | 292,799 | 3,502,950 | 1,106,419 | 4,609,369 | AR |
| California | 67,879,451 | 5,118,355 | 4,447,694 | 4,199,939 | 8,647,632 | 48,184,412 | 42,503,231 | 90,687,642 | CA |
| Colorado | 8,347,778 | 158,565 | 1,082,766 | 181,775 | 1,264,541 | 11,024,043 | 1,679,324 | 12,703,367 | CO |
| Connecticut | 4,125,451 | 790,022 | 880,050 | 14,332 | 894,382 | 9,302,827 | 78,089 | 9,380,916 | CT |
| Delaware | 1,638,152 | 56,280 | 320,938 | 12,126 | 333,064 | 2,429,692 | 180,253 | 2,609,945 | DE |
| Dist. of Columbia | 2,563,637 | 4,664 | 342,682 | 0 | 342,682 | 3,066,096 | 0 | 3,066,096 | DC |
| Florida | 39,150,062 | 481,613 | 3,947,009 | 1,558,753 | 5,505,762 | 37,294,886 | 14,583,197 | 51,878,084 | FL |
| Georgia | 18,080,602 | 274,871 | 1,845,623 | 489,367 | 2,334,990 | 16,340,557 | 4,615,838 | 20,956,395 | GA |
| Hawaii | 3,372,540 | 19,705 | 269,183 | 6,652 | 275,835 | 2,143,738 | 25,021 | 2,168,759 | HI |
| Idaho | 1,976,353 | 30,709 | 289,757 | 33,464 | 323,221 | 2,681,922 | 329,878 | 3,011,800 | ID |
| Illinois | 22,067,695 | 342,608 | 3,117,565 | 1,367,074 | 4,484,641 | 23,631,101 | 11,493,120 | 35,124,221 | IL |
| Indiana | 11,853,520 | 261,113 | 1,343,887 | 598,247 | 1,942,134 | 9,767,533 | 4,728,681 | 14,496,214 | IN |
| Iowa | 3,969,987 | 84,974 | 462,881 | 162,968 | 625,849 | 4,422,064 | 1,685,339 | 6,107,403 | IA |
| Kansas | 5,044,046 | 104,444 | 250,921 | 108,786 | 359,707 | 4,719,937 | 1,421,536 | 6,141,474 | KS |
| Kentucky | 7,336,994 | 229,450 | 748,006 | 222,479 | 970,485 | 6,129,897 | 2,107,221 | 8,237,118 | KY |
| Louisiana | 11,047,094 | 114,109 | 764,990 | 257,966 | 1,022,956 | 6,864,784 | 2,665,004 | 9,529,788 | LA |
| Maine | 1,226,161 | 360,146 | 238,180 | 232,991 | 471,171 | 2,168,814 | 742,611 | 2,911,425 | ME |
| Maryland | 11,689,061 | 178,861 | 1,672,311 | 831,105 | 2,503,416 | 12,541,864 | 4,286,238 | 16,828,102 | MD |
| Massachusetts | 11,676,857 | 643,230 | 1,541,481 | 713,248 | 2,254,729 | 14,987,045 | 4,983,741 | 19,970,786 | MA |
| Michigan | 16,550,177 | 1,400,296 | 1,912,968 | 1,292,438 | 3,205,405 | 14,204,894 | 11,143,037 | 25,347,931 | MI |
| Minnesota | 6,845,144 | 27,188 | 740,674 | 216,543 | 957,217 | 7,207,006 | 2,178,316 | 9,385,322 | MN |
| Mississippi | 5,789,777 | 205,672 | 471,387 | 77,142 | 548,529 | 4,445,212 | 972,843 | 5,418,055 | MS |
| Missouri | 12,939,967 | 255,059 | 683,896 | 202,279 | 886,175 | 10,058,140 | 2,807,691 | 12,865,830 | MO |
| Montana | 992,285 | 25,853 | 139,411 | 33,904 | 173,315 | 1,492,833 | 393,973 | 1,886,806 | MT |
| Nebraska | 2,352,299 | 41,353 | 346,565 | 104,701 | 451,266 | 2,998,917 | 847,114 | 3,846,030 | NE |
| Nevada | 4,499,901 | 20,510 | 631,016 | 77,903 | 708,920 | 5,045,197 | 697,085 | 5,742,282 | NV |
| New Hampshire | 1,313,623 | 371,571 | 399,535 | 250,905 | 650,440 | 3,600,116 | 737,824 | 4,337,940 | NH |
| New Jersey | 15,726,621 | 1,140,613 | 3,209,197 | 1,563,929 | 4,773,126 | 24,103,023 | 11,920,581 | 36,023,604 | NJ |
| New Mexico | 2,875,747 | 71,505 | 379,547 | 64,766 | 444,312 | 3,522,621 | 544,143 | 4,066,764 | NM |
| New York | 37,300,874 | 402,223 | 4,382,164 | 3,127,281 | 7,509,445 | 37,616,011 | 17,342,620 | 54,958,631 | NY |
| North Carolina | 14,671,861 | 149,758 | 1,638,801 | 729,734 | 2,368,535 | 14,745,969 | 6,064,734 | 20,810,683 | NC |
| North Dakota | 675,993 | 14,174 | 98,134 | 21,550 | 119,684 | 966,209 | 273,541 | 1,239,750 | ND |
| Ohio | 21,694,469 | 384,022 | 2,464,054 | 1,448,063 | 3,912,117 | 17,599,044 | 10,817,613 | 28,416,657 | OH |
| Oklahoma | 6,730,535 | 104,752 | 299,551 | 103,219 | 402,770 | 5,469,388 | 1,308,089 | 6,777,476 | OK |
| Oregon | 6,204,050 | 113,607 | 780,959 | 179,900 | 960,859 | 6,715,712 | 1,548,333 | 8,264,045 | OR |
| Pennsylvania | 23,118,360 | 886,695 | 2,927,517 | 1,485,392 | 4,412,909 | 21,936,749 | 11,592,842 | 33,529,592 | PA |
| Rhode Island | 1,550,073 | 260,283 | 309,220 | 175,794 | 485,014 | 2,593,537 | 431,446 | 3,024,983 | RI |
| South Carolina | 6,777,254 | 130,343 | 614,779 | 180,307 | 795,086 | 5,970,253 | 1,650,057 | 7,620,311 | SC |
| South Dakota | 775,552 | 19,372 | 117,170 | 16,452 | 133,622 | 1,160,523 | 219,047 | 1,379,570 | SD |
| Tennessee | 12,330,701 | 254,068 | 939,460 | 216,157 | 1,155,617 | 9,342,725 | 2,252,713 | 11,595,438 | TN |
| Texas | 50,249,117 | 387,938 | 2,336,065 | 1,501,014 | 3,837,079 | 31,969,883 | 16,490,695 | 48,460,578 | TX |
| Utah | 3,687,734 | 176,223 | 413,273 | 61,556 | 474,829 | 4,064,007 | 546,295 | 4,610,302 | UT |
| Vermont | 729,384 | 127,815 | 161,298 | 97,235 | 258,533 | 1,399,346 | 290,595 | 1,689,941 | VT |
| Virginia | 14,974,760 | 148,698 | 2,434,966 | 696,474 | 3,131,439 | 16,995,255 | 5,513,409 | 22,508,665 | VA |
| Washington | 11,408,549 | 287,581 | 1,299,592 | 333,387 | 1,632,980 | 11,498,899 | 3,088,673 | 14,587,572 | WA |
| West Virginia | 2,781,604 | 36,232 | 326,805 | 101,531 | 428,336 | 2,726,022 | 783,818 | 3,509,840 | WV |
| Wisconsin | 6,671,762 | 228,225 | 915,281 | 423,024 | 1,338,305 | 6,831,512 | 3,910,289 | 10,741,802 | WI |
| Wyoming | 566,584 | 22,074 | 113,320 | 18,516 | 131,836 | 1,142,596 | 190,842 | 1,333,438 | WY |
| United States | 548,482,042 | 17,385,118 | 57,192,939 | 26,322,467 | 83,515,403 | 516,354,069 | 219,769,554 | 736,123,624 | US |
| Puerto Rico | 5,371,195 | 731,122 | 614,023 | 0 | 614,023 | 2,918,837 | 0 | 2,918,837 | PR |
| Ocean Cable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | OC |
| Total | 553,853,237 | 18,116,240 | 57,806,962 | 26,322,467 | 84,129,426 | 519,272,906 | 219,769,554 | 739,042,461 | TO |

** See notes following this Table.

Notes for Tables 2.2 through 2.5

Data for Tables 2.2 through 2.5 were obtained from annual ARMIS (Automated Reporting Management Information System) operating data reports (FCC Report 43-08) of reporting local exchange carriers.

See Table 2.6 for data of individual carriers. A zero has been inserted where no information was reported. Totals by state may be understated because of the incomplete data.

Detail may not match totals because of necessary rounding.

Outside Plant Statistics

Unless otherwise stated, data include local loop and interoffice facilities.  A cable containing only copper, coaxial or other metallic conductors is classified as metallic, but a cable containing both fiber and copper, coaxial or metallic conductors is classified as fiber.

Kilometers equals total miles multiplied by 1.6093 and then rounded to the nearest whole number.  Non-zero entries in the ARMIS reports of less than 1 kilometer are reported as 1 kilometer.

Equivalent number of poles is the number of solely owned poles plus the sum of the products of the numbers of jointly owned times their ownership percentages.

Notes for Tables 2.2 through 2.5 – Continued

Access Lines

Access lines include WATS and WATS-like access lines, 800 and 800-like access lines, and employee concession lines, but not official/company circuits. Analog access lines are shown in 4Khz equivalents and include access lines from digital switches if the lines themselves are not terminated at the customer's premises as digital lines.

Digital access lines are shown in 64 Kbps equivalents. To be classified as digital, the access lines must be terminated at the customer end as digital lines or be available for use by the customer as digital lines.

Other switched access lines exclude digital centrex extensions, which were included prior to 1991. Switched access lines exclude ISDN control channels, which were included as 64 Kbps equivalents prior to 1991. Switched access lines also exclude Wats and Wats-like access lines, which were included as switched access lines prior to 1997. WATS and WATS-like access lines are classified as special access lines.

Figures for switched access lines reported in the ARMIS 43-08 Report for some companies are slightly different from figures for billable access lines reported in the ARMIS annual summary report (FCC Report 43-01) for a variety of reasons, including different reporting requirements, the interpretation of those requirements by the various companies, and the methods different companies use to calculate the number of lines. The majority of the differences come from the fact that derived ISDN channels are included in the count of switched access lines in the ARMIS 43-08, but are not treated as billable access lines in the ARMIS 43-01. Some companies may have included official/company circuits with ARMIS 43-08 access lines.

The Ameritech operating companies, now part of SBC, did not report digital PBX & Centrx trunks or Centrex extensions.

The GTE operating companies, except for Puerto Rico Telephone Company which reported only digital PBX & Centrex trunks, did not report digital PBX & Centrex trunks or Centrex extensions.

The Sprint operating companies did not report digital Centrex extensions.

BellSouth Telecommunications, Inc. excluded feature Group A, out-WATS, 800 service, and two-way WATS from access lines. The company reported only CPE and semi-public access lines as public access lines. The company was unable to provide digital PBX & Centrex Trunks by technology, reporting analog and digital PBX & Centrex trunks in the analog category.


Telephone Calls and Minutes

The number of toll calls is based on originating message volumes and includes outward calls, 800 service, directory service, dial-it services (e.g., 900 and 936 services), and optional calling plans. IntraLATA toll calls are carried by the reporting local operating company within a given Local Access and Transport Area (LATA). InterLATA toll calls are directed to and carried by interexchange carriers. Billed access minutes are based on bills sent to interexchange carriers and include total originating and terminating access minutes-of-use, including call set-up time, holding time and conversation time.

## STATISTICS OF COMMUNICATIONS COMMON CARRIERS

### Table 2.6 - Operating Statistics of Reporting Local Exchange Carriers as of December 31, 1999

| Items | 1 All Reporting Local Exchange Companies | 2 Regional Bell Operating Companies | 3 GTE Reporting Local Exchange Companies | 4 All Reporting Mid-Sized Local Exchange Companies |
|---|---|---|---|---|
| **Outside Plant Statistics:** | | | | |
| Km of Aerial Wire | 474,955 | 281,415 | 123,817 | 69.723 |
| Aerial Cable:  Sheath Km of Metallic Cable | 1,925.301 | 1,334,594 | 364,206 | 226,501 |
| Sheath Km of Fiber | 167,007 | 126,864 | 21,153 | 18.990 |
| Underground Cable:  Sheath Km of Metallic Cable | 579,513 | 483,710 | 71,802 | 24,001 |
| Sheath Km of Fiber | 235,761 | 202,774 | 24,805 | 8,182 |
| Buried Cable:  Sheath Km of Metallic Cable | 3,357,297 | 2,200,390 | 755,564 | 401,343 |
| Sheath Km of Fiber | 228,570 | 156,805 | 48,333 | 23.432 |
| Submarine Cable:  Sheath Km of Metallic Cable | 2,411 | 1,885 | 252 | 274 |
| Sheath Km of Fiber | 291 | 228 | 34 | 29 |
| Deep Sea Cable:  Sheath Km of Metallic Cable | 0 | 0 | 0 | 0 |
| Sheath Km of Fiber | 449 | 0 | 449 | 0 |
| Intrabuilding Network Cable:  Sheath Km of Metallic Cable | 130,226 | 98,481 | 1,960 | 29,785 |
| Sheath Km of Fiber | 8,127 | 5,966 | 8 | 2,153 |
| Total Cable: Sheath Km of Metallic Cable | 5,994,749 | 4,119,061 | 1,193,784 | 681,904 |
| Sheath Km of Fiber | 640,203 | 492,635 | 94,782 | 52,786 |
| Km of Fiber in Cable:  Fiber Km Equipped (Lit) | 13,119,015 | 10,973,640 | 1,515,576 | 629,799 |
| Total Fiber Km Deployed (Lit & Dark) | 29,410,807 | 25,145,618 | 2,606,917 | 1,658,272 |
| Km of Metallic Wire in Cable | 2,639,381,104 | 2,214,432,234 | 302,128,431 | 122,820,439 |
| Equipped Km of Tube in Coaxial Cable | 33,341 | 33,299 | 0 | 42 |
| Equivalent Number of Poles | 19,484,648 | 14,220,415 | 3,140,123 | 2,124,110 |
| Conduit System:  Trench Km | 288,287 | 231,147 | 42,422 | 14,718 |
| Duct Km | 1,480,062 | 1,273,346 | 160,398 | 46,318 |
| Km of Terrestrial Radio Relay System | 71,720 | 49,206 | 18,226 | 4,288 |
| Km of One-Way Terrestrial Radio Channel | 286,115 | 183,198 | 89,040 | 13,877 |
| Terrestrial Km of One-Way Satellite Radio Channel | 0 | 0 | 0 | 0 |
| Km of Telephone Channel on Radio: Analog (4Khz or Equiv) | 2,784,199 | 2,031,804 | 81,896 | 670,499 |
| Digital (64Kbps or Equiv) | 207,219,540 | 194,027,909 | 9,836,942 | 3,354,689 |
| Total Equipped Local Loop Circuit Km: Analog (4Khz or Equiv) | 714,577,249 | 701,422,321 | 4,455,381 | 8,699,547 |
| (Cable and Microwave)  Digital (64Kbps or Equiv) | 796,335,812 | 733,062,762 | 47,706,357 | 15,566,693 |
| Video | 171,873 | 68,178 | 0 | 103,695 |
| Total Equipped Interoffice Circuit Km: Analog (4Khz or Equiv) | 15,112,320 | 3,801,039 | 10,613,249 | 698.032 |
| (Cable and Microwave)  Digital (64Kbps or Equiv) | 4,631,945,679 | 4,101,846,552 | 314,580,633 | 215,518,494 |
| Video | 22,205 | 16,221 | 0 | 5,984 |
| **Switched Access Lines by Type of Technology:** | | | | |
| Analog (4Khz or Equiv):  Main Access Lines | 146,719,158 | 118,941,912 | 18,141,827 | 9,635,419 |
| PBX & Centrex Trunks | 4,899,857 | 3,806,716 | 636,724 | 456,417 |
| Centrex Extensions | 12,562,216 | 10,480,043 | 1,414,208 | 667,965 |
| Digital (64Kbps or Equiv):  Main Access Lines | 2,410,232 | 1,909,472 | 468,286 | 32,474 |
| PBX & Centrex Trunks | 2,850,606 | 2,729,223 | 12,424 | 108,959 |
| Centrex Extensions | 3,486,069 | 3,474,981 | 0 | 11,088 |
| Other Switched Access Lines | 1,784,354 | 1,463,664 | 314,989 | 5,701 |
| Total Switched Access Lines | 174,712,492 | 142,806,011 | 20,988,458 | 10,918,023 |
| Central Office Switches Excluding Remotes | 6,870 | 4,635 | 1,677 | 558 |
| Remote Switches | 11,990 | 5,329 | 4,986 | 1,675 |
| Total Central Office Switches | 18,860 | 9,964 | 6,663 | 2,233 |
| Basic Rate ISDN Control Channels | 1,753,075 | 1,555,476 | 168,580 | 29,019 |
| Primary Rate ISDN Control Channels | 263,854 | 178,402 | 47,647 | 37,805 |
| **Access Lines by Type of Customer:** | | | | |
| Business Access Lines:  Analog Single Line (4Khz or Equiv) | 4,810,263 | 3,188,669 | 945,254 | 676,340 |
| Analog Multi Line (4Khz or Equiv) | 44,246,362 | 37,386,193 | 4,624,438 | 2,235,731 |
| Digital (64Kbps or Equiv) | 8,389,855 | 7,756,982 | 480,710 | 152,163 |
| Payphone Lines | 1,801,972 | 1,524,210 | 221,882 | 55,880 |
| Residential Access Lines:  Analog (4Khz or Equiv) | 114,873,548 | 92,359,862 | 14,716,174 | 7,797,512 |
| Digital (64Kbps or Equiv) | 357,052 | 356,694 | 0 | 358 |
| Mobile Access Lines | 233,440 | 233,401 | 0 | 39 |
| Total Switched Access Lines | 174,712,492 | 142,806,011 | 20,988,458 | 10,918,023 |
| Special Access Lines (Non-Switched): Analog (4Khz or Equiv) | 1,028,511 | 891,189 | 99,205 | 38,117 |
| Digital (64Kbps or Equiv) | 52,206,017 | 44,592,162 | 3,707,771 | 3,906,084 |
| Total Access Lines (Switched and Special) | 227,947,020 | 188,289,362 | 24,795,434 | 14,862,224 |
| **Telephone Calls and Billed Access Minutes (in Thousands):** | | | | |
| Local Calls | 553,853,237 | 452,438,093 | 70,482,715 | 30,932,429 |
| IntraLATA Toll Calls Completed  (Originating) | 18,116,240 | 15,443,078 | 2,028,338 | 644,824 |
| InterLATA Toll Calls Completed:  Interstate | 57,806,961 | 45,900,595 | 7,624,277 | 4,282,089 |
| (Originating)  Intrastate | 26,322,465 | 20,752,916 | 3,348,874 | 2,220,675 |
| Total | 84,129,426 | 66,653,511 | 10,973,151 | 6,502,764 |
| InterLATA Billed Access Minutes:  Interstate | 519,272,905 | 430,086,059 | 56,057,844 | 33,129,002 |
| (Originating and Terminating)  Intrastate | 219,769,554 | 179,797,275 | 25,243,525 | 14,728,754 |
| Total | 739,042,462 | 609,883,334 | 81,301,372 | 47,857,756 |

/27

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Table 2.6 - Operating Statistics of Reporting Local Exchange Carriers as of December 31, 1999 — Continued

| Items | 25     O<br>Cincinnati Bell<br>Telephone Co. | 26     O<br>Aliant<br>Communications<br>Company | 27     AL<br>Alltel<br>Carolina<br>Inc. | 28     AL<br>Alltel Georgia<br>Communications<br>Corp. |
|---|---|---|---|---|
| **Outside Plant Statistics:** | | | | |
| Km of Aerial Wire | 5,613 | 0 | 0 | 0 |
| Aerial Cable:     Sheath Km of Metallic Cable | 14,191 | 1,727 | 4,472 | 10,791 |
| Sheath Km of Fiber | 1,375 | 217 | 195 | 969 |
| Underground Cable:     Sheath Km of Metallic Cable | 4,737 | 472 | 149 | 323 |
| Sheath Km of Fiber | 1,336 | 214 | 48 | 131 |
| Buried Cable:     Sheath Km of Metallic Cable | 5,718 | 27,488 | 10,880 | 18,086 |
| Sheath Km of Fiber | 50 | 2,008 | 336 | 1,379 |
| Submarine Cable:     Sheath Km of Metallic Cable | 0 | 0 | 0 | 7 |
| Sheath Km of Fiber | 0 | 0 | 0 | 0 |
| Deep Sea Cable:     Sheath Km of Metallic Cable | 0 | 0 | 0 | 0 |
| Sheath Km of Fiber | 0 | 0 | 0 | 0 |
| Intrabuilding Network Cable:  Sheath Km of Metallic Cable | 799 | 87 | 0 | 52 |
| Sheath Km of Fiber | 71 | 0 | 0 | 0 |
| Total Cable: Sheath Km of Metallic Cable | 25,445 | 29,774 | 15,501 | 29,259 |
| Sheath Km of Fiber | 2,832 | 2,439 | 579 | 2,479 |
| Km of Fiber in Cable:  Fiber Km Equipped (Lit) | 90,170 | 13,936 | 11,340 | 28,798 |
| Total Fiber Km Deployed (Lit & Dark) | 175,081 | 40,313 | 28,555 | 82,281 |
| Km of Metallic Wire in Cable | 25,445 | 3,989,630 | 2,668,345 | 5,088,242 |
| Equipped Km of Tube in Coaxial Cable | 0 | 0 | 0 | 0 |
| Equivalent Number of Poles | 150,000 | 41,895 | 29,145 | 53,326 |
| Conduit System:     Trench Km | 3,257 | 492 | 50 | 89 |
| Duct Km | 10,512 | 1,574 | 268 | 530 |
| Km of Terrestrial Radio Relay System | 0 | 0 | 0 | 0 |
| Km of One-Way Terrestrial Radio Channel | 0 | 0 | 0 | 0 |
| Terrestrial Km of One-Way Satellite Radio Channel | 0 | 0 | 0 | 0 |
| Km of Telephone Channel on Radio: Analog (4Khz or Equiv) | 0 | 0 | 0 | 0 |
| Digital (64Kbps or Equiv) | 0 | 0 | 0 | 0 |
| Total Equipped Local Loop Circuit Km: Analog (4Khz or Equiv) | 0 | 0 | 1,346,160 | 2,543,280 |
| (Cable and Microwave)     Digital (64Kbps or Equiv) | 1,479,320 | 292,363 | 4,482 | 10,592 |
| Video | 0 | 82 | 0 | 0 |
| Total Equipped Interoffice Circuit Km: Analog (4Khz or Equiv) | 0 | 0 | 0 | 0 |
| (Cable and Microwave)     Digital (64Kbps or Equiv) | 5,727,320 | 50,890,083 | 527,536 | 913,497 |
| Video | 0 | 2,390 | 0 | 0 |
| **Switched Access Lines by Type of Technology:** | | | | |
| Analog (4Khz or Equiv):     Main Access Lines | 889,706 | 252,672 | 205,420 | 279,756 |
| PBX & Centrex Trunks | 20,112 | 3,837 | 2,518 | 3,868 |
| Centrex Extensions | 74,517 | 34,495 | 11,389 | 35,911 |
| Digital (64Kbps or Equiv):     Main Access Lines | 5,785 | 0 | 68 | 0 |
| PBX & Centrex Trunks | 48,833 | 0 | 0 | 0 |
| Centrex Extensions | 0 | 0 | 0 | 0 |
| Other Switched Access Lines | 106 | 0 | 0 | 0 |
| Total Switched Access Lines | 1,039,059 | 291,004 | 219,395 | 319,535 |
| Central Office Switches Excluding Remotes | 45 | 10 | 14 | 27 |
| Remote Switches | 13 | 148 | 17 | 43 |
| Total Central Office Switches | 58 | 158 | 31 | 70 |
| Basic Rate ISDN Control Channels | 10,871 | 0 | 646 | 1,313 |
| Primary Rate ISDN Control Channels | 30,284 | 0 | 82 | 134 |
| **Access Lines by Type of Customer:** | | | | |
| Business Access Lines:  Analog Single Line (4Khz or Equiv) | 169,320 | 8,345 | 24,439 | 37,066 |
| Analog Multi Line (4Khz or Equiv) | 94,688 | 87,352 | 24,864 | 57,899 |
| Digital (64Kbps or Equiv) | 54,535 | 0 | 68 | 0 |
| Payphone Lines | 10,232 | 3,383 | 534 | 2,412 |
| Residential Access Lines:   Analog (4Khz or Equiv) | 710,201 | 191,924 | 169,490 | 222,157 |
| Digital (64Kbps or Equiv) | 83 | 0 | 0 | 0 |
| Mobile Access Lines | 0 | 0 | 0 | 1 |
| Total Switched Access Lines | 1,039,059 | 291,004 | 219,395 | 319,535 |
| Special Access Lines (Non-Switched): Analog (4Khz or Equiv) | 5,709 | 507 | 237 | 428 |
| Digital (64Kbps or Equiv) | 117,345 | 33,361 | 29,652 | 1,949 |
| Total Access Lines (Switched and Special) | 1,162,113 | 324,872 | 249,284 | 321,912 |
| **Telephone Calls and Billed Access Minutes (in Thousands):** | | | | |
| Local Calls | 4,725,958 | 527,438 | 464,359 | 828,634 |
| IntraLATA Toll Calls Completed     (Originating) | 22,224 | 23,860 | 40,949 | 38,229 |
| InterLATA Toll Calls Completed     Interstate | 466,139 | 119,848 | 126,386 | 207,904 |
| (Originating)     Intrastate | 217,997 | 48,996 | 49,946 | 105,264 |
| Total | 684,136 | 168,844 | 176,332 | 313,168 |
| InterLATA Billed Access Minutes: Interstate | 3,314,166 | 814,600 | 700,607 | 843,306 |
| (Originating and Terminating)     Intrastate | 946,860 | 287,640 | 267,207 | 461,788 |
| Total | 4,261,026 | 1,102,240 | 967,814 | 1,305,094 |

128

## STATISTICS OF COMMUNICATIONS COMMON CARRIERS

### Table 2.6 - Operating Statistics of Reporting Local Exchange Carriers as of December 31, 1999 — Continued

| Items | 29 AL Alltel Pennsylvania Inc. | 30 AL The Western Reserve Telephone Co. | 31 O Citizens Telecommuni-Cations Co. of New York, Inc. | 32 O Commonwealth Telephone Company |
|---|---|---|---|---|
| **Outside Plant Statistics:** | | | | |
| Km of Aerial Wire | 0 | 0 | 2,694 | 27,260 |
| Aerial Cable: Sheath Km of Metallic Cable | 20,194 | 7,222 | 13,272 | 17,943 |
| Sheath Km of Fiber | 913 | 689 | 1,242 | 2,257 |
| Underground Cable: Sheath Km of Metallic Cable | 148 | 398 | 292 | 77 |
| Sheath Km of Fiber | 41 | 75 | 66 | 35 |
| Buried Cable: Sheath Km of Metallic Cable | 4,249 | 3,002 | 13,990 | 4,615 |
| Sheath Km of Fiber | 15 | 55 | 687 | 26 |
| Submarine Cable: Sheath Km of Metallic Cable | 0 | 0 | 200 | 0 |
| Sheath Km of Fiber | 0 | 0 | 0 | 0 |
| Deep Sea Cable: Sheath Km of Metallic Cable | 0 | 0 | 0 | 0 |
| Sheath Km of Fiber | 0 | 0 | 0 | 0 |
| Intrabuilding Network Cable: Sheath Km of Metallic Cable | 0 | 0 | 27,754 | 1 |
| Sheath Km of Fiber | 0 | 0 | 1,995 | 6 |
| Total Cable: Sheath Km of Metallic Cable | 24,591 | 10,622 | 55,508 | 22,636 |
| Sheath Km of Fiber | 969 | 819 | 3,990 | 2,324 |
| Km of Fiber in Cable: Fiber Km Equipped (Lit) | 2,687 | 4,767 | 3,990 | 15,246 |
| Total Fiber Km Deployed (Lit & Dark) | 34,093 | 33,968 | 3,990 | 37,201 |
| Km of Metallic Wire in Cable | 2,920,714 | 2,376,809 | 55,508 | 4,099,491 |
| Equipped Km of Tube in Coaxial Cable | 0 | 0 | 0 | 0 |
| Equivalent Number of Poles | 164,071 | 64,100 | 177,014 | 121,688 |
| Conduit System: Trench Km | 56 | 142 | 0 | 41 |
| Duct Km | 300 | 548 | 0 | 192 |
| Km of Terrestrial Radio Relay System | 0 | 0 | 0 | 63 |
| Km of One-Way Terrestrial Radio Channel | 0 | 0 | 0 | 125 |
| Terrestrial Km of One-Way Satellite Radio Channel | 0 | 0 | 0 | 0 |
| Km of Telephone Channel on Radio: Analog (4Khz or Equiv) | 0 | 0 | 0 | 0 |
| Digital (64Kbps or Equiv) | 0 | 0 | 0 | 74,088 |
| Total Equipped Local Loop Circuit Km: Analog (4Khz or Equiv) | 2,309,297 | 1,874,488 | 29,084 | 498,245 |
| (Cable and Microwave) Digital (64Kbps or Equiv) | 1,154 | 1,279 | 0 | 15,791 |
| Video | 0 | 0 | 0 | 0 |
| Total Equipped Interoffice Circuit Km: Analog (4Khz or Equiv) | 0 | 0 | 0 | 0 |
| (Cable and Microwave) Digital (64Kbps or Equiv) | 1,895,614 | 4,265,535 | 2,960 | 499,215 |
| Video | 0 | 0 | 0 | 0 |
| **Switched Access Lines by Type of Technology:** | | | | |
| Analog (4Khz or Equiv): Main Access Lines | 216,111 | 150,673 | 286,280 | 268,393 |
| PBX & Centrex Trunks | 1,634 | 430 | 2,807 | 2,263 |
| Centrex Extensions | 16,008 | 30,619 | 18,574 | 21,395 |
| Digital (64Kbps or Equiv): Main Access Lines | 1,297 | 1,815 | 61 | 404 |
| PBX & Centrex Trunks | 1,610 | 2,967 | 0 | 0 |
| Centrex Extensions | 0 | 0 | 0 | 0 |
| Other Switched Access Lines | 0 | 0 | 45 | 0 |
| Total Switched Access Lines | 236,660 | 186,504 | 307,767 | 292,455 |
| Central Office Switches Excluding Remotes | 30 | 18 | 31 | 12 |
| Remote Switches | 53 | 26 | 97 | 393 |
| Total Central Office Switches | 83 | 44 | 128 | 405 |
| Basic Rate ISDN Control Channels | 609 | 895 | 41 | 335 |
| Primary Rate ISDN Control Channels | 70 | 129 | 0 | 85 |
| **Access Lines by Type of Customer:** | | | | |
| Business Access Lines: Analog Single Line (4Khz or Equiv) | 25,343 | 8,777 | 18,380 | 43,214 |
| Analog Multi Line (4Khz or Equiv) | 22,031 | 39,243 | 43,807 | 23,658 |
| Digital (64Kbps or Equiv) | 2,907 | 4,782 | 61 | 381 |
| Payphone Lines | 1,312 | 1,099 | 2,829 | 2,162 |
| Residential Access Lines: Analog (4Khz or Equiv) | 185,067 | 132,603 | 242,690 | 223,017 |
| Digital (64Kbps or Equiv) | 0 | 0 | 0 | 23 |
| Mobile Access Lines | 0 | 0 | 0 | 0 |
| Total Switched Access Lines | 236,660 | 186,504 | 307,767 | 292,455 |
| Special Access Lines (Non-Switched): Analog (4Khz or Equiv) | 747 | 406 | 0 | 0 |
| Digital (64Kbps or Equiv) | 13,336 | 25,128 | 0 | 0 |
| Total Access Lines (Switched and Special) | 250,743 | 212,038 | 307,767 | 292,455 |
| **Telephone Calls and Billed Access Minutes (in Thousands):** | | | | |
| Local Calls | 330,946 | 294,783 | 556,134 | 621,358 |
| IntraLATA Toll Calls Completed (Originating) | 64,607 | 28,325 | 92,099 | 38,755 |
| InterLATA Toll Calls Completed: Interstate | 83,477 | 149,028 | 99,911 | 132,200 |
| (Originating) Intrastate | 43,928 | 68,429 | 70,244 | 92,900 |
| Total | 127,405 | 217,457 | 170,155 | 225,100 |
| InterLATA Billed Access Minutes: Interstate | 517,252 | 545,797 | 845,220 | 577,982 |
| (Originating and Terminating) Intrastate | 267,792 | 294,317 | 579,303 | 467,661 |
| Total | 785,044 | 840,114 | 1,424,523 | 1,045,643 |

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Notes for Table 2.6

*[handwritten: no — you have to distinguish between unavail (blank) and none (zero).]*

| Name of Company | Code |
|---|---|
| Bell Atlantic Corporation | BA |
| BellSouth Corporation | BS |
| SBC Communications Inc. | SBC |
| U.S West, Inc. | W |
| Alltel Corporation | AL |
| Global Crossing Ltd. | GC |
| GTE Corporation | G |
| Sprint Corporation | S |
| All others that are part of a holding company group | O |

Source:   Annual ARMIS (Automated Reporting Management Information System) operating data reports (FCC Report 43-08) of
reporting local exchange carriers.

Note -- Certain data pertaining to the carriers included in this table are unavailable. Where such is the case, a zero has been
inserted in the space provided for the information, which means that none was reported.

– Detail may not match totals because of necessary roundings.

– Unless otherwise stated, outside plant statistics include local loop and interoffice facilities. A cable containing only copper,
coaxial or other metallic conductors is classified as metallic; but a cable containing both fiber and copper, coaxial or other
metallic conductors is classified as fiber.

– Kilometers equals total miles multiplied by 1.6093 and then rounded to the nearest whole number. Non-zero entries in the
ARMIS reports of less than 1 kilometer are reported as 1 kilometer.

– Equivalent number of poles is the number of solely owned poles plus the sum of the products of the numbers of jointly
owned times their ownership percentages.

– Access lines include WATS and WATS-like access lines, and 800 and 800-like access lines, and employee concession lines,
but not official/company circuits. Analog access lines are shown in 4Khz equivalents and include access lines from digital
switches if the lines themselves are not terminated at the customer's premises as digital lines. Digital access lines are shown
in 64 kbps equivalents. To be classified as digital, the access lines must be terminated at the customer end as digital lines
or be available for use by the customer as digital lines.

– Other switched access lines exclude digital Centrex extensions, which were included prior to 1991. Switched access lines
exclude ISDN control channels, which were included as 64 Kbps equivalents prior to 1991. Switched access lines also
exclude WATS and WATS-like access lines, which were included as switched access lines prior to 1997. WATS and
WATS-like access lines are classified as special access lines.

– Figures for switched access lines reported in the ARMIS 43-08 Report for some companies are slightly different from figures
for billable access lines reported in the ARMIS annual summary report (FCC Report 43-01) for a variety of reasons, including
different reporting requirements, the interpretation of those requirements by the various companies, and the methods
different companies use to calculate the lines. The majority of the differences come from the fact that derived ISDN
channels are included in the count of switched access lines in the ARMIS 43-08, but are not treated as billable access lines
in the ARMIS 43-01. Some companies may have included official/company circuits with the ARMIS 43-08 access lines.

-- The number of toll calls is based on originating message volumes and includes outward calls, 800 service, directory service,
dial-it services (e.g., 900 and 936 services), and optional calling plans. Intralata toll calls are carried by the reporting local
operating company within a given Local Access and Transport Area (LATA). InterLATA toll calls are directed to and carried
by interexchange carriers. Billed access minutes are based on bills sent to interexchange carriers and include total
originating and terminating access minutes of use, including call set-up time, holding time, and conversation time.

*     See footnotes below regarding data of individual carriers.

1/    BellSouth Telecommunications, Inc. excluded feature Group A, out-WATS, 800 service, and two-way WATS from access lines. The
company reported only CPE and semi-public access lines as payphone lines. The company was unable to provide digital PBX &
Centrex trunks by technology, reporting analog and digital PBX & Centrex trunks in the analog category.

2/    The Ameritech operating companies did not report digital PBX & Centrex trunks or digital Centrex extensions.
According to SBC Communications, the increase in the amount of digital special access lines (non-switched) for its Ameritech
affiliates due to a different method of counting the loops in prior years.

*[handwritten: no longer applicable]*

*[handwritten: What happened to the ALLTEL FN that has been there in the past?]*

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Table 2.7 - Communications Plant of Reporting Local Exchange Carriers
Year Ended December 31, 1999

(Amounts Shown in Thousands)

| Acct No. | Items | All Reporting Local Exchange Companies 1/ | | | | |
|---|---|---|---|---|---|---|
| | | Balance at Beginning of Year 2/ | Plant Added | Plant Retired | Transfers and Adjustments | Balance at End of Year |
| | **Plant:** | | | | | |
| 2001 | Telecommunications Plant in Service (TPIS) | $319,809,187 | $26,303,620 | $11,640,506 | $1,013,507 | $335,485,811 |
| 2002 | Property Held for Future Telecom Use | 8,199 | 36,518 | 0 | 1,585 | 46,302 |
| 2003 | Telecom Plant Under Construction (TPUC) | 4,099,302 | 3,029,278 | 1,277,962 | (167,363) | 5,683,255 |
| 2004 | Reserved | NA | NA | NA | NA | NA |
| 2005 | Telecommunications Plant Adjustment | 350,276 | 23,857 | 385 | 2 | 373,750 |
| 2006 | Nonoperating Plant | 400,386 | 58,955 | 35,527 | (122,978) | 300,838 |
| 2007 | Goodwill | 41,495 | 0 | 1,213 | 0 | 40,282 |
| 210 | Total Plant | 324,708,847 | 29,452,228 | 12,955,594 | 724,754 | 341,930,237 |
| | **TPIS - General Support:** | | | | | |
| 2111 | Land | 1,244,272 | 24,060 | 22,399 | 35,368 | 1,281,303 |
| 2112 | Motor Vehicles | 2,779,611 | 430,946 | 176,362 | 3,622 | 3,037,815 |
| 2113 | Aircraft | 35,341 | 1,019 | 1,753 | 0 | 34,607 |
| 2114 | Tools and Other Work Equipment | 2,463,027 | 289,112 | 152,630 | (1,999) | 2,597,511 |
| 2121 | Buildings | 22,329,439 | 1,033,473 | 609,709 | 220,388 | 22,973,591 |
| 2122 | Furniture | 375,161 | 3,045 | 36,675 | (1,353) | 340,182 |
| 2123 | Office Equipment | 1,921,074 | 127,269 | 110,348 | (5,488) | 1,932,504 |
| 2124 | General Purpose Computers | 9,680,041 | 980,203 | 1,878,608 | (37,830) | 8,743,806 |
| 2110 | Land and Support | 42,813,144 | 3,000,273 | 3,047,835 | 216,068 | 42,981,650 |
| | **TPIS - Central Office Switching:** | | | | | |
| 2211 | Analog Electronic Switching | 5,621,153 | 147,270 | 1,479,802 | (10,082) | 4,278,538 |
| 2212 | Digital Electronic Switching | 53,287,022 | 4,906,350 | 2,209,527 | 370,556 | 56,354,401 |
| 2215.1 | Step-By-Step Switching | 2,855 | 24 | 1,941 | (921) | 16 |
| 2215.2 | Crossbar Switching | 61 | 0 | 822 | 786 | 25 |
| 2215.3 | Other Electro-Mechanical Switching | 888 | 0 | 681 | (207) | 0 |
| 2215 | Electro-Mechanical Switching | 3,803 | 24 | 3,445 | (342) | 41 |
| 2210 | Total Central Office Switching | 63,246,403 | 5,480,775 | 3,866,528 | 362,961 | 65,223,609 |
| 2220 | Operator Systems | 931,072 | 57,926 | 170,814 | 3,453 | 821,636 |
| | **TPIS - Central Office Transmission** | | | | | |
| 2231.1 | Satellite and Earth Station Facilities | 19 | 1 | 9 | 9 | 20 |
| 2231.2 | Other Radio Facilities | 976,926 | 23,398 | 104,829 | 4,079 | 899,575 |
| 2231 | Radio Systems | 976,945 | 23,399 | 104,839 | 4,089 | 899,595 |
| 2232 | Circuit Equipment | 60,426,446 | 7,857,854 | 2,328,511 | 339,389 | 66,295,175 |
| 2230 | Central Office-Transmission | 64,932,308 | 8,438,271 | 2,526,274 | 350,680 | 71,194,982 |
| | **TPIS - Information Orig/Term:** | | | | | |
| 2311 | Station Apparatus | 235,135 | 34,721 | 113,140 | (1,722) | 154,994 |
| 2321 | Customer Premises Wiring | 142,672 | 0 | 0 | 0 | 142,672 |
| 2341 | Large Private Branch Exchanges | 164,685 | 20,908 | 55,062 | 9,155 | 139,686 |
| 2351 | Public Telephone Terminal Equipment | 1,262,589 | 66,708 | 78,761 | (7) | 1,250,530 |
| 2362 | Other Terminal Equipment | 3,184,394 | 477,124 | 189,789 | 16,238 | 3,487,967 |
| 2310 | Total Information Origination/Termination | 5,369,320 | 643,934 | 474,767 | 20,386 | 5,558,868 |
| | **TPIS - Cable & Wire Facilities:** | | | | | |
| 2411 | Poles | 5,684,103 | 228,340 | 61,843 | 3,263 | 5,853,863 |
| 2421 | Aerial Cable | 30,862,910 | 1,673,713 | 396,093 | 39,502 | 32,180,036 |
| 2422 | Underground Cable | 26,222,850 | 1,167,873 | 180,301 | 21,339 | 27,231,760 |
| 2423 | Buried Cable | 48,984,777 | 2,665,531 | 409,939 | 45,777 | 51,286,147 |
| 2424 | Submarine Cable | 92,865 | 640 | 873 | (132) | 92,500 |
| 2425 | Deep Sea Cable | 17,040 | 0 | 0 | 0 | 17,040 |
| 2426 | Intrabuilding Network Cable | 2,013,763 | 60,679 | 14,835 | 236 | 2,059,843 |
| 2431 | Aerial Wire | 183,758 | 10,430 | 4,288 | 100 | 190,001 |
| 2441 | Conduit Systems | 17,166,009 | 630,494 | 32,541 | 10,251 | 17,774,213 |
| 2410 | Cable and Wire Facilities | 140,546,777 | 6,961,757 | 1,177,957 | 116,781 | 146,447,357 |
| 240 | Total TPIS (Before Amortizable Assets) | 317,839,022 | 24,582,928 | 11,264,177 | 1,070,327 | 332,228,101 |
| | **TPIS - Amortizable Assets:** | | | | | |
| 2681 | Capital Leases | 686,511 | 123,181 | 160,597 | (66,810) | 582,285 |
| 2682 | Leasehold Improvements | 1,159,474 | 104,481 | 223,444 | 3,083 | 1,043,592 |
| 2680 | Amortizable Tangible Assets | 1,918,319 | 240,914 | 386,250 | (63,458) | 1,709,525 |
| 2690 | Intangibles | 51,846 | 1,479,773 | (9,923) | 6,638 | 1,548,180 |
| 260 | Total Telecommunications Plant in Service | 319,809,188 | 26,303,617 | 11,640,503 | 1,013,506 | 335,485,811 |

Note -- Boldfaced amounts equal the sum of the same accounts for all reporting local exchange companies. Unbolded amounts reflect only the large incumbent local exchange carriers, i.e. the Bell operating companies and GTE.

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Table 2.7 - Communication Plant of Reporting Local Exchange Carriers
Year Ended December 31, 1999 — Continued
(Amounts Shown in Thousands)

| Acct No. | Items | Reporting Mid-Sized Local Exchange Companies 1/ | | | | |
|---|---|---|---|---|---|---|
| | | Balance at Beginning of Year 2/ | Plant Added | Plant Retired | Transfers and Adjustments | Balance at End of Year |
| | **Plant:** | | | | | |
| 2001 | Telecommunications Plant in Service (TPIS) | $19,665,255 | $1,688,049 | $453,862 | ($1,499) | $20,897,947 |
| 2002 | Property Held for Future Telecom Use | 2,217 | 0 | 0 | (667) | 1,550 |
| 2003 | Telecom Plant Under Construction (TPUC) | 422,344 | 280,573 | 205,859 | (70,554) | 426,503 |
| 2004 | Reserved | NA | NA | NA | NA | NA |
| 2005 | Telecommunications Plant Adjustment | 270,984 | 23,824 | 0 | 0 | 294,808 |
| 2006 | Nonoperating Plant | 49,432 | (1,902) | 3,190 | (15,918) | 28,424 |
| 2007 | Goodwill | 0 | 0 | 0 | 0 | 0 |
| 210 | Total Plant | 20,410,235 | 1,990,545 | 662,912 | (88,638) | 21,649,232 |
| | **TPIS - General Support:** | | | | | |
| 2111 | Land | | | | | |
| 2112 | Motor Vehicles | | | | | |
| 2113 | Aircraft | | | | | |
| 2114 | Tools and Other Work Equipment | | | | | |
| 2121 | Buildings | | | | | |
| 2122 | Furniture | | | | | |
| 2123 | Office Equipment | | | | | |
| 2124 | General Purpose Computers | | | | | |
| 2110 | Land and Support | 1,985,178 | 111,145 | 59,352 | 3,358 | 2,040,332 |
| | **TPIS - Central Office Switching:** | | | | | |
| 2211 | Analog Electronic Switching | | | | | |
| 2212 | Digital Electronic Switching | | | | | |
| 2215.1 | Step-By-Step Switching | | | | | |
| 2215.2 | Crossbar Switching | | | | | |
| 2215.3 | Other Electro-Mechanical Switching | | | | | |
| 2210 | Total Central Office Switching | 4,334,424 | 427,131 | 173,755 | 2,831 | 4,590,628 |
| 2220 | Operator Systems | 36,122 | 3,678 | 10,365 | (836) | 28,598 |
| | **TPIS - Central Office Transmission** | | | | | |
| 2231.1 | Satellite and Earth Station Facilities | | | | | |
| 2231.2 | Other Radio Facilities | | | | | |
| 2231 | Radio Systems | | | | | |
| 2232 | Circuit Equipment | | | | | |
| 2230 | Central Office-Transmission | 3,528,917 | 557,019 | 92,925 | 7,202 | 4,000,212 |
| | **TPIS - Information Orig/Term:** | | | | | |
| 2311 | Station Apparatus | | | | | |
| 2321 | Customer Premises Wiring | | | | | |
| 2341 | Large Private Branch Exchanges | | | | | |
| 2351 | Public Telephone Terminal Equipment | | | | | |
| 2362 | Other Terminal Equipment | | | | | |
| 2310 | Total Information Origination/Termination | 379,840 | 44,470 | 38,012 | (3,279) | 383,017 |
| | **TPIS - Cable & Wire Facilities:** | | | | | |
| 2411 | Poles | | | | | |
| 2421 | Aerial Cable | | | | | |
| 2422 | Underground Cable | | | | | |
| 2423 | Buried Cable | | | | | |
| 2424 | Submarine Cable | | | | | |
| 2425 | Deep Sea Cable | | | | | |
| 2426 | Intrabuilding Network Cable | | | | | |
| 2431 | Aerial Wire | | | | | |
| 2441 | Conduit Systems | | | | | |
| 2410 | Cable and Wire Facilities | 9,318,698 | 524,055 | 77,245 | (3,555) | 9,761,953 |
| 240 | Total Tpis (Before Amortizable Assets) | 19,583,181 | 1,667,492 | 451,654 | 5,722 | 20,804,741 |
| | **TPIS - Amortizable Assets:** | | | | | |
| 2681 | Capital Leases | | | | | |
| 2682 | Leasehold Improvements | | | | | |
| 2680 | Total Amortizable Tangible Assets | 72,334 | 13,252 | 2,206 | 269 | 83,648 |
| 2690 | Intangibles | 9,739 | 7,305 | 0 | (7,490) | 9,554 |
| 260 | Total Telecommunications Plant in Service | 19,665,255 | 1,688,049 | 453,862 | (1,500) | 20,897,946 |

Note – Detail may not match totals because of necessary rounding.
1/ See Tables 2.10 and 2.11 for data of individual carriers. The FCC's Accounting Review Order, 14 FCC Rcd at 11402-11405, granted streamlined reporting requirements for mid-sized incumbent local exchange carriers beginning in the 1999 reporting year. Mid-sized carriers are those individual carriers, or carriers affiliated with any other carrier that it controls by, or with which it is under common control having aggregate revenues less than $7 billion. Blanks have been entered in the table to denote the mid-sized carrier accounts that have been deleted to reflect the new streamlined reporting requirements.

2/ Discrepancies between last year's ending balance and this year's beginning balances are due to additions, deletions, and mergers of reporting carriers.

*all pages*

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

Table 2.8 - Expenses of Reporting Local Exchange Carriers Year Ended
December 31, 1999

(Amounts Shown in Thousands)

*langer font*

| Line No. | Acct No. | Items | All Reporting Local Exchange Companies 1/ | | | | |
|---|---|---|---|---|---|---|---|
| | | | Total | Salaries and Wages | Benefits | Rents | Other Expenses |
| | | **Plant Specific Operations:** | | | | | |
| | | **Network Support Expenses:** | | | | | |
| 1 | 6112 | Motor Vehicle Expenses | $585,446 | $49,897 | $10,449 | $112,386 | $412,712 |
| 2 | 610 | Clearance - Motor Vehicle | 487,450 | 38,398 | 8,092 | 95,813 | 345,147 |
| 3 | 615 | Net Balance - Motor Vehicle | 97,996 | 11,499 | 2,357 | 16,573 | 67,565 |
| 4 | 6113 | Aircraft Expenses | 17,753 | 2,246 | 542 | 129 | 14,834 |
| 5 | 620 | Clearance - Aircraft | 860 | 0 | 0 | 0 | 860 |
| 6 | 625 | Net Balance - Aircraft | 16,893 | 2,246 | 542 | 129 | 13,974 |
| 7 | 6114 | Tools and Other Work Equipment | 351,704 | 69,278 | 26,518 | 5,416 | 250,492 |
| 8 | 630 | Clearance - Tools and Other Work Equipment | 300,830 | 35,928 | 15,149 | 4,269 | 245,484 |
| 9 | 635 | Net Balance-Tools and Other Work Equipment | 50,874 | 33,350 | 11,369 | 1,147 | 5,008 |
| 10 | 6110 | Network Support | 178,101 | 49,164 | 14,710 | 18,202 | 96,018 |
| | | **General Support Expenses:** | | | | | |
| 11 | 6121 | Land and Building Expenses | 1,839,349 | 122,490 | 28,661 | 497,569 | 1,190,628 |
| 12 | 6122 | Furniture and Artworks Expenses | 134,094 | 1,223 | 203 | 2,834 | 129,831 |
| 13 | 6123 | Office Equipment Expenses | 266,719 | 52,309 | 12,952 | 70,989 | 130,469 |
| 14 | 6124 | General Purpose Computers Expenses | 2,463,347 | 229,689 | 62,452 | 256,035 | 1,915,175 |
| 15 | 6120 | General Support | 5,105,962 | 434,715 | 110,293 | 921,882 | 3,639,076 |
| | | **Central Office Switching Expenses** | | | | | |
| 16 | 6211 | Analog Electronic Expenses | 270,171 | 176,923 | 39,176 | 9,597 | 44,474 |
| 17 | 6212 | Digital Electronic Expenses | 2,338,171 | 1,135,832 | 96,571 | 84,325 | 1,021,445 |
| 18 | 6215 | Electro-Mechanical Expenses | 3,443 | 2,477 | 224 | 59 | 681 |
| 19 | 6210 | Central Office - Switching | 2,849,480 | 1,389,180 | 149,821 | 97,478 | 1,213,004 |
| 20 | 6220 | Operator Systems Expenses | 48,183 | 7,830 | 1,403 | 8,366 | 30,579 |
| | | **Central Office Transmission Expenses:** | | | | | |
| 21 | 6231 | Radio Systems Expenses | 15,570 | 8,557 | 1,935 | 307 | 4,771 |
| 22 | 6232 | Circuit Equipment Expenses | 1,151,420 | 746,919 | 178,896 | 11,992 | 213,612 |
| 23 | 6230 | Central Office - Transmission | 1,248,855 | 795,426 | 187,936 | 16,589 | 248,904 |
| | | **Information Orig/Term Expenses:** | | | | | |
| 24 | 6311 | Station Apparatus Expenses | 461,432 | 54,564 | 30,468 | 2,258 | 374,139 |
| 25 | 6341 | Large Private Branch Exchange Expenses | 255,366 | 60,985 | 21,295 | 390 | 172,698 |
| 26 | 6351 | Public Telephone Terminal Equipment Expenses | 241,842 | 86,919 | 23,289 | 8,626 | 123,006 |
| 27 | 6362 | Other Terminal Equipment Expenses | 2,775,816 | 1,187,058 | 266,759 | 11,194 | 1,310,806 |
| 28 | 6310 | Information Origination/Termination | 4,191,369 | 1,465,726 | 353,334 | 23,830 | 2,347,482 |
| | | **Cable and Wire Facilities Expenses:** | | | | | |
| 29 | 6411 | Pole Expenses | 310,449 | 18,220 | 3,784 | 217,959 | 70,485 |
| 30 | 6421 | Aerial Cable Expenses | 2,892,770 | 1,918,447 | 430,933 | 32,671 | 510,720 |
| 31 | 6422 | Underground Cable Expenses | 803,612 | 512,505 | 105,898 | 17,041 | 168,169 |
| 32 | 6423 | Buried Cable Expenses | 2,826,475 | 1,589,098 | 349,673 | 13,289 | 874,412 |
| 33 | 6424 | Submarine Cable Expenses | 482 | 212 | 33 | 5 | 231 |
| 34 | 6425 | Deep Sea Cable Expenses | 83 | 11 | 2 | 68 | 2 |
| 35 | 6426 | Intrabuilding Network Cable Expenses | 56,225 | 39,419 | 9,262 | 488 | 7,058 |
| 36 | 6431 | Aerial Wire Expenses | 8,277 | 4,923 | 1,024 | 200 | 2,126 |
| 37 | 6441 | Conduit Systems Expenses | 185,465 | (22,016) | (12,208) | 38,913 | 180,776 |
| 38 | 6410 | Cable and Wire Facilities | 7,610,214 | 4,267,201 | 919,165 | 352,786 | 2,071,062 |
| 39 | 650 | Total Plant Specific Operations Expenses | 21,232,164 | 8,410,247 | 1,736,655 | 1,439,134 | 9,646,128 |

Note -- Boldfaced amounts equal the sum of the same accounts for all reporting local exchange companies. Unbolded
amounts reflect only the large incumbent local exchange carriers, i.e., the Bell operating companies and GTE.

STATISTICS OF COMMUNICATIONS COMMON CARRIERS

**Introduction to Historical Rate Table 4.12**

Table 4.12 presents a summary of trends in basic interstate message toll rates for the three largest interstate long distance carriers: AT&T Communications, MCI-WorldCom Inc., and Sprint Communications company. The information is based on each carrier's TARIFF F.C.C NO. 1, as well as AT&T's TARIFF F.C.C. NO. 27*, and on the rates that were in effect on December 31 of each year. The rates shown may differ slightly from the amounts charged due to rounding.

The toll rates are charges for toll telephone calls between the top 10 Metropolitan Statistical Areas (MSAs) as determined by the 1990 Census:

    1) New York, NY-NJ-CT
    2) Los Angeles, CA
    3) Chicago, IL-IN-WI
    4) San Francisco, CA
    5) Philadelphia, PA-NJ-DE-MD
    6) Detroit, MI
    7) Boston, MA-NH
    8) Washington, DC-MD-VA
    9) Dallas, TX
    10) Houston, TX

*Alternative rates and discount calling plans are available from each of these carriers giving customers better value for their long distance expenditures*

The toll rates are based on approximate rate distances between pairs of cities. Rate distances are airline mileages determined by the "V-H System." Rate centers are designated by vertical (V) and horizontal (H) coordinates, and distances (mileages) are mathematically computed using the coordinate differences between rate centers. Rate mileages are used to determine the per-minute rate charged. Beginning in 1984, all three carriers restructured their tariff rate schedules so as to charge lower rates for each additional minute. Between 1989 and 1992, each of the three carriers eliminated the differences between its initial-minute and additional-minute rates. Beginning in 1993, all three carriers began to restructure their basic business rates so as to apply to Peak (Day) and Off-Peak (Evening and Night/Weekend) periods only. Moreover, in addition to rate-period unification, these carriers began to move toward mileage-band consolidation and basic rate simplification shown by trends in the rate table.

**Approximate Rate Mileages Between**

| New York City, NY and: | | | Philadelphia, PA and: | | |
|---|---|---|---|---|---|
| Boston, MA | - | 187 | Dallas, TX | - | 1,309 |
| Chicago, IL | - | 711 | Detroit, MI | - | 448 |
| Dallas, TX | - | 1,369 | Houston, TX | - | 1,345 |
| Detroit, MI | - | 495 | San Francisco, CA | - | 2,513 |
| Houston, TX | - | 1,411 | | | |
| Los Angeles, CA | - | 2,452 | Detroit, MI and: | | |
| Philadelphia, PA | - | 82 | Dallas, TX | - | 999 |
| San Francisco, CA | - | 2,544 | Houston, TX | - | 1,101 |
| | | | San Francisco, CA | - | 2,062 |
| Los Angeles, CA and: | | | | | |
| Boston, MA | - | 2,582 | Boston, MA and: | | |
| Chicago, IL | - | 1,707 | Dallas, TX | - | 1,556 |
| Dallas, TX | - | 1,251 | Detroit, MI | - | 605 |
| Detroit, MI | - | 1,984 | Houston, TX | - | 1,616 |
| Houston, TX | - | 1,386 | Philadelphia, PA | - | 274 |
| Philadelphia, PA | - | 2,346 | Washington, DC | - | 398 |
| | | | | | |
| Chicago, IL and: | | | Washington, DC and: | | |
| Boston, MA | - | 846 | Chicago, IL | - | 598 |
| Dallas, TX | - | 796 | Dallas, TX | - | 1,201 |
| Detroit, MI | - | 238 | Detroit, MI | - | 386 |
| Houston, TX | - | 923 | Houston, TX | - | 1,240 |
| Philadelphia, PA | - | 657 | Los Angeles, CA | - | 2,307 |
| San Francisco, CA | - | 1,858 | New York, NY | - | 206 |
| | | | Philadelphia, PA | - | 127 |
| San Francisco, CA and: | | | San Francisco, CA | - | 2,412 |
| Boston, MA | - | 2,717 | | | |
| Dallas, TX | - | 1,467 | | | |
| Houston, TX | - | 1,622 | | | |

---

* In September 1995, AT&T moved its residential service from TARIFF NO. 1 to TARIFF NO. 27.

# ATTACHMENT B
## to Exhibit 2

# Alan Feldman

| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Thursday, May 22, 1997 1:47 PM |
| **To:** | PWYNNS; AFELDMAN |
| **Cc:** | TBEERS; COHARRIS |
| **Subject:** | Reply to Alan's e-mail |

Text item: Message Text

Peyton and Alan:
I have had time to digest Alan's insultive e-mail of today to me. And in this reply, I am going to kill two birds with a stone by addressing this to both of you (to Peyton, as our division chief and to Alan, the deputy chief and sender).

While Alan was right about adjusting 2/8/96 stock prices for Nynex and SBC, the fact is that our financial data-set has not been revised for both companies (I know there are blames to be passed around on this, eh!!). So this was an "honest" mistake and not a "sloppy" or "messy" work: I am proud of what I do as a professional or otherwise. As such, I am embrassed by this and apologise for the honest mistake; and will make revisions to the data-set as soon as possible. Even had I adjusted the prices, it would have made the result worse (see attached file).

However, I reject the insultive tone and/or the manner of reproach in the Alan's e-mail to me. There is a professional and/or refined manner of pointing out other's mistakes and/or of correcting others. This is a professional shop and, honestly, I still don't know how to take his e-mail whether as a rebuke of a "messy" work as alleged or simply pointing out an honest error.

As a professional, I am proud of my work and would not appreciate of being ridiculed for an honest mistake. This is his/your second insultive e-mail directly to me. Enough is enough!! I would neither appreciate nor tolerate any insults or disrespects from anyone regardless of the person's position. We are all professionals here and we should behave as such. Thank you for your time and attention.

John

1

# Alan Feldman

**From:** John Adesalu
**Sent:** Wednesday, January 14, 1998 7:17 AM
**To:** AFELDMAN
**Cc:** TBEERS; PWYNNS
**Subject:** SOCC table instructions -Reply


Text item: Message Text

Alan, this was an oversight on my part and not intentional. The instructions for Tables 2.7, 2.8 and Part 3 do not need any updates. I will try to give you the instructions for Parts 5 and 7 either today or latest tomorrow morning, and am working on them now. Sorry for the delay.

John

>>> Alan Feldman 01/14/98 07:28am >>>
John,
  At our last SOCC meeting, which was held around the middle of December, I asked everyone in the SOCC group to update the table instructions for the tables they had completed and also to update the section in their table instructions pertaining to final book editing that documents which items to check and compare within the table as well as which items to compare with items
in other tables.    The book's production had just been completed and the procedures for doing tables should have been fresh in everyone's mind, especially with all the last minute problems we had.   I requested the updates as soon as possible, although no deadline was given.
  I sent an email reminder to everyone in the group on Jan. 7, 1998 and set a deadline for close of business, Monday Jan. 12.    You're the only one in the group I haven't received anything from.   You should be aware that it is very important when assignments are given that work is completed and schedules and deadlines are met.
  Your table instructions, as well as the final edit procedures, should be easy to update so that they reflect accurate procedures for generating correct tables.   Please let me know today why you haven't been able to complete this
assignment and when you will be able to complete it.   Thanks
   Alan

1

**From:** Alan Feldman
**Sent:** Thursday, December 18, 2003 9:24
**To:** John Adesalu
**Subject:** Personal Development Plan (PDP)

John, You're the only one in the division without an agreed upon PDP. Please finish your plan and get it to me so we can sign off on it or, if necessary, continue to get it acceptable to both of us. Thanks, Alan

# Alan Feldman

| | |
|---|---|
| **From:** | Alan Feldman |
| **Sent:** | Wednesday, June 30, 2004 4:25 PM |
| **To:** | John Adesalu |
| **Subject:** | RE: Fed's latest action |

John, I need to know how the conversion form Lotus to Excel is going, whether any tables are done and/or how close are they to completion, and if the data looks like it's in good shape. Thanks, Alan

-----Original Message-----

| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Wednesday, June 30, 2004 4:20 PM |
| **To:** | Alan Feldman |
| **Subject:** | RE: Fed's latest action |

I am working on them. The dissemination of fed's action does not hinder the SOCC book. It is additional!

John B. Adesalu

-----Original Message-----

| | |
|---|---|
| **From:** | Alan Feldman |
| **Sent:** | Wednesday, June 30, 2004 4:08 PM |
| **To:** | John Adesalu |
| **Subject:** | RE: Fed's latest action |

Thanks John. Where do you stand on your statistics book tables? I asked this question Monday and I still haven't heard from you.

-----Original Message-----

| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Wednesday, June 30, 2004 3:50 PM |
| **To:** | IATD |
| **Subject:** | Fed's latest action |

FYI, as expected the Federal Reserve (Central Bank) this afternoon raised federal fund rate by a quarter-point, or 0.25%, to 1.25%. Federal fund rate is the interest rate paid by the member banks for the overnight use of other banks' deposits at the fed. All things being equal, this action should not cause any surprises to the Wall Street because the market follows a random-walk.

http://www.washingtonpost.com/wp-dyn/articles/A18096-2004Jun30.html?referrer=email

Thanks
John B. Adesalu

# Alan Feldman

**From:** Alan Feldman
**Sent:** Friday, July 23, 2004 3:00 PM
**To:** Joseph Hall
**Subject:** FW: RE: Employee Annual Reviews

Joe,  What is the best way to respond to an employee who insists he doesn't need to improve a particular skill that I think definitely needs improvement?  I'm willing to drop the issue and let him have his own way because the PDP is meant to be the employee's plan for improvement.  Obviously, if an employee feels strongly that he doesn't need improvement in a particular area then that may be acceptable to the PDP program.  However, I think it would be beneficial for him to take this training because I have recommended this class to many of our employees (some that are exceptionally good writers) and all employees that have taken the class felt it was very beneficial.  Thanks, Alan

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** John Adesalu
**Sent:** Friday, July 23, 2004 2:42 PM
**To:** Alan Feldman
**Subject:** RE: Employee Annual Reviews

I've reviewed the attached document and the last highlighted statement should not be included because (1) we did not discuss it; and (2) I do not need to take any writing class, I can write proficiently as illustrated by my past publications. I agreed with the rest of the review. Thanks

John B. Adesalu



EmployeeReviewLet
ter0704JohnAd...

1

## Alan Feldman

**From:** Alan Feldman

**Sent:** Friday, August 06, 2004 1:54

**To:** John Adesalu

**Subject:** RE: SOCC table 2.6

John, I don't see any changes to the company data on the version that's now on the K drive. Therefore, the totals are still not equal to the sum of the parts. Can you tell me (or show me) exactly what you're doing to correct this problem? Thanks, Alan

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** John Adesalu
**Sent:** Friday, August 06, 2004 11:46 AM
**To:** Alan Feldman
**Subject:** RE: SOCC table 2.6

It is done and saved on K drive. Please check it.

John B. Adesalu

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Friday, August 06, 2004 11:14 AM
**To:** John Adesalu
**Subject:** SOCC table 2.6
**Importance:** High

John, This past Tuesday afternoon I again mentioned the problems with the totals shown on table 2.6 not being equal to the sum of the columns in the table. You indicated you would review the table by double checking the sum and get back to me the following day. It is now Friday and I still haven't heard from you. Please let me know today where you stand with correcting the table or if you need help to get this done. Thanks, Alan

*** Non-Public: For Internal Use Only ***

**Alan Feldman**

**From:** Alan Feldman

**Sent:** Tuesday, January 11, 2005 4:01

**To:** John Adesalu

**Subject:** RE: SOCC Instructions

Ok, thanks.

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** John Adesalu
**Sent:** Tuesday, January 11, 2005 3:56 PM
**To:** Alan Feldman
**Subject:** RE: SOCC Instructions

Alan, I am working on them and should finish soon. Please allow me until this Friday to give them to you. Sorry for the lateness. Thanks!

John B. Adesalu

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Tuesday, January 11, 2005 2:15 PM
**To:** John Adesalu
**Subject:** RE: SOCC Instructions

John, Where are the instructions that were due last Friday? If they're not done, when will they be completed? Alan

*** Non-Public: For Internal Use Only ***

-----Original Message-----
**From:** Alan Feldman
**Sent:** Wednesday, December 15, 2004 4:20 PM
**To:** Katie Rangos; John Adesalu; Mike Lehner
**Subject:** SOCC Instructions

I think it's time we refresh our SOCC table-preparation instructions. Please think about how you compiled your SOCC tables, including the types of editing checking necessary, and provide detailed written instructio so that others can understand and, if necessary, pick up the work should the need arise. In addition, you should include instructions on the final editing process so that it is clear which items need to be checked an compared within the tables as well as which items need to be compared to items in other tables. I would lik to see these written instructions by COB, Friday, Jan. 7, 2005. That should be more than enough time to complete this assignment and not interfere with your end of year vacation plans. Please get with me this week if this assignment poses any problem or if you need any guidance on the level of detail that should be provided. Thanks, Alan

*** Non-Public: For Internal Use Only ***

## Alan Feldman

| | |
|---|---|
| **From:** | Alan Feldman |
| **Sent:** | Monday, July 18, 2005 3:47 PM |
| **To:** | John Adesalu; Katie Rangos |
| **Subject:** | RE: A suggestion! |

John, I don't think scaling it to hundredths, as opposed to percentages, will make a difference. You seem to be using one scale on the left for AT&T and MCI, and another on the right for Sprint. I've never seen a trends chart shown that way. Alan

\*\*\* Non-Public: For Internal Use Only \*\*\*

-----Original Message-----
| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Monday, July 18, 2005 3:43 PM |
| **To:** | Alan Feldman; Katie Rangos |
| **Subject:** | RE: A suggestion! |

O.k., good enough reason. Thanks, Katie.

Alan, the chart (just a rough example) would be clearer if I scaled it to the hundredths instead of the percentages. John B. Adesalu

\*\*\* Non-Public: For Internal Use Only \*\*\*

-----Original Message-----
| | |
|---|---|
| **From:** | Alan Feldman |
| **Sent:** | Monday, July 18, 2005 2:58 PM |
| **To:** | Katie Rangos; John Adesalu |
| **Subject:** | RE: A suggestion! |

John, Katie is correct. Besides, I don't understand your chart. Alan

\*\*\* Non-Public: For Internal Use Only \*\*\*

-----Original Message-----
| | |
|---|---|
| **From:** | Katie Rangos |
| **Sent:** | Monday, July 18, 2005 2:56 PM |
| **To:** | John Adesalu; Alan Feldman |
| **Subject:** | RE: A suggestion! |

John,

I don't know if we can pay for color charts in the book. I think you'd need to talk to Toby about that. I'm not a fan of black and white. That's the reason we have not done charts in the past. I think we would have put charts in Section 5 which has tables from Trends that had charts and we deleted them for the SOCC.

Katie

\*\*\* Non-Public: For Internal Use Only \*\*\*

-----Original Message-----
| | |
|---|---|
| **From:** | John Adesalu |
| **Sent:** | Monday, July 18, 2005 2:09 PM |
| **To:** | Alan Feldman |
| **Cc:** | Katie Rangos |
| **Subject:** | A suggestion! |

Alan, I am suggesting that we start incorporating charts, where appropriate (see attached chart), to accompany the tables in the SOCC publication. The rationale for my suggestion is that a chart gives

pictorial illustration of the data, which is easy to digest. It also embellishes the SOCC presentation as it is done for other publications. The attached chart for Table 1.5 is an example because it vividly shows trends in the data presented. Thanks!

<< File: Ta-1-5-04P.xls >>

John B. Adesalu


*** Non-Public: For Internal Use Only ***

essage

lan Feldman

| | |
|---|---|
| rom: | Alan Feldman |
| ent: | Monday, August 15, 2005 10:20 |
| o: | John Adesalu |
| ubject: | FW: Finishing the SOCC book |

nportance: High

ohn, I was expecting to see the hard copies of all your SOCC tables this morning. Please let me know when you'll have them for
e and which of your tables, if any, still need work. Please highlight any necessary unmade changes, unfinished work or
uestionable data on the hard copy. Otherwise, I'll expect the hard copy versions to be the camera-ready copy necessary for
inting. Thanks, Alan

'* Non-Public: For Internal Use Only ***

----Original Message-----
rom: Alan Feldman
ent: Friday, August 05, 2005 5:09 PM
o: Katie Rangos; John Adesalu
ubject: Finishing the SOCC book

atie and John,    As you both know, I'll be on leave next week. Based on the timing we agreed upon to produce this year's
atistics book, I would like to see final versions of all of your tables when I return on Monday, August 15, 2005. It would also be
ery beneficial if the both of you share copies of your tables amongst yourselves given the fact that this year you are both doing
e tables done by the other person in the past. Please make sure the final versions of all tables are placed in the appropriate
lders on the K drive and also print out hard copies and leave them in my mailbox. Also, if for some reason you can't complete
ny tables I want to see hard copies of the preliminary drafts with the missing information highlighted and hand written notes
dicating why the information is missing and when it will be available.

'* Non-Public: For Internal Use Only ***

# Defendant's Exhibit
# No. 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| John Adesalu, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2187 (PLF) |
| | ) | |
| KEVIN J. MARTIN, CHAIRMAN, | ) | |
| FEDERAL COMMUNICATIONS | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF NOELLE M. GREEN

1.     I am presently employed as Human Resources Specialist, Office of Managing Director ("OMD"), Federal Communications Commission ("FCC"). I have served in that capacity since May 18, 2003.

2.     The information set forth in this Declaration is based upon my official knowledge acquired in my official position in OMD, FCC.

3.     The FCC's OMD keeps records of all FCC vacancies. I performed a search of OMD's records for Industry Economist vacancies at the GS-14 grade level for which John B. Adesalu contends that he applied on January 25, 2002, March 9, 2004, and July 15, 2004. OMD could not locate merit promotion or delegated examining unit files concerning any such vacancies in January 2002 or July 2004. OMD has thus been unable to ascertain whether Mr. Adesalu was eligible and/or applied for the vacancies, or information regarding the selection processes. It is likely that, even had files regarding such vacancies existed, they would have been purged consistent with the Agency's records retention policy.

4.     The FCC recently located a delegated examining unit file pertaining to VAN DEU-04-003, which advertised Industry Economist positions in various FCC offices and bureaus at the GS-11 through 14 levels. The vacancy was open from February 25, 2004 through March 9, 2004. Mr. Adesalu applied for the vacancy at the GS-14 level on March 9, 2004. The selectee, Kitty K. Chan, was chosen to fill the position at the GS-13 level on April 28, 2004, and thereafter began work in IATD at the GS-13 level. By letter dated March 29, 2004, Mr. Adesalu was informed that he was rated as eligible for the position, but did not rank among the best qualified candidates, so therefore was not referred to the selecting official for consideration. *See* Attachment A hereto.

5.      Pursuant to 28 U.S.C. § 1746, I, Noelle M. Green, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 25th day of July, 2008.

Noelle M. Green

# ATTACHMENT A
## to Exhibit 3

**Federal Communications Commission**
**Washington, DC 20554**

March 29, 2004

Reference # DEU-04-003CL-11265

Mr. John Adesalu
5303 Grovemont Drive
Elkridge, MD 21075

Dear Mr. Adesalu:

Thank you for submitting an application for the position(s) of Industry Economist, DEU-04-003CL. You were found eligible, but did not rank among the most highly qualified. Therefore, you were not referred to the selecting official for final consideration.

We appreciate your interest and hope you will continue to apply for future vacancies.

Sincerely yours,

Carolyn P. Lark

Carolyn Lark

Personnel Management Specialist
Personnel Resources Service Center

# Defendant's Exhibit
# No. 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| John Adesalu, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-2187 (PLF) |
| ) | |
| Kevin J. Martin, Chairman, ) | |
| Federal Communications Commission, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF RODGER WOOCK

1.      I am presently employed as Chief, Industry Analysis and Technology Division ("IATD"), Wireline Competition Bureau ("WCB"), Federal Communications Commission ("FCC" or "Commission"). I have served in that capacity since June, 2004, except I was detailed to the FCC's Office of Managing Director from June 2006 through December 2007. During the time of my detail, Alan Feldman served as Acting Chief of IATD.

2.      The information set forth in this Declaration is based upon my official knowledge acquired in my official management position in WCB, FCC.

3.      I have supervised John B. Adesalu since June 2004, except during my detail as described in paragraph no. 1 above. I never promised Mr. Adesalu that I would promote him to the GS-14 level. I met with Mr. Adesalu on December 2, 2005. Mr. Adesalu came into my office and demanded that I promote him to the GS-14 level. I told Mr. Adesalu that I would not promote him. I had no authority to promote him automatically to the GS-14 level, but could only recommend an employee for promotion. Moreover, based upon Mr. Adesalu's work performance, I did not believe that a non-competitive promotion through accretion of duties was warranted. Mr. Adesalu has never requested a desk audit.

4.      As Chief, IATD, I tried to work with Mr. Adesalu on several occasions to improve his work performance. I assigned Mr. Adesalu a project to perform a competitive financial analysis of the Regional Bell Operating Companies to determine their ability to leverage assets to capitalize acquisitions. Mr. Adesalu was unable to work independently and complete this work project satisfactorily, despite repeated assistance from me. For example, when I would provide him with sources to obtain information to complete the project, Mr. Adesalu would merely copy information from these sources (often incorrectly) and return to my office.

5.      In contrast, other Industry Economists employed in IATD have performed well. Ellen Burton heads major work projects, handles many assignments, and does superior work in timely fashion.  Jim Eisner does outstanding work, frequently picks up extra assignments, and meets deadlines.  Craig Stroup has an excellent work record, does a lot of consulting work for IATD with other FCC divisions, looks for extra work, and is willing and able to take on significant responsibility.

6.      I am Caucasian, white, and was born in the United States.

7.      Pursuant to 28 U.S.C. § 1746, I, Rodger Woock, declare under penalty of perjury that the foregoing is true and correct.  Executed on this *25* day of July, 2008.

Rodger Woock

2

# Defendant's Exhibit
# No. 5

Redact Page

MAY. 22. 2006  4:19PM    FCC-OGC 202-418-2543    NO. 417   P. 4/12

## FORMAL COMPLAINT OF DISCRIMINATION

2006 MAR 20  A 10:07

| | |
|---|---|
| Authority: | Public Law 92-261 |
| Principle Purpose: | Formal filing of allegation of discrimination because of race, color, religion, sex, handicap, age, natl |
| Routine Uses: | This form and the information on this form may be used: (a) as a data source for complaint informat summary descriptive statistics and analytical studies of complaints processing and resolution effort used to respond to general requests for information under the Freedom of Information Act; (b) to res from legitimate outside individuals or agencies (e.g. Members of Congress, The White House, and t Opportunity Commission(EEOC) regarding the status of the complaint or appeal; and (c) to adjudic |
| Disclosure: | Voluntary; however, failure to complete all appropriate portions of this form may lead to rejection of basis of inadequate data on which to determine if complaint is acceptable. |

| 1. NAME OF COMPLAINANT (Last, First, Middle Initial) | 4. ADDRESS (Include City, State, and Zi |
|---|---|
| Adesalu,  John B. | ▓▓▓▓▓▓▓▓▓▓▓▓ |

| 2. SOCIAL SECURITY NUMBER |
|---|
| ▓▓▓▓▓▓▓▓ |

| 3a. HOME TELEPHONE NO. ▓▓▓▓▓ | 3b. WORK TELEPHONE NO 202-418-7097 |
|---|---|

| 5. ARE YOU BEING REPRESENTED? | 5c. IF YES, NAME OF REPRESENTATIVE |
|---|---|
| ☒ a. Yes (Complete 5c)   ☐ b. No | Alan Lescht, Attorney at Law |

| 6a. NAME OF PERSON YOU BELIEVE DISCRIMINATED AGAINST YOU | 6b. LOCATION OF INDIVIDUAL NAMED I |
|---|---|
| Rodger Woock, Chief | Industry Analysis & Technology Division, WCB |

| 7a. TITLE AND GRADE OF YOUR CURRENT JOB | 7c. ADDRESS OF YOUR CURRENT JOB |
|---|---|
| Industry Economist, GS-13-7 | FCC<br>455 12th Street, SW<br>Washington, DC |

| 7b. ARE YOU CURRENTLY A FEDERAL EMPLOYEE ☒ Yes  ☐ No<br>If Yes (Complete 7c) | 8. DATE ON WHICH MOST RECENT AL OCCURRED<br>December 2, 2005 |
|---|---|

### 9. Reason you believe you were discriminated against (Check Below):

| | |
|---|---|
| ☒ a. RACE (State your race) African American | e. HANDICAP ☐ Mental ☐ |
| ☒ b. COLOR (State your color)   Black | f. SEX ☐ Female ☐ |
| ☐ c. RELIGION (State your religion) | g. AGE ☐ (specify age) |
| ☒ d. NATIONAL ORIGIN (State Natl. Origin) Nigeria | h. REPRISAL ☐ |

| 10. I HAVE DISCUSSED MY COMPLAINT WITH AN EEO OFFICIAL | 10c. IF YES, NAME OF COUNSELOR |
|---|---|
| ☒ a. Yes (Complete 10c)   ☐ b. No | Dr. Paula Ann Lech |

12. EXPLAIN SPECIFICALLY HOW YOU WERE DISCRIMINATED AGAINST (That is treated differently from other employees of your race, color, religion, sex, national origin, age, mental or physical handicap, or reprisal.) (If your complaint involves m for your dissatisfaction, list and number each such allegation separately and furnish specific, factual information in support additional sheets if necessary.

SEE ATTACHED

## DISCRIMINATION COMPLAINT OF JOHN ADESALU

I believe that I have been subjected to discrimination on the basis of my color (black) and national origin (Nigeria) as follows:

1. I have worked for FCC for over 11 years.
2. I am employed as an Industry Economist, GS 13, Step 7.
3. I have been in the same grade and step for over 10 years.
4. I have not been promoted for over 10 years.
5. Similarly situated people who are not black and who are not from Nigeria have been promoted during this time.
6. I believe that my experience and qualifications are equal to or better than the people who have been promoted.
7. I believe that I have been repeatedly denied promotions because I am black and because of my national origin.
8. The most recent incident of discrimination occurred on December 2, 2005, when I met with my supervisor, Roger Woock (white male), and he told me he would not promote me.
9. Mr. Woock had promised me earlier that he would promote me in December 2005.
10. I believe his decision not to promote me is based on my color and national origin.
11. I also believe that my supervisor Alan Feldman (white) has also discriminated against me on the basis of my race and national origin in that he has played a role in denying me promotions.

_____
John Adesalu

2

13. WHAT SPECIFIC ACTION DO YOU WANT TAKEN TO RESOLVE YOUR COMPLAINT? (If more than one allegation is be corrective action desired and the specific corrective action desired for each separate allegation.)

(1) Promotion to GS-14/15;

(2) Compensation of lost earnings for past years of discrimination; and

(3) Refund of all out-of-pocket costs for my legal representation.

14. LIST IN ITEM 15 THE NAMES OF YOUR WITNESSES AND WHAT FACTUAL INFORMATION EACH WILL BE EXPECTE THROUGH HIS/HER TESTIMONY TO THE INVESTIGATION OF YOUR COMPLAINT.

15. HAS THE MATTER LISTED IN ITEM 12 BEEN APPEALED TO THE MERIT SYSTEM PROTECTION BOARD OR FILED L GRIEVANCE PROCEDURE?  ☐ a. Yes (explain in Item 16)  ☒ b. No

16. REMARKS

| 17. SIGNATURE OF COMPLAINANT | 18. DATE (Month, Day, Yea |
|---|---|
| | 3-20-06 |

To be Completed by the Organization's EEO Office

I certify that: (1) The complainant has reaffirmed this complaint in my presence and has stated that the facts contained therein a her knowledge ; (2) a determined effort at informal resolution of this complaint failed to produce a solution satisfactory to the co management in the appropriate charge of command has been informed concerning the complaint and its submission in the abov

| 19. SIGNATURE OF EEO OFFICIAL | 20. PRINTED NAME & TITLE | 21. TELEPHONE NO. |
|---|---|---|
| | | |

INFORMATION CONCERNING THE PROCESSING OF YOUR COMPLAINT OF DISCRIMINATION

# Defendant's Exhibit No. 6

FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF WORKPLACE DIVERSITY

## INITIAL CONTACT AND/OR COUNSELING SESSION FOR INFORMAL COMPLAINT OF DISCRIMINATION

DATE 12/22/05

COMPLAINT NUMBER _____

PART I:  BACKGROUND:

NAME: Adesalu, John B
(Last, First, Middle Initial)

SSN: _____

ORGANIZATION ASSIGNED TO:

WCB — IATD

HOME ADDRESS: _____

WORK TELEPHONE: 202 418 7097

HOME TELEPHONE: _____

PART II:  BASIS OF COMPLAINT:  (Identify specific race, color, religion, national origin, disability, age or reprisal if alleged.)

RACE: _____✓_____

COLOR: _____
RELIGION: _____
NATIONAL ORIGIN ___✓___

DISABILITY: Physical _____
Mental _____
SEX: Male [ ]  Female [ ]
AGE: _____
REPRISAL: _____

PART III:  INCIDENT GIVING RISE TO VISIT/CONTACT:  (Who, What, When, Where, Dates) Use separate sheet of paper if necessary. Sent e-mails to me but no response

John had been seeking meetings with Division Chief to discuss possible promotions. Finally December 2, 2005 meeting Roger Wdock. Division Chief who had promises promotion if he worked hard and did not fulfill his promise after the 2 year time span that was agreed upon. This is reflective of years of being passed over for

12

(white males and white females)

promotions after applying for them and others being given them in his
Division. See attached email to Jonaythos Leva, Deputy Chief Economist.
Subject believes his immediate Supervisor is keeping him from being promoted. Supervisor is Alan Feldman.
NAME AND ADDRESS OF ALLEGED DISCRIMINATION ORGANIZATION:

Federal Communications Commission
445 12th St.
Washington DC 20054

PART IV:   RELIEF SOUGHT:

Promotion to GS 14/15

PART V:   SUMMARY:

The complainant agrees by initialing the following subject areas
that the complaint process and/or Alternate Dispute Resolution
(ADR) program has been discussed and/or handouts provided:

Explained the role of the EEO Counselor                    TBA

Informed of basis(es) for filing an informal
and formal individual or class complaint,                  TBA
and right to file.

Explained the individual or class complaint                TBA
process.

Issued avenues of redress.                                 TBA

Informed of rights and responsibilities.                   TBA

Informed of 45-day requirement from effective
date of personnel action or of the date of the
matter alleged to be discriminatory to contact             TBA
EEO Counselor

Informed of requirement to notify EEO office
of non-attorney or attorney representation in              TBA
writing with address and phone number.

13

2

Notified of requirement of attorney's
submission of billing requirements at
formal stage.

*Not discussed*

*TBA*

Informed of witness(es) rights.

*TBA*

Explained ADR Program.

*TBA*

Offered informal counseling/ADR.

PART VI:    <u>OUTCOME</u>:

Contact resulted in the
election of:

[ ] traditional counseling
[X] ADR
[ ] declined to pursue
    matter under Title VII

Name of assigned counselor/mediator _____

Date EEO counselor/mediator assigned _____

At this time (aggrieved to initial one):
_____ I elect to remain anonymous.
_____ I waive my right to remain anonymous.


_____ 12/22/05
Aggrieved person

_____
EEO official

*EEO Counselor*
*Industry Economist*
Title of EEO official

3

*14*

# Defendant's Exhibit
# No. 7



Federal Communications Commission
Washington, D.C. 20554

April 10, 2006

Mr. Allen Lescht, Esq.
Allen Lescht and Associates
1050 17th Street, N.W.
Suite 220
Washington, DC 20036

John Adesalu v. Kevin Martin (FCC-EEO-06-01)

Dear Mr. Lescht:

This will acknowledge receipt of your client's, Mr. John Adesalu, EEO discrimination complaint filed in this Office on March 20, 2006.

Prior to processing your client's complaint, we would like to receive additional information as set forth below.

Your client asserts that he was repeatedly denied promotions. In this connection, please provide the dates and the announcement numbers where your client applied for a suitable positions but was not selected. He also claims that similarly situated employees, who were not Black and/or who were not from Nigeria, have been promoted. Please specify the employee names and relevant time frames involving these personnel actions.

We would appreciate your client's response to the above questions by Friday, April 21, 2006.

If you have any further questions about your client's rights, or if any portion of the EEO discrimination complaint process is unclear to you, you may call Ms. Linda Miller at (202) 418-2581 for explanation or clarification.

Sincerely,

Federal Communications Commission

P.
Ac     Courier
Off          Mail

37705512

Cc: Mr. John Adesalu
Wireline Competition Bureau
445 12th Street, SW
Washington, DC 20554

Internet: www.fcc.gov
E-mail: FCCInfo@fcc.gov
Phone: 1-888-CALL-FCC
TTY: 1-888-TELL-FCC

# Defendant's Exhibit No. 8

ALAN LESCHT & ASSOCIATES, P.C.

1050 17th Street, N.W.
Suite 220
Washington, D.C. 20036

RECEIVED & INSPECTED

APR 2 4 2006

FCC-MAILROOM

April 18, 2006

P. June Taylor
Acting Director
Office of Workplace Diversity
Federal Communications Commission
Wash., DC 20554

Re:   John Adesalu v. Kevin Martin (FCC-EEO-06-01)

Dear Ms. Taylor:

The enclosed document responds to the questions raised in your letter of April 10, 2006.

Very truly yours,

Alan Lescht

TEL 202-463-6036
Fax 202-463-6067

4

## SUPPLEMENT TO DISCRIMINATION COMPLAINT OF JOHN ADESALU

I believe that I have been subjected to discrimination on the basis of my color (black) and national origin (Nigeria) as follows:

1. I have worked for FCC for over 11 years.

2. I am employed as an Industry Economist, GS 13, Step 7.

3. I have been in the same grade and step for over 10 years.

4. I have not been promoted for over 10 years.

5. Similarly situated people who are not black and who are not from Nigeria have been promoted during this time.

6. I believe that my experience and qualifications are equal to or better than the people who have been promoted.

7. I believe that I have been repeatedly denied promotions because I am black and because of my national origin.

8. The most recent incident of discrimination occurred on December 2, 2005, when I met with my supervisor, Roger Woock (white male), and he told me he would not promote me.

9. Mr. Woock had promised me earlier that he would promote me in December 2005.

10. I believe his decision not to promote me is based on my color and national origin.

11. I also believe that my supervisor Alan Feldman (white) has also discriminated against me on the basis of my race and national origin in that he has played a role in denying me promotions.

12. Set forth below are dates of prior vacancy announcements for promotions that I applied for:

5

| Application | Date submitted |
|---|---|
| 1 Vacancy announcement | March 9, 2004 |
| 1 Vacancy announcement | July 15, 2004 |
| 1 Vacancy announcement | January 25, 2002. |

13. The names of white and non-Nigerian employees who were promoted in my division since I joined it over ten years ago are:

Ellen Burton, hired in 1996 (after me) by the division, the old Industry Analysis Division (IAD), as a GS-14 economist and promoted to GS-15 a year or two later;

Jim Eisner hired by IAD in 1997 or 1998 as a GS-12/13 (?) economist, promoted the following year to GS-14 and to GS-15 a year or two later.

Craig Stroup, hired in 1998 (?) followed the same career path as Jim Eisner's above;

Les Selser, a GS-14 economist, came to the IAD from the old Network Services Division of the bureau during the last restructuring of the agency, and was promoted to GS-15 a year or two later. He retired immediately after the promotion; and

Tracy Waldon, a GS-13 economist in the IATD (new name for the division)---Industry Analysis and Technology Division---was promoted to GS-15 and chief economist of the Media Bureau about 3 years ago.

Date:  April 18, 2006

John Adesalu

6

# Defendant's Exhibit No. 9

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### WASHINGTON FIELD OFFICE
#### 1801 L Street, N.W., Suite 100
#### Washington, D.C. 20507

|  |  |
|---|---|
| John Adesalu, | ) |
| | ) |
| Complainant, | ) EEOC No. 570-2006-00564X |
| | ) |
| v. | ) Agency No. FCC-EEO-0601 |
| | ) |
| Kevin J. Martin, Chairman, | ) |
| Federal Communications Commission, | ) |
| | ) **Date: May 16, 2007** |
| Agency. | ) |

### ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed Decision dated May 16, 2007, judgment in the above-captioned matter is hereby entered. A Notice To The Parties explaining their appeal rights is attached. This office is also enclosing a copy of the hearing record and the report of investigation for the Agency.

**It is so ORDERED.**

For the Commission:

_____
Frances del Toro
Administrative Judge

Enclosures

## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing documents within five (5) calendar days after the date they were sent *via* first class mail. I certify that on May 16, 2007, the foregoing documents were sent *via* first class mail to the following:

John B. Adesalu
5303 Grovemont Drive
Elkridge, MD 21075

Michael A. Krasnow
Federal Communications Commission
Office of the General Counsel
445 12th Street, SW
Suite 8-A764
Washington, DC 20554

Alan Lescht, Esq.
Alan Lescht & Associates, PC
1050 17th Street, NW
Suite 220
Washington, DC 20554

Director, Office of Workplace Diversity
Federal Communications Commission
445 12th Street, SW
Suite 5-C741
Washington, DC 20554

_____
Frances del Toro
Administrative Judge

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**1801 L Street, N.W., Suite 100**
**Washington, D.C. 20507**

| | |
|---|---|
| John Adesalu, | ) |
| Complainant, | ) EEOC No. 570-2006-00564X |
| v. | ) Agency No. FCC-EEO-0601 |
| Kevin J. Martin, Chairman, | ) |
| Federal Communications Commission, | ) |
| Agency. | ) **Date: May 16, 2007** |

<table>
<tr><td>John Adesalu,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Complainant,</td><td>)</td><td>EEOC No. 570-2006-00564X</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td><td>Agency No. FCC-EEO-0601</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Kevin J. Martin, Chairman,</td><td>)</td></tr>
<tr><td>Federal Communications Commission,</td><td>)</td></tr>
<tr><td></td><td>)</td><td>**Date: May 16, 2007**</td></tr>
<tr><td>Agency.</td><td>)</td></tr>
</table>

## DECISION

This Decision is being issued without a hearing, pursuant to 29 C.F.R. § 1614.109(g)(3) (2006). On January 22, 2007, the Agency filed a Motion for Summary Judgment ("Agency's Motion"). On February 20, 2007, Complainant filed an Opposition to Agency's Motion for Summary Judgment ("Complainant's Opposition"). On March 18, 2007, the Agency filed a Reply to Complainant's Opposition to Agency's Motion for Summary Judgment ("Agency's Reply"). The remaining procedural history is contained in the case file and the Report of Investigation ("ROI") and will not be reiterated. The record before me consists of the ROI and the parties' submissions.

## CLAIMS

Whether Complainant was subjected to discrimination on the bases of his race (Black) and National Origin (Nigerian), when the Agency repeatedly denied his requests for promotion

and his supervisor informed him that he would not promote him.[1]

## FINDINGS AND ANALYSIS

### A. THE GOVERNING LAW FOR SUMMARY JUDGMENT

The EEOC's regulations on summary judgment are patterned after Rule 56 of the Federal Rules of Civil Procedure, which provides that a moving party is entitled to summary judgment if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. There is no genuine issue of material fact where the relevant evidence in the record, taken as a whole, indicates that a reasonable factfinder could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B. UNDISPUTED FACTS

1. At the time relevant to this complaint, Complainant worked for the Agency as an Industry Economist, GS-13, in the Industry Analysis and Technology Division ("IATD"), Wireline Competition Bureau ("WBC").

2. Complainant identified himself as being black and his national origin as Nigerian.

3. At the time Complainant initiated the EEO process in December 2005, his first-level supervisor was Alan Feldman (Caucasian, American), former Deputy Chief, IATD.

4. Complainant's second-level supervisor was Rodger Woock (White, American), former Chief, IATD.

5. The GS-13 level is the full performance level of Complainant's position.

---

[1] Complainant avers that he applied for unspecified vacancy announcements on January 25, 2002, March 9, 2004 and July 15, 2005.

6. On December 2, 2005, Complainant met with Woock and requested a promotion to a GS-14 level. Woock stated to Complainant that he could not promote him to a GS-14.

## C. CONCLUSIONS OF LAW

To establish a *prima facie* case of disparate treatment in a nonselection case, a Complainant must show: (1) that he is a member of a group protected from discrimination; (2) that he applied for and was qualified for the position at issue; and (3) that he was rejected under circumstances which give rise to an inference of unlawful discrimination, *e.g.*, the Agency continued to seek applicants or filled the positions with persons who were not members of Complainant's protected group. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973).

Complainant can establish a *prima facie* case of age discrimination by showing that: (1) he is a member of a group protected from discrimination, *i.e.*, age 40 or older; and (2) similarly situated individuals significantly younger than Complainant were treated more favorably. *O'Connor v. Consol. Coin Caterers*, 517 U.S. 308 (1996); *McDonnell Douglas*, 411 U.S. at 802, n.13; *Miller v. Lyng*, 660 F. Supp. 1375 (D.D.C. 1987). For Complainant to prevail on his age discrimination claim, he must show that age was a determining factor in his disparate treatment, *i.e.*, but for his age, he would have been treated more favorably. *O'Connor*, 517 U.S. at 312; *Cuddy v. Carmen*, 694 F.2d 853, 857-58 (D.C. Cir. 1982).

If a *prima facie* case is established, the burden shifts to the Agency to articulate a legitimate, non-discriminatory reason for the challenged action. *Burdine*, 450 U.S. at 253-54; *McDonnell Douglas*, 411 U.S. at 802. Complainant may then show that the explanation offered by the Agency was not the true reason, but a pretext for discrimination. *Burdine*, 450 U.S. at

3

256; *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of persuading the trier of fact

that the Agency discriminated against Complainant always remains with Complainant. *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *United States Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 715 (1983).

    a.    **Complainant's Claims of Non-promotion are Untimely**

    Complainant claims that he applied for several positions during a 10-year span and that

he was not selected for any of them. More specifically, that he applied for vacancy

announcements on January 25, 2002, March 9, 2004, and July 15, 2004.[2] As the Agency

correctly argues, it appears that Complainant's non-promotion claims are untimely. The record

shows that Complainant contacted an EEO counselor on December 22, 2005. Moreover, the

alleged incidents of non-selection took place on January 25, 2002, March 9, 2004, and July 15,

2004, clearly past the 45 days imposed by EEO regulations. Pursuant to 29 C.F.R. § 1614.105

(a)(1), an aggrieved party must initiate contact with an EEO counselor within 45 days of the date

of the alleged discriminatory conduct or the effective date of an alleged discriminatory personnel

action. Complainant argues that his non-promotions constitute "a series of related discriminatory

acts comprising a continuing violation," and thus, the 45-day time required imposed by EEO

statutes should be waived. *Complainant's Opposition at 8-9*. Pursuant to *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 113 (2002), claims alleging discrete acts of discrimination that

---

    [2] Complainant did not identify the specific vacancy announcements he applied for and
only provided dates for them. Also, the Agency was unable to identify the specific vacancy
announcements Complainant referred to. In fact, the Agency avers that IATD has not advertised
any GS-14 Industry Economist positions since its creation in March 2002. For purposes of this
decision, I will assume that Complainant applied for and was not selected for the three
unidentified vacancy announcements.

occur outside of the statutory time period are not actionable as being time-barred, even if they are related to discriminatory acts that are timely. Non-promotions are considered discrete acts that are subject to the established time limitations. Therefore, I find that Complainant's three claims of non-selection are time-barred and must be dismissed.[3]

### b. Complainant's Timely Claim

Complainant's only surviving timely-claim is his allegation that on December 2, 2005, his supervisor told him that he would not promote him. Although the initial inquiry in a discrimination case usually focuses on whether Complainant has established a *prima facie* case, following this order of analysis is unnecessary when the Agency has articulated legitimate, nondiscriminatory reasons for its actions. *See Washington v. Department of the Navy*, EEOC Petition No. 03900056 (May 31, 1990). In such cases, the inquiry shifts from whether Complainant has established a *prima facie* case to whether he has demonstrated by a preponderance of the evidence that the Agency's reasons for its actions were merely a pretext for discrimination. *Id. See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714-17 (1983). In this case, I find that the Agency has articulated a legitimate, nondiscriminatory reason for denying Complainant's request for promotion.

Woock attested that he met with Complainant on December 2, 2005, at which time Complainant requested that he be promoted to a GS-14. Woock stated that he denied Complainant's request because of the applicable personnel regulations. Woock explained that

---

[3] Complainant also asserted that he was denied promotional opportunities since 1999, without providing any specific dates and/or pertinent information with respect to the denials prior to the dates listed above. I find that any claims for denials for promotion between 1999 and January 25, 2002, are also time-barred.

5

he "had no authority to promote him willy-nilly ... and that his work record didn't indicate that he was eligible and should be promoted." ROI, Ex. 5 at 58. The Agency also explained that because Complainant had already reached the full performance level for his position, GS-13, there were only two ways for Complainant to obtain a promotion to GS-14: first, by applying for and being selected for a competitive vacancy announcement for a GS-14 position; and second, by requesting a desk audit to determine whether he was performing work at the GS-14 level. The Agency explained that IATD has not advertised any GS-14 Industry Economist vacancies since its creation or has promoted an employee non-competitively within IATD from GS-13 to GS-14 "via accretion of duties." *Agency's Motion at 12.* In addition, the Agency stated that there was no justification available for promoting Complainant through a non-competitive promotion because his work performance did not warrant such a promotion.

Since the Agency has articulated legitimate non-discriminatory reasons for denying Complainant's request for a promotion, Complainant must now proffer some evidence to show that the Agency's reasons are a pretext for unlawful discrimination. I find that Complainant failed to present evidence to show that the Agency's reasons are pretextual. Complainant avers that Woock promised him a promotion in two years if he "worked hard for it" and completed certain assignments. ROI, Ex. 4 at 33. Woock denied that he made such a promise. Assuming *arguendo* that Woock made such a statement, the alleged promise was conditioned upon Complainant's work performance. The Agency presented unrebutted evidence to show that Complainant's work performance was at most average and did not justify a promotion. ROI, Ex. 5 at 57-58, Ex. 6 at 67-68, 72-74, Ex. 10; *Agency's Motion* Ex. 4. Moreover, pursuant to Agency regulations Woock had no authority or implied authority to grant such a promotion. Woock

6

could only make a recommendation for promotion that was subject to approval from WCB's front office and the Agency's Human Resources Office.

I note that the record is devoid of any indication that Complainant requested a desk audit during the relevant time period and that it is undisputed that Complainant reached the maximum level of his career ladder. Also, Complainant failed to show that similarly situated employees, that is employees with nearly identical employment duties or situations, were treated more favorably by the Agency. Accordingly, I find that Complainant failed to show that the Agency's articulated reasons were pretextual.

## CONCLUSION

For the foregoing reasons, and in the absence of any evidence indicating that the Agency's actions were discriminatorily motivated, I find that this claim of discrimination cannot survive Summary Judgment.

_____

**Frances del Toro**
**Administrative Judge**

## NOTICE TO THE PARTIES

### TO THE AGENCY:

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### TO THE COMPLAINANT:

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

### WHERE TO FILE AN APPEAL:

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

### BY MAIL:

Director, Office of Federal Operations

8

Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

BY PERSONAL DELIVERY:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, NW
Washington, D.C. 20507

BY FACSIMILE:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

9

# Defendant's Exhibit
# No. 10



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

John Adesalu,
Complainant,

v.

Michael K. Powell,
Chairman,
Federal Communications Commission,
Agency.

Appeal No. 0120073054

Agency No. FCC-EEO-0601

Hearing No. 570-2006-00564X

DECISION

Pursuant to 29 C.F.R. § 1614.405, the Commission accepts complainant's appeal from the agency's June 4, 2007 final order concerning his equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq. Complainant alleged that the agency discriminated against him on the bases of race (Black) and national origin (Nigerian) when:

    1.    As recently as December 2, 2005, complainant was denied his repeated requests for a promotion.

After a review of the record in its entirety, including consideration of all statements submitted on appeal, it is the decision of the Equal Employment Opportunity Commission to affirm the agency's final order, because the Administrative Judge's issuance of a decision without a hearing was appropriate and a preponderance of the record evidence does not establish that discrimination occurred.

2                              0120073054

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.  The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.  The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

3                                    0120073054

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

SEP   7 2007

Date

4                              0120073054

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.**  I certify that this decision was mailed to the following recipients on the date below:

John Adesalu
5303 Grovemont Dr
Elkridge, MD  21075

Alan Lescht, ESQ
1050  17th St  NW  #220
Washington, DC  20036

Linda Miller, EEO Manager
Federal Communications Commission
445 12th St., SW  #5C741
Washington, DC  20554

SEP   7 2007
Date

Equal Opportunity Assistant

# Defendant's Exhibit No. 11

## Alan Feldman

| | |
|---|---|
| **From:** | Peyton Wynns |
| **Sent:** | Monday, October 04, 1999 1:13 PM |
| **To:** | Alan Feldman; Thomas Beers |
| **Subject:** | Fwd: 2nd Progress meeting! |

Text item: Message Text

fyi

Forwarded:

From: John Adesalu
Subject: 2nd Progress meeting!
Date: Mon, 04 Oct 1999 12:14:00
To: Peyton Wynns
On June 7, 1999, I met briefly with you based on my May 25th e-mail requesting the meeting to discuss and seek remedy from you on my lack of progress (i.e., career promotion) in your division. At the meeting, you only acknowledged my accomplishments which I attached with my e-mail to you. You told me that "we," which I took to mean you and your deputies, expect me to do more; and then gave me two new urgent assignments to do which I accomplished very quickly. The two assignments were, (1) to edit the "International Trends" that was due for publication; and (2) to provide a comparative summary, for possible presentation to the BWTF, in a spreadsheet of all ADSL offerings filed with the agency. But to my chagrin that was the end of things! There have been no improvements and changes in my lack of progress since then as things continue as usual. I celebrated my fourth anniversary as GS-13 economist on August the 3rd. Ipso facto, I need to meet with you again to discuss the following: (1) I need to know why your refusal to promote me in light of my accomplishments (an updated one is attached) since I joined your division. Matter-of-factly, you have promoted all others that you hired after me in the division. And I have personal responsibilities (family to feed and mortgage to pay) just like everybody!
(2)  I need an action plan from you on my promotion. I celebrated my 4th anniversary as a GS-13 economist on August 3rd. And  have been given all kinds of excuses, which have nothing to do with either my credentials and ability as economist, for lack of my promotion, despite the fact that I have accomplished all the official tasks that have been assigned to me since I joined your division. Enough is enough! I have been silent too long on this issue. I would like to meet and discuss this issue with you, with a view to finding a practical solution to it. Thanks

John



Accompl2. (15 KB)

1

# Defendant's Exhibit No. 12

**Message**

## Val Brock

| | |
|---|---|
| **From:** | Joseph Hall |
| **Sent:** | Tuesday, October 21, 2003 11:31 AM |
| **To:** | John Adesalu; William Maher |
| **Subject:** | RE: Lack of career advancement |
| **Sensitivity:** | Private |

John, we received your e-mail dated October 15 and Bill and I have met regarding your situation. Thank you for your concerns and for acknowledging your ability to put these issues behind you.

We are also in receipt of your resume, writing sample and list of accomplishments. Unfortunately at this time, we do not have any vacancies that match your qualifications. One idea we have is for you to contact the Learning and Development Service Center and request some assistance in preparing a draft *Personal Development Plan (PDP)*. We also encourage you to make an appointment with the Human Resources staff so they can also review your current qualifications and suggest improvements so that in the future you may better qualify for vacancies in your area of expertise that are posted in WCB or elsewhere.

-----Original Message-----
**From:** John Adesalu
**Sent:** Wednesday, October 15, 2003 4:16 PM
**To:** William Maher
**Cc:** Joseph Hall
**Subject:** Lack of career advancement
**Sensitivity:** Private

Dear Sir (or Bill):

Thanks to you and Joseph Hall for taking the time from your busy schedules to respond (dated 9/12/03) to my inquiry. I also want to take this opportunity to bring to your attention, as the Bureau Chief, the issue of my **lack of career advancement** in the Division and the Bureau.

I have tried to no avail all attempts to rectify this situation with both old and current (acting) Division managers (more on this below). Honestly, my current situation is unacceptable and I can no longer tolerate it and need an action from the Bureau to rectify this. Please note that I am not asking for a special favor but a level playing field. These are the facts of the situation:

**Fact I:** I am still a GS-13, Step 6, economist while all other economists that came after me into both the Division and Bureau are currently performing at the GS-15 positions, despite the fact that I have performed outstanding service to the agency.

**Fact II:** While I do not want to dwell on the past, I have to say for the record the following: Peyton Wynns violated my civil rights during his tenure as our Division Chief by failing to provide me equal employment opportunities, ignoring my accomplishments and creating hostile workplace for me compared with other staff economists. Be that as it may! This is a new day because he is no longer the Chief.

**Fact III:** Even in this new day with a new (acting) manager, nothing has changed: It is still "tail-wagging-the-dog" situation for me. I have met twice with Alan Feldman as both my Supervisor and Acting Division Chief to discuss the matter. He told me to await the new Division Chief.

I have attached my updated resume, a writing sample and a combined listing of all my accomplishments since joining the division for this purpose. Note that the format of my listed accomplishments is different from period-to-period because they were written in different space and time-periods.

Message

Thanking you in advance for your exigent attention and response to this matter.

With best regards,
John B. Adesalu