# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN ADESALU )
)
)
Plaintiff, )
) Civ. Action No. 07-2187 (PLF)
v. )
)
KEVIN J. MARTIN,  Chairman )
Federal Communications Commission, )
)
)
Defendant. )
)
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through undersigned counsel, Alan Lescht & Associates, P.C.,

hereby Opposes Defendant's Motion for Summary Judgment and in support of states that

there are numerous material facts in dispute that preclude a judgment as a matter of law

in favor of Defendant.  Plaintiff further states that he has successfully established a *prima

facie* case of employment discrimination while the Defendant has failed and continues to

fail to present a legitimate and nondiscriminatory explanation for its adverse employment

action.

## I.    INTRODUCTION

Plaintiff is Black and originally from Nigeria.  He is employed at the FCC as an

Industry Economist at the GS-13 grade level.  For the last twelve years, Plaintiff has

remained at the GS-13 grade level while other non-Black and non-Nigerian individuals

have been promoted within his division to the GS-14 grade level and above.

Plaintiff has made countless efforts to obtain a promotion via competitive

selection and accretion of duties.  He has applied for several GS 14 and GS 15 positions without success.  He also turned to his supervisors, Peyton Wynns, Alan Feldman and Rodger Woock about obtaining a promotion, but his requests were systematically avoided and ignored, despite his numerous accomplishments and exceptional job performance.

Finally, Rodger Woock promised Plaintiff that he would get a promotion, provided he worked hard and successfully completed certain assignments.  Plaintiff fulfilled his end of the bargain, but in a meeting on December 2, 2005, Rodger Woock told Plaintiff that despite his accomplishments, he would not be promoted.  It is Plaintiff's position that he was denied a promotion by Defendant for the past ten years on the basis of his race and national origin.

## II.    STATEMENT OF FACTS[1]

1.  Mr. Adesalu is a Black male of Nigerian national origin.

2.  Mr. Adesalu is the only Industry Economist within the Industry Analysis and Technology Division ("IATD") of the Federal Communications Commission ("FCC") who is black or of Nigerian national origin.

3.  Mr. Adesalu has been employed as an Industry Economist with the FCC within the Industry Analysis Division ("IAD") (subsequently renamed as "IATD") for over 12 years.

4.  The IATD is essentially the same entity as the IAD, but with a new name and a few additional employees.

5.  Alan Feldman has been Mr. Adesalu's immediate supervisor since 1996.  Peyton Wynns was his second level supervisor until 2003.  Rodger Woock has been his second level supervisor since 2003.  Mr. Feldman, Mr. Wynns and Mr. Woock are white.

---

[1] The numbered paragraphs correspond to the numbered paragraphs in Mr. Adesalu's declaration, attached.

6. Mr. Adesalu has been at the same GS-13 grade for over twelve years, while other Industry Economists who are not Black and not from Nigeria have been promoted during this time.

7. IAD and IATD have promoted Industry Economists non-competitively to GS-14 levels and higher through accretion of duties.

8. The following Industry Economists were promoted during the time period that Mr. Adesalu has been employed at IAD and IATD:

   a.    Ellen Burton, White, promoted from GS 14 to GS 15.

   b.    Jim Eisner, White, promoted from GS 12 or 13 to GS 15.

   c.    Craig Stroup, White, promoted from GS 12 or 13 to GS 15.

   d.    Tracy Waldon, White, promoted from GS 13 to GS 15.

   e.    Keith Brown, White, promoted from GS 13 to GS 15.

   f.    Kenneth Lynch, White, promoted from GS 13 to GS 14 and from GS 14 to GS 15.

   g.    Paul Zimmerman, Hispanic, promoted from GS 13 to GS 14.

9. With the exception of Tracy Waldon, all of the Industry Economists who were promoted were hired after Mr. Adesalu.

10. Mr. Adesalu has a similar professional background and education as the promoted individuals.  See Mr. Adesalu's resume attached as **Exhibit A** to the declaration.

11. None of the positions to which other Industry Economists who were not Black and/or not Nigerian were promoted required a Ph.D. and at least one Industry Economist who was promoted did not have a Ph.D.

12. Mr. Adesalu's performance appraisals for the last twelve years with the FCC rate him as having "successfully performed [my] assigned duties and responsibilities to further the mission and goals of the Federal Communications Commission."

13. Mr. Adesalu has received many compliments on his work as an Industry Economist.

14. In 1995, Mr. Adesalu's then-supervisor recommended him for promotion to the highest grade possible within his career ladder, stating, "[S]ince he has begun working with this Division, John has taken on a number of significant projects and has performed at above satisfactory levels." See **Exhibit B** to Mr. Adesalu's declaration.

15. In August 2003, Mr. Adesalu received an Individual Superior Achievement Award for his service to internal and external customers regarding the SOCC and DSL tariff monitoring and for his contribution to the Agency Mission. See **Exhibit C** to Mr. Adesalu's declaration.

16. On October 25, 2004, Mr. Adesalu received a Wireline Competition Bureau Special Achievement Award for "outstanding contributions to the work and mission of the Bureau." See **Exhibit D** to Mr. Adesalu's declaration.

17. Mr. Adesalu has successfully completed numerous research and other assignments that warrant a promotion via accretion of duties including but not limited to the Digital Subscriber Line project; the Financial Analysis Team project; creating a financial database in Excel of the RBOCs and MSOs; the publication of the Statistics of Communications Common Carrier, a major and widely referenced annual industry statistical publication of the Agency that used to be a shared responsibility between three people, but was assigned solely to Mr. Adesalu for the 2005/2006 edition. In addition, on

two occasions in 2007, Mr. Adesalu was detailed to work on the Do Not Call List project in the Enforcement Bureau.

18. Mr. Adesalu applied for three competitive Industry Economists vacancies at the GS14 and GS 14/15 levels within the FCC on January 25, 2002, March 9, 2004 and July 15, 2004.  Mr. Adesalu provided this information to the Agency and the EEO investigator.  In 2006 Mr. Adesalu applied for a GS 15 vacancy in the IATD.  In 2007, Mr. Adesalu applied for a GS 15 vacancy in the Office of Strategic Policy.

19. Mr. Adesalu was not selected for any of the vacancy announcements and the selecting officials were not able to provide him with the reason for his non-selection.

20. Records pertaining to the vacancy announcements were destroyed by Defendant.

21. Agency regulations regarding the documentation and closure of competitive promotion procedures require the promotion file to be maintained by the Employer for at least one year.

22. Mr. Adesalu's supervisors, Alan Feldman and Rodger Woock, served as the selecting officials for at least one of the vacancies for which Mr. Adesalu was an applicant.

23. In addition to applying for vacancies, Mr. Adesalu also attempted to obtain a promotion through accretion of duties.

24. Mr. Adesalu requested numerous supervisory audits of his work and met with his supervisors, Peyton Wynns, Alan Feldman and Rodger Woock, on many occasions to discuss his accomplishments and obtain a promotion through accretion of duties.  Mr. Adeslau also initiated work on various projects, including a large research project, with the express purpose of obtaining a promotion upon successful completion.

25. In or about May 2004, Rodger Woock promised Mr. Adesalu that he would promote him in two years time if he worked hard and continued working on the statistical tables for the annual publication of the SOCC.  Rodger Woock also assigned Mr. Adesalu to a project that involved building a national database.  Mr. Adesalu completed all the required tasks, but at a meeting on December 2, 2005, Rodger Woock told Mr. Adesalu that he would not promote him.

26. Mr. Woock, as the then acting Chief of the IATD, had the ability and the authority to recommend Mr. Adesalu for a promotion, but he did not do so.

27. Alan Feldman and Rodger Woock impeded Mr. Adesalu's ability to obtain a promotion by underutilizing his skills and abilities.  On numerous occasions, Mr. Adesalu requested to be assigned to the higher profile projects such as those involving the Cingular and AT & T Wireless merger.  Despite his requests, these projects were assigned to the other Industry Economists in his division who are white or non-Nigerian. These projects have resulted in career advancement opportunities for his white and non-Nigerian co-workers.

28. Alan Feldman made untrue and deprecating statements about Mr. Adesalu to other individuals within the IAD and the IATD, including to Rodger Woock, with the aim of denying Mr. Adesalu a promotion.  These statements influenced Roger Woock's opinion of Mr. Adesalu and his job performance.  See Statement of Rodger Woock, **Exhibit E** to Mr. Adesalu's declaration.

29. In 2003, Mr. Adesalu believed that Peyton Wynns denied him opportunities for promotion on the basis of his race and national origin.  Mr. Adesalu did not file a complaint with EEO at that time because Defendant removed Peyton Wynns from his

position and Mr. Adesalu believed that the discrimination would end with the new Division Chief.

30. Mr. Adesalu did not file an EEO complaint in 2004 after Defendant failed to select him for the two GS 14/15 Industry Economist vacancies within the Agency because he believed that the Agency would make things right and he would be promoted in 2005, as promised by Rodger Woock.

31. When Rodger Woock told Mr. Adesalu on December 2, 2005, that he would not promote him as promised, Mr. Adesalu realized that the Agency was continuing to discriminate against him.

32. The Agency continues to discriminate against Mr. Adesalu.  In 2006 Mr. Adesalu applied for a GS 15 vacancy in the IATD.  In 2007, Mr. Adesalu applied for a GS 15 vacancy in the Office of Strategic Policy.  Mr. Adesalu did not receive either of these promotional opportunities.

33. There was no GS-14 Industry Economist position posted for IATD in January 2008.  I know this because I check the posted positions every day.


III.     STANDARD OF REVIEW

Summary Judgment may be granted only if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,247 (1986).  A dispute about a material fact is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  In deciding a motion for summary judgment, the court must view all the facts and the reasonable inferences from the facts "in light

most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[I]f reasonable minds could differ as to the import of the evidence... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

IV.    **ARGUMENT**

    a.    <u>**Plaintiff's Claims Constitute A Continuing Violation By The Agency And Are Therefore Timely And Actionable.**</u>

The Court should reject Defendant's claim that the majority of his claims are untimely.  The Defendant's continued refusal to promote Plaintiff is part of a continuing violation of the law.

Incidents occurring outside the limitations period are not time barred if the Plaintiff can prove a series of related acts one or more of which falls within the statutory period. *Moore v. Chertoff,* 437 F. Supp. 2d 156, 160 (D.D.C. 2006); *Anderson v. Zubieta,* 336 U.S. App. D.C. 394, 180 F.3d 329, 337 (D.C. Cir. 1999) ("Where . . . discrimination is not limited to isolated incidents, but pervades a series or pattern of events which continue to within [45] days of the filing charge . . . , the filing is timely . . . regardless of when the first discriminatory incident occurred.") (quoting *Laffey v. Northwest Airlines,* 185 U.S. App. D.C. 322, 567 F.2d 429, 473 (D.C. Cir. 1976)).   In a continuing violation case the "critical question" is whether any present violation exists.  *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977).

In this case, Plaintiff applied for promotions in 2002 and 2004.  After he was denied the promotional position he applied for in 2002, Defendant removed Peyton Wynns from his position and Mr. Adesalu believed that the discrimination would end with the new Division Chief.  In 2004, his new supervisor told him that he would be promoted via

accretion of duties if he completed certain projects. Plaintiff believed he would receive a promotion after he completed the projects. However, in 2005, after Plaintiff completed the projects, his supervisor told him he would not be promoted. Thus, the Defendant's failure to promote Plaintiff in 2002 and 2004 are part of a continuing violation of the law and should not be time-barred.

### b. __Plaintiff Has Established A *Prima Facie* Case Of Discrimination.__

Plaintiff has met his burden of establishing a *prima facie* case of discrimination under Title VII of 42 U.S.C. Sec. 2000(e) et seq., and the Defendant has been unable to articulate some legitimate, nondiscriminatory reason for its challenged action. Courts analyze claims brought under Title VII by conducting the three step, burden-shifting analysis set for in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the initial burden is on the plaintiff to establish a *prima facie* case of discrimination. *Id*. at 802. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its challenged action. *Id*. If the defendant is successful, the plaintiff must then prove, by a preponderance of the evidence, that the legitimate, nondiscriminatory reason articulated by the defendant is merely a pretext for discrimination. *Id*. at 804. To establish a *prima facie* case of discrimination in a failure-to-promote context, Plaintiff must show that (1) he is a member of a protected class, (2) he applied and was qualified for a promotion, (3) he was considered for and denied a promotion, and (4) other employees of similar qualifications who were not members of a protected class received promotions at the time Plaintiff's requests for promotion were

denied. *Ozier v. RTM Enters of Ga., Inc.*, 2007 U.S. App. LEXIS 2965 at 10 (citing

*Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000)).

      Because he is Black and Nigerian, Plaintiff is a member of a protected class.  He

applied to three vacancies in order to receive a promotion to GS-14 or GS 14/15 levels,

respectively, and was considered but rejected. The Plaintiff also requested numerous

supervisory audits of his work by Peyton Wynns, Alan Feldman and Rodger Woock and

met with all these individuals to discuss his qualifications and advancement opportunities

within the division.  Nevertheless, Plaintiff's efforts to discuss his qualifications and

promotion opportunities were ignored or rejected outright by his supervisors.

      Plaintiff was at least equally qualified to receive a promotion to a higher GS grade

as the other employees who were promoted to those positions.  None of the positions

required a Ph.D.  In fact, Tracy Waldon, who did not have a Ph.D., was promoted to a

higher GS level while Plaintiff was not.  Plaintiff also accomplished all his assignments,

initiated and successfully completed additional research projects, and received awards for

his extraordinary job performance.  Additionally, during several meetings to discuss a

promotion, Plaintiff's supervisors, in particular, Peyton Wynns and Rodger Woock, told

him that in order to get promoted via accretion of duties, they expected more work

product and assigned him new projects.  Plaintiff quickly completed those projects, but

did not receive a promotion.

      Finally, Rodger Woock's reneging of his promise that Plaintiff would receive a

promotion, by itself constitutes prima facie evidence of discrimination.  Sometime in

May or June, 2004, Rodger Woock promised Plaintiff that he would be promoted if he

accomplished certain tasks, namely, the statistical tables for the annual publication of the

SOCC and another project that involved building a national database. Plaintiff successfully accomplished all these assignments, but in a meeting on December 2, 2005, Rodger Woock told Plaintiff that despite these accomplishments, he would not be promoted.

The court should reject the Defendant's argument that Rodger Woock did not have the express or implied authority to promote Plaintiff. Defendant admits that Mr. Woock had the authority to recommend Plaintiff for a promotion, but Mr. Woock did not even do that much. Thus, Plaintiff has established a *prima facie* case of discrimination.

### c. Defendant Failed To Provide A Legitimate, Non-Discriminatory Explanation For Plaintiff's Non-Promotion.

A plaintiff can show that the defendant's articulated reasons are a mere pretext for discrimination either directly, by showing that a discriminatory reason more likely motivated the defendant, or indirectly, by showing that the defendant's proffered explanation is unworthy of credence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Plaintiff has successfully demonstrated that he was qualified for a promotion to at least a GS-14 level through his successful completion of all tasks, awards for superior professional achievement, extensive experience at the FCC, and accomplishment of all of the additional projects assigned to him by his supervisors. In particular, Rodger Woock promised Plaintiff a promotion upon successful completion of certain assigned projects. Plaintiff completed the projects but was nevertheless denied a promotion. Therefore, Plaintiff was at least equally qualified as his white co-workers who received promotions in the last twelve years to GS-14/15 levels, especially due to his similar educational background and to his longer record of outstanding service to the FCC.

The reasons articulated by the Defendant to show a legitimate, non-discriminatory reason for Plaintiff's non-promotion, are contested by Plaintiff and therefore constitute disputed material facts, precluding Summary Judgment in this case. Defendant claims that Rodger Woock never promised a promotion to Plaintiff while Plaintiff alleges that Mr. Woock promised him a promotion upon the completion of certain assignments. Defendant claims that Plaintiff did not request a desk audit while Plaintiff claims that he requested numerous supervisory audits of his work. Defendant claims that Plaintiff's work was sub-par while Plaintiff's evaluations, awards and comments by his former supervisor indicate otherwise.

Finally, the failure of the Defendant to promote Plaintiff for the last twelve years must be considered in light of the promotions of five white individuals through accretion of duties. These individuals had the same qualifications as Plaintiff and all had less professional experience than Plaintiff at the FCC. Further, other than the Defendant's self-serving statements of Rodger Woock and Alan Feldman that these individuals performed good work, there is no objective evidence that Plaintiff's work was in any way inferior to that of the employees who were promoted. Plaintiff has produced evidence of two professional awards, a recommendation from a prior supervisor, and successful completion of numerous research projects that warrant a promotion to a GS-14/15 grade.

## V.      CONCLUSION

Plaintiff has established a *prima facie* case of discrimination based on race and national origin. Defendant has not articulated a legitimate, non-discriminatory reason for failing to promote Plaintiff in the last twelve years. Additionally, this case is laden with

questions of disputed material fact that do not warrant a granting of Summary Judgment.

Therefore, the Defendant's Motion for Summary Judgment should be denied.


Respectfully submitted,


_____/s/_____
Alan Lescht, Bar No. 441691
Susan L. Kruger, Bar No. 414566
Alan Lescht & Associates, P.C.
1050 17th St., N.W. Suite 220
Washington, D.C. 20036
(202) 463-6036
(202) 463-6067 (fax)
Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN ADESALU                              )
                                          )
                                          )
          Plaintiff,                      )
                                          )        Civ. Action No. 07-2187 (PLF)
     v.                                   )
                                          )
KEVIN J. MARTIN,  Chairman                )
Federal Communications Commission,        )
                                          )
                                          )
          Defendant.                      )
                                          )
_____)

## DECLARATION OF JOHN ADESALU

Pursuant to 28 U.S.C. Section 1746, I, John Adesalu, declare as follows:


1.  I am a Black male of Nigerian national origin.

2.  I am the only Industry Economist within the Industry Analysis and Technology
Division ("IATD") of the Federal Communications Commission ("FCC") who is black or
of Nigerian national origin.

3.  I have been employed as an Industry Economist with the FCC within the Industry
Analysis Division ("IAD") (subsequently renamed as "IATD") for over 12 years.

4.  The IATD is essentially the same entity as the IAD, but with a new name and a
few additional employees.

5.  Alan Feldman has been my immediate supervisor since 1996.  Peyton Wynns was
my second level supervisor until 2003.  Rodger Woock has been my second level
supervisor since 2003.  Mr. Feldman, Mr. Wynns and Mr. Woock are white.

6.  I have been at the same GS-13 grade for over twelve years, while other Industry Economists who are not Black and not from Nigeria have been promoted during this time.

7.  IAD and IATD have promoted Industry Economists non-competitively to GS-14 levels and higher through accretion of duties.

8.  The following Industry Economists were promoted during the time period that I have been employed at IAD and IATD:

a.        Ellen Burton, White, promoted from GS 14 to GS 15.

b.        Jim Eisner, White, promoted from GS 12 or 13 to GS 15.

c.        Craig Stroup, White, promoted from GS 12 or 13 to GS 15.

d.        Tracy Waldon, White, promoted from GS 13 to GS 15.

e.        Keith Brown, White, promoted from GS 13 to GS 15.

f.        Kenneth Lynch, White, promoted from GS 13 to GS 14 and from GS 14 to GS 15.

g.        Paul Zimmerman, Hispanic, promoted from GS 13 to GS 14.

9.  With the exception of Tracy Waldon, all of the Industry Economists who were promoted were hired after me.

10. I have a similar professional background and education as the promoted individuals.  See my resume attached as **Exhibit A.**

11. None of the positions to which other Industry Economists who were not Black and/or not Nigerian were promoted required a Ph.D. and at least one Industry Economist who was promoted did not have a Ph.D.

12. My performance appraisals for the last twelve years with the FCC rate me as having "successfully performed [my] assigned duties and responsibilities to further the mission and goals of the Federal Communications Commission."

13. I have received many compliments on my work as an Industry Economist.

14. In 1995, my then-supervisor recommended me for promotion to the highest grade possible within my career ladder, stating, "[S]ince he has begun working with this Division, John has taken on a number of significant projects and has performed at above satisfactory levels."  See **Exhibit B.**

15. In August 2003, I received an Individual Superior Achievement Award for my service to internal and external customers regarding the SOCC and DSL tariff monitoring and for my contribution to the Agency Mission.  See **Exhibit C**.

16. On October 25, 2004, I received a Wireline Competition Bureau Special Achievement Award for "outstanding contributions to the work and mission of the Bureau."  See **Exhibit D**.

17. I have successfully completed numerous research and other assignments that warrant a promotion via accretion of duties including but not limited to the Digital Subscriber Line project; the Financial Analysis Team project; creating a financial database in Excel of the RBOCs and MSOs; the publication of the Statistics of Communications Common Carrier, a major and widely referenced annual industry statistical publication of the Agency that used to be a shared responsibility between three people, but was assigned solely to me for the 2005/2006 edition.  In addition, on two occasions in 2007, I was detailed to work on the Do Not Call List project in the Enforcement Bureau.

18. I applied for three competitive Industry Economists vacancies at the GS14 and GS 14/15 levels within the FCC on January 25, 2002, March 9, 2004 and July 15, 2004. I provided this information to the Agency and the EEO investigator. In 2006 I applied for a GS 15 vacancy in the IATD. In 2007, I applied for a GS 15 vacancy in the Office of Strategic Policy.

19. I was not selected for any of the vacancy announcements and the selecting officials were not able to provide me with the reason for my non-selection.

20. Records pertaining to the vacancy announcements were destroyed by Defendant.

21. Agency regulations regarding the documentation and closure of competitive promotion procedures require the promotion file to be maintained by the Employer for at least one year.

22. My supervisors, Alan Feldman and Rodger Woock, served as the selecting officials for at least one of the vacancies for which I was an applicant.

23. In addition to applying for vacancies, I also attempted to obtain a promotion through accretion of duties.

24. I requested numerous supervisory audits of my work and met with my supervisors, Peyton Wynns, Alan Feldman and Rodger Woock, on many occasions to discuss my accomplishments and obtain a promotion through accretion of duties. I also initiated work on various projects, including a large research project, with the express purpose of obtaining a promotion upon successful completion.

25. In or about May 2004, Rodger Woock promised me that he would promote me in two years time if I worked hard and continued working on the statistical tables for the annual publication of the SOCC. Rodger Woock also assigned me to a project that

4

involved building a national database. I completed all the required tasks, but at a meeting on December 2, 2005, Rodger Woock told me that he would not promote me.

26. Mr. Woock, as the then acting Chief of the IATD, had the ability and the authority to recommend me for a promotion, but he did not do so.

27. Alan Feldman and Rodger Woock impeded my ability to obtain a promotion by underutilizing my skills and abilities. On numerous occasions, I requested to be assigned to the higher profile projects such as those involving the Cingular and AT & T Wireless merger. Despite my requests, these projects were assigned to the other Industry Economists in my division who are white or non-Nigerian. These projects have resulted in career advancement opportunities for my white and non-Nigerian co-workers.

28. Alan Feldman made untrue and deprecating statements about me to other individuals within the IAD and the IATD, including to Rodger Woock, with the aim of denying me a promotion. These statements influenced Roger Woock's opinion of me and my job performance. See Statement of Rodger Woock, **Exhibit E.**

29. In 2003, I believed that Peyton Wynns denied me opportunities for promotion on the basis of my race and national origin. I did not file a complaint with EEO at that time because Defendant removed Peyton Wynns from his position and I believed that the discrimination would end with the new Division Chief.

30. I did not file an EEO complaint in 2004 after Defendant failed to select me for the two GS 14/15 Industry Economist vacancies within the Agency because I believed that the Agency would make things right and I would be promoted in 2005, as promised by Rodger Woock.

31. When Rodger Woock stated on December 2, 2005, that he would not promote me as promised, I realized that the Agency was continuing to discriminate against me.

32. The Agency continues to discriminate against me. In 2006 I applied for a GS 15 vacancy in the IATD. In 2007, I applied for a GS 15 vacancy in the Office of Strategic Policy. I did not receive either of these promotional opportunities.

33. There was no GS-14 Industry Economist position posted for IATD in January 2008. I know this because I check the posted positions every day.

Under penalty of perjury, I declare pursuant to 28 U.S.C. Section 1746 that the

foregoing is true and correct.

Executed this _____ day of August, 2008.

_____
John Adesalu

# EXHIBIT A

*Attachment 2*

**JOHN B. ADESALU**
7064 Ducketts Lane, #204
Elkridge, MD 21075
Home: (410) 796-8282
Office: (202) 418-7097
E-mail: jbadesalu@comcast.net

**CAREER OBJECTIVE:**

Industrial Organization; Analysis of Telecommunications Industry and of Financial Markets; Cost-Benefit Analysis; and International Transfer-Pricing Examination (Section 482).

**BACKGROUND SUMMARY:**

Comparative static analysis; trend analysis of the telecommunications stocks and digital subscriber line; construction of index numbers; valuation of intangible assets to determine fair-market values; investment and feasibility studies, project and database management; and labor market analysis.

Computer skills in Microsoft Word, WordPerfect, Statistical Analysis System (SAS), Lotus 1-2-3, Excel, Paradox, and Access 97.

**EDUCATION:**

M.A. (Economics), Pennsylvania State University in 1989. Major study: Industrial Organization.
M.A. (Economics), University of Wisconsin in 1975. Major study: Monetary Economics.
B.A. (Economics), St. Francis College, New York, 1973.

**PROFESSIONAL ACCOMPLISHMENTS:**

Research

Market-study examining the effects of the FCC's rules and regulations on telecom company stocks. Research studies to compare intra-industry financial performance and trend.

Comparative static analysis of the effect of variation in state sales tax on the demand for and on retail price of gasoline aimed at studying the structure and competitiveness of the U.S. retail gasoline market.

1

44

Times-series analysis of the CPS data and Handbook of unemployment estimates for 30 SMSAs using X-11 computer program. Decomposed unemployment data into their seasonal components for more robust unemployment estimates.

Constructed price indices using firm's per-share stock prices and market values for five telecommunications sectors with charts showing current and historical trends. Created and maintained financial database that tracks daily stock price movements of 6 major telecommunications markets for research and for reports to the management.

Developed a codebook using data from 1980 Census' Survey of Income and Earnings (SIE) for the Bureau of Labor Statistics, which resulted in a permanent database for research purposes.

Analysis
Data on Access Tariffs filed with the FCC were used to examine the structure of Digital Subscriber Line (DSL) offerings of the incumbent local exchange companies.

Analyzed and taught economics principles to undergraduate economics students resulting in the publication of a study guide.

Determined fair market value of a popular food company's trademark based on the economic analysis of financial data obtained from company's annual report, which resulted in higher tax revenues for the U.S. Treasury.

Conducted feasibility studies of bank's investment projects using a cost/benefit analysis (CBA) resulting in maximum returns for the financial institution.

**PROFESSIONAL EXPERIENCE:**

Industry Economist (1996-). Federal Communications Commission (FCC), Wireline Competition Bureau, Industry Analysis and Technology Division, Washington, DC. Primary responsibilities include economic and financial analyses of telecomm markets; harvesting data to develop financial statement models in Excel that track comparative performance among leading communications companies for pilot project relevant to the merger reviews; tracked and managed database on DSL service offerings of the ILECs for the BWTF; preparing statistical tables for the FCC's annual SOCC publication; providing data and information to the public. Other duties included participation in Section 706 working group, etc. Writing reports using desktop computer.

45

<u>Industry Analyst</u> (1995-1996). FCC, Cable Services Bureau (now merged with Media Bureau), Washington, DC. In the *Consumer Protection and Competition Division,* I applied microeconomic analyses to examine pricing and competitive access issues in the satellite broadcast programming market; analyzed cost-of-service (COS) showings; reviewed cost studies submitted as declaration to support appeals and petitions filed by cable companies. Prepared written reports based on my analytical research findings using desktop computer. In the *Financial Analysis and Compliance Division,* I managed two databases containing over 40,000 observations on the rate complaints, social contracts and resolutions; provided weekly reports to the management from the databases; examined the issues on the pole attachments and reviewed cable rate complaint cases.

<u>Consultant</u> (1992-94). Alpha Inc., College Park, MD. Served as economic specialist responsible for project coordination assignments required for the project proposals to the World Bank.

<u>Industry Economist</u> (1991-92). U.S. Department of the Treasury, Internal Revenue Service (IRS), Chicago, Illinois. Served as economic specialist to identify and analyze economic issues in the tax audits of fortune-500 corporations and their foreign subsidiaries in the mid-western region. Evaluated corporate mergers and acquisitions, analyzed international transfer-pricing and other related Internal Revenue Regulations Section 482 issues. Estimated fair-market value of corporate intangible assets; and presented findings to the corporate taxpayers before submitting final reports to team managers using desktop computer.

<u>Instructor</u> (1988-90). Pennsylvania State University (PSU), Department of Independent Learning, University Park, PA. Responsible for grading correspondence lessons, examinations, and proctoring students in microeconomics principles courses. Prepared and published a new STUDY GUIDE (1990) in microeconomics principles.

<u>Teaching Assistant</u> (1987-89). PSU (Department of Economics), University Park, PA. Responsibilities included assisting professors, grading exams, holding office hours for problem-solving and holding weekly recitations for students in the Public Finance and Macroeconomics classes.

<u>Economist</u> (1980-86). U.S. Department of Labor, Bureau of Labor Statistics (BLS), Washington, D.C. Responsibility included a methodological research to improve the statistical techniques of estimating the local area unemployment figures and rates. Analyzed labor market trends and disseminated them to the public and financial communities. Prepared unemployment estimates for both monthly and annual publications and press releases.

Analyst/Project Leader (1978-80). The Equitable Trust Bank (ETB), Baltimore, MD. Responsibilities included research and analysis of capital and investment projects and their administration. Managed a Support Staff of project analysts and developed their career profiles; prepared weekly reports showing management of staff's resources to the executive branch; and developed the Unit-Cost Measurement (Software Physics) for the Operations Department.

Adjunct Assistant Professor of Economics (1979-83). Loyola College (Department of Economics), Baltimore, MD. I taught micro- and macroeconomics principles to undergraduate classes and proctored examinations and quizzes.

**HONORS & AWARDS:**

Federal Communications Commission (FCC) – Individual Superior Achievement Award, 2003.
Pennsylvania State University - Minority Scholars Graduate Scholarship and Graduate Teaching Assistantship; both are in Economics.
University of Wisconsin – Fellowship and Graduate Teaching Assistantship; both are in Economics.
St. Francis College - Omicron Delta Epsilon and Dean's List.

**PUBLICATIONS:**

ECONOMICS 2 (GS): INTRODUCTORY MICROECONOMIC ANALYSIS AND POLICY. Published by the Pennsylvania State University, Department of Independent Learning, and University Division of Media and Learning Resources, University Park, PA (April 1990).
Working papers and book reviews.

**PROFESSIONAL MEMBERSHIPS & ACTIVITIES:**

Members: American Economic Association; Penn State University Alumni Association. Review and discuss papers at the professional meetings.

**PERSONAL:**

U.S. Citizen.

47

# EXHIBIT B

From:
To:          Joann Lucanik
Date:        DMATTHEW
Subject:     10/25/95 5:59pm
             John Adesalu

I would like to promote John to the highest grade possible within his current career ladder. Since he has begun working in this Division, John has taken on a number of significant projects and has performed at above satisfactory levels.

# EXHIBIT C





# FEDERAL COMMUNICATIONS COMMISSION
## AUTHORIZATION FOR SUPERIOR ACHIEVEMENT AWARD
### AND QUALITY STEP INCREASE

| | |
|---|---|
| 1. EMPLOYEE'S NAME *(Last, First, Middle Initial)*<br>Adesalu, John B. | 2. SOCIAL SECURITY NUMBER<br>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 |
| 3. EMPLOYEE'S POSITION/TITLE/SERIES/GRADE AND STEP<br>Industry Economist, GS-110-13/5 | 4. BUREAU/OFFICE GRANTING AWARD<br>WCB/IATD |
| 5. EMPLOYEE'S ORGANIZATION *(Bureau/Office, Division, Branch)*<br>FCC/WCB/IATD | 6. EFFECTIVE DATE OF QSI |
| 7. PERIOD OF SERVICE FOR RECOMMENDED AWARD<br>FY2003 | 8. TOTAL SALARY (Base & Comparability Pay)<br>$78,263.00 |

2003 AUG 12 A 11:55

**9. TYPE OF AWARD RECOMMENDED** (See reverse)

**9A. SPECIAL ACHIEVEMENT AWARDS** (Signify type of award by selecting one designation from each column - see reverse.)

- [x] Superior Achievement Award - Individual
- [ ] Superior Achievement Award - Group

- [ ] Award Based On Long Term Performance
- [x] Award Based On Short Term or Special Act of Service

**9B. OTHER AWARDS**
- [ ] QSI (See Reverse)
- [ ] Equal Employment Opportunity Award
- [ ] Travel Gainsharing (Saved government funds while on official TDY travel)
- [ ] Other (Specify)

**10. BASIS FOR THE SUPERIOR ACHIEVEMENT AWARD** (See next page side for a complete description of each of the eligibility criteria listed below) Check one or more of the following eligibility criteria and justify in block 11:

- [x] a. Contribution to the Agency Mission
- [ ] b. Quality Performance
- [ ] c. Leadership
- [ ] d. Creativity
- [ ] e. Problem Solving

- [x] f. Customer Service
- [ ] g. Streamlining
- [ ] h. Special Accomplishment
- [ ] i. Other

**11. SPACE FOR NARRATIVE AWARD JUSTIFICATION** (See reverse side for instructions)

Employee is being recognized for his service to internal and external customers regarding the SOCC and DSL tariff monitoring.

## PROCESSED

By: _____    PP: _____

**12 APPROVAL** — Indicate amount of award recommended and approved. (See Reverse)

| | Amount | Name, Title, & B/O | Signature | Date |
|---|---|---|---|---|
| a. Recommending Official | $166.66 | Cathy Zima, Deputy Division Chief, WCB/IATD | *(signature)* | 8/8/03 |
| b. Reviewing Official | | | | |
| c. Approving Official | $166.66 | Alan Feldman, Acting Division Chief, WCB/IATD | *(signature)* | 8/8/03 |
| d. Chairman (if required) | | | | |
| e. Commissioners (if required) | | | *(signature)* | 8/11/03 |

| Fiscal Year | BOCC | 13. Official Authorized to Approve Payment | Signature | |
|---|---|---|---|---|
| 2003 | 1153 | 2003 AUG 12 A 11:55 | *(signature)* | 8/11/03 |
| | | | Title<br>ASST BUREAU CHIEF<br>ADM & MGMT, WCB | Date |

Form A-440
December 2002

# EXHIBIT D



**Wireline Competition Bureau**

*Special Achievement Award*

**John Adesalu**

*For Outstanding Contributions to the Work and Mission of the Bureau*

*Jeffrey J. Carlisle, Chief*

*October 25, 2004*



# EXHIBIT E

1

FEDERAL COMMUNICATIONS COMMISSION

JOHN ADESALU,                  )
                               )
        Complainant,       )
                               )
                               )
                               )  No. FCC-EEO-06-01
                               )
KEVIN J. MARTIN, CHAIRMAN,  )
FEDERAL COMMUNICATIONS      )
COMMISSION,                 )
                               )
        Respondent.       )

                            445 12th Street, N.W.
                            Washington, D.C.

                            Thursday,
                            June 15, 2006

Deposition of:

                   RODGER WOOCK,

a witness of lawful age, taken on behalf of the Defendant,

pursuant to notice, in the offices of the Federal

Communications Commission, 445 12th Street, N.W.,

Washington, D.C., on Thursday, June 15, 2006, at 11:34 a.m.,

before Christina Chesley, Notary Public in and for the

District of Columbia, when were present:

                APPEARANCES:

                RAE EATON
                EEO Contract Investigator
                445 12th Street, N.W.
                Washington, D.C.

49

9

1      Q    So, did you make this statement -- that's

2    irrelevant.  Do you know any goals that were set for him to

3    meet -- to be promoted?

4      A    Actually, I tried to work with him when I took

5    over the division, because his reputation is an extremely

6    poor performer.  I've worked with a lot of poor performers

7    in the past in positions I've had previous to the FCC and so

8    many people, you can bring along, figure out how to re-task

9    them and bring their performance and they're fine.  I worked

10    -- tried to work with John on some specific side projects,

11    beyond his normal work.  You have to do everything for him.

12    I mean, that's, I think, the core issue with him is if you

13    give him explicit line-by-line instructions and do

14    everything for him and then he'll turn around and give it

15    back to you and say, look, I've done it.  But, as far as him

16    doing it on his own, he just doesn't get it done.

17      Q    Did you ever do a PAP for him, performance

18    improvement --

19      A    No, no.  There didn't seem to be any case for

20    really grinding him down.  And Alan Feldman was his direct

21    supervisor and basically, I kept asking Alan, can you deal

22    with him as he is.  He had specific work objectives that

23    Alan monitored to prepare tables and get them to other

24    people in the division, who would review them.  And that got

25    done badly and apparently, from just from hearsay, what

10

1    people have told me, is they would fix them for him, so the

2    work would eventually get done.

3        Q    Okay.  So, did you ever meet on December 2 and

4    state you would not promote him?

5        A    I did meet with him on December 2nd.  I checked my

6    calendar.  I had a meeting with him then.  And he came in

7    and demanded that I promoted him and I told him, no.  I have

8    no authority to promote him willy-nilly, I can't promote him

9    willy-nilly, and his work record didn't indicate that he was

10   eligible and should be promoted.

11       Q    Okay.  That's all the questions I have.  Do you

12   have any questions of me?

13       A    No.

14       Q    Okay.  I have to swear you to your statement.

15   Whereupon,

16                        RODGER WOOCK,

17   declared under penalty of perjury that my statement is true

18   and complete to the best of my knowledge and belief.  I

19   understand that the information I have given is not to be

20   considered confidential and that it may be shown to the

21   interested parties.

22            [Whereupon, at 11:44, the deposition was

23   concluded.]

24   //

25   //

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN ADESALU | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. Action No. 07-2187 (PLF) |
| v. | ) | |
| | ) | |
| KEVIN J. MARTIN,  Chairman | ) | |
| Federal Communications Commission, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## <u>PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS</u>

Plaintiff John Adesalu, by counsel, responds as follows to Defendant's statement of

material facts:

1. Denied.

2. Admitted.

3. Admitted.

4. Admitted.

5. Plaintiff has insufficient knowledge to either admit or deny.

6. Admitted except that Plaintiff began working for the FCC in 1995.  He came into the

   division as a GS-13.

7. Admitted.

8. Admitted.

9. Denied.

10. Denied.

11. Admitted.

12. Denied.

13. Denied.

14. Admitted.

15. Admitted except that his supervisor also gave him a financial database to build.

16. Admitted.

17. Denied.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted that he provided all the information he had with respect to these vacancies and was under the belief that the Agency had the complete information in its records.

22. Admitted.

23. Denied.

24. Denied.

Respectfully submitted,

_____/s/_____
Alan Lescht, Bar No. 441691
Susan L. Kruger, Bar No. 414566
Alan Lescht & Associates, P.C.
1050 17th St., N.W. Suite 220
Washington, D.C. 20036
(202) 463-6036
(202) 463-6067 (fax)
Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | |
|---|---|
| JOHN ADESALU | ) Civil Action No. 1:07-CV-02187(PLF) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KEVIN J. MARTIN, CHAIRMAN | ) |
| Federal Communications Commission, | ) |
| | ) |
| | ) |
| Defendant | ) |

**ORDER**

UPON CONSIDERATION of Defendant's Motion for Summary Judgment, Plaintiff's Opposition and the entire record herein, it is by the Court this _____ day of _____, 2008 hereby

ORDERED that Defendant's Motion for Summary Judgment is DENIED.

_____
UNITED STATES DISTRICT JUDGE